

$400.⁰⁰

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

**FILED**
JAN 2 3 2015
MICHAEL E. KUNZ, Clerk
By_____ Dep. Clerk

ROGER VANDERKLOK

*Plaintiff*

15        370

*v.*                                          Docket No.:

UNITED STATES OF AMERICA,

TRANSPORTATION SAFETY ADMINISTRATION (TSA),

CHARLES KIESER (TSA),

CITY OF PHILADELPHIA,

CITY OF PHILADELPHIA POLICE DEPARTMENT,

RAYMOND PINKNEY (PHILADELPHIA POLICE),

DETECTIVE M. WOJCIECHOWSKI (PHILADELPHIA POLICE),

KENNETH FLAVILLE (PHILADELPHIA POLICE),

JEH JOHNSON (DEPARTMENT OF HOMELAND SECURITY),

JOHN S. PISTOLE (TSA)

*Defendants.*

## COMPLAINT

(Violation of First, Fourth and Fourteenth Amendment Rights; Federal Tort Claims Act)

Plaintiff ROGER VANDERKLOK makes the following representations to this

Court against the named Defendants as follows:

1.       Plaintiff Roger Vanderklok, a 56-year old Architect at the time of the events described in this Complaint, was detained, handcuffed, and jailed for over 23 hours because a TSA Supervisor did not like something Mr. Vanderklok said to him and because Philadelphia Police personnel failed to perform their duties and arrested him without probable cause. In short - TSA Supervisor made up a story that involved Mr. Vanderklok becoming irate, pointing in his face and saying something insulting that included the word "bomb." And the Philadelphia Police failed to realize that, even if the TSA Supervisor's claims were accurate, there was no probable cause to arrest Mr. Vanderklok.

2.       Mr. Vanderklok, a married father of three children, was attempting to travel from Philadelphia to Miami in order to run in a Marathon the following day. In the carry-on bag he packed were, amongst other things, a heart-monitoring watch and Power Bars. He had no weapons, prohibited liquids, sharp items (and no Arabic flash-cards). He had not visited countries known to sponsor terrorism and was not reading a book critical of the U.S. Government. He said good-bye to his wife and told her he would call her when he landed at his destination – which was his custom when he travelled by air.

3.       At Philadelphia International's Security Screening checkpoint, he was stopped and detained by TSA screeners and repeatedly questioned about the contents of his bag. He politely answered all their questions and invited the TSA personnel to inspect his bag and its contents. After a thorough check of his bag, and after TSA personnel were sure that there was nothing improper, dangerous, or illegal in his bag, the TSA supervisor gave Mr. Vanderklok his bag back - but had an Agent "watch" Mr.

Vanderklok while he called Philadelphia Police to have Mr. Vanderklok arrested. Mr.
Vanderklok was then handcuffed, without explanation, and paraded through the Airport
by a Philadelphia Police Officer to the Airport Police Station where he was jailed for
countless hours. Handcuffed behind his back, he was then put into a vehicle and
transported to a Philadelphia Police station outside of the Airport where he was jailed
again.

4.     While Mr. Vanderklok languished in jail cells, without access to a
telephone, his wife started to worry. His flight had landed in Miami and she had not
heard from her husband. After several attempts to reach him on his cell phone over the
course of many hours, Elanor, fearing the worst, started to make calls to file a "Missing
Person Report." With Mrs. Vanderklok panicking and Mr. Vanderklok toiling in a jail
cell, the TSA supervisor was telling Philadelphia Police different versions of the same
event – but trying to make sure that Mr. Vanderklok's ordeal would continue.

5.     The TSA Supervisor told the first Police Officer that Mr. Vanderklok had
angrily said to him that "anybody can bring a bomb and you wouldn't even know it."
Later, he told the Detective that the words were: "I could bring a bomb through here any
day of the week and you would never find it."

6.     After Officers/Detectives purposefully harassed and scared him, Mr.
Vanderklok was charged with crimes he did not commit, including "Threatening the
Placement of a Bomb" and "Terroristic Threats."   Bail was set at $40,000.00. He was
forced to post bail and inform his employer of the criminal charges pending against him.
And he was subsequently under the restrictions of all defendants on bail in Philadelphia
(which include travel restrictions).

7.     At the criminal trial, the TSA Supervisor made up a third version of what Mr. Vanderklok said and did at the Screening Area. Under oath in Municipal Court, the TSA supervisor testified that his attention was directed to Mr. Vanderklok when Mr. Vanderklok became "irate" and started angrily waving his arms and hands in the air. The TSA supervisor demonstrated this for the Court. The TSA supervisor testified that he approached Mr. Vanderklok, who eventually stated: "Let me tell you something – I'll bring a bomb through here any day that I want … you'll never find it."

8.     The TSA supervisor also made up additional facts at the criminal trial. The TSA Supervisor testified that "the passenger [Mr. Vanderklok] put his finger in my face." He went on to demonstrate for the court. He testified that Mr. Vanderklok's finger came within six to eight inches of his face. He testified that Mr. Vanderklok moved his finger towards and away from his face approximately six times.

9.     Philadelphia International Airport has security cameras placed throughout the Security checkpoints and screening areas. Those cameras were functional and recording on January 26, 2013. The video footage acquired by counsel before the criminal trial clearly shows the actions and movements of Mr. Vanderklok at the Security Checkpoint. According to his testimony, the TSA Supervisor did not watch the video footage before testifying against Mr. Vanderklok in Municipal Court. The video captures the entire interaction between the TSA Supervisor and Mr. Vanderklok. Mr. Vanderklok does not wave his arms or hands. He does not point his finger in anyone's face (or anywhere else). He does not once appear irate. The video depicts a calm man engaged in quiet conversation with TSA personnel who have "alerted" to his bag.

10.     The District Attorney's Office had two witnesses present at the trial – TSA

Supervisor Charles Kieser and Philadelphia Police Officer Raymond Pinckney. They called only Kieser in their case-in-chief. No other evidence was submitted. After hearing the testimony of Kieser, the Honorable Judge Stack granted a Defense Motion for Judgment of Acquittal. The Court concluded that, viewing the State's evidence in its entirety, direct and/or circumstantial, in the light most favorable to the Commonwealth, Mr. Vanderklok could not be found guilty of any of the charges. Mr. Vanderklok denies doing and saying that to which Kieser testified, and the surveillance footage supports Mr. Vanderklok's account.

## PARTIES

11.     Plaintiff Roger Vanderklok  is an adult individual who, at all times Relevant hereto, resided at 834 Chestnut St., Philadelphia, PA 19107

12.     Defendant, City of Philadelphia, ("City") is a municipal corporation within the Commonwealth of Pennsylvania, with administrative offices located at One Parkway Building, 17th Floor, 1515 Arch Street, Philadelphia, PA 19102-1595

13.     Defendant City of Philadelphia Police Department is a governmental entity which is organized and exists under the laws of the Commonwealth of Pennsylvania, having its principal office located at One Franklin Square, Philadelphia, PA 19106. Its police officers have jurisdiction on and adjacent in Philadelphia County and at Philadelphia International Airport. The police officers of such force should have been trained on and expected to understand the Pennsylvania Crimes Code so that they can faithfully and fairly execute their duties including, but not limited to probable cause,

the detention/arrest and charging of citizens.

14.     Defendant, Raymond Pinkney, is an individual who holds the position of Police Officer with the Philadelphia Police Department. During the time in question, he was expected to know and understand the Pennsylvania Crimes Code so that he could make proper decisions on whether to detain and/or arrest citizens for offenses including but not limited to Disorderly Conduct, Terroristic Threats, and Threatening the Placement of a Bomb. This action is brought against the named individual in his individual and in his official capacity as a police officer of the City of Philadelphia.  Defendant Pinckney was acting under color of state law during the events described in this Complaint.

15.     Defendant, M. Wojciechowski, is an individual who was a Detective at the time of this incident. In such capacity as Detective, he was charged with knowing and understanding the Pennsylvania Crimes Code so that he could make proper decisions on whether to detain and/or arrest citizens for offenses including but not limited to Disorderly Conduct, Terroristic Threats, and Threatening the Placement of a Bomb. Additionally, if he was the "assigned" investigator on a given matter, he was charged with knowing how to conduct, and conducting a proper investigation to make sure innocent people are not detained/charged for crimes for which there is no evidence.  This action is brought against the named individual in his individual and in his official capacity as a police officer of the City of Philadelphia. Defendant Wojciechowski was acting under color of state law during the events described in this Complaint.

16.     Defendant Kenneth Flaville, at all times relevant hereto, is an individual who is employed as a police officer/detective by the City of Philadelphia. This action is brought against the named individual in his individual and in his official capacity as a

police officer of the City of Philadelphia. In such capacity as police officer/detective, he was charged with knowing and understanding the Pennsylvania Crimes Code so that he could make proper decisions on whether to detain and/or arrest citizens for offenses including but not limited to Disorderly Conduct, Terroristic Threats, and Threatening the Placement of a Bomb. Additionally, if he was the "assigned" investigator or "approving supervisor" on a given matter, he was charged with knowing how to conduct, and conducting proper investigations to make sure innocent people are not detained/charged for crimes for which there is no evidence. This action is brought against the named individual in his individual and in his official capacity as a police officer of the City of Philadelphia. Defendant Flaville was acting under color of state law during the events described in this Complaint.

17.    Defendant Charles Kieser, at all times material hereto, is an individual who is employed as a TSA Agent/Supervisor by the Transportation Security Administration (hereafter "TSA"). This action is brought against the named individual in his individual and in his official capacity as a TSA Agent/Supervisor.

18.    Defendant, Transportation Safety Administration, ("TSA") and Defendant John S. Pistole (TSA Administrator), employed/continue to employ Defendant Kieser, partner with local law enforcement agencies (like the Philadelphia Police Department) for the safety of Airoports and citizens, comes under the auspices of Defendant Jeh Johnson (Secretary - Department of Homeland Security), and have administrative offices located at 601 12th Street South, Arlington, VA  20598. United States of America is the appropriate defendant under the Federal Tort Claims Act. This action is brought against the named individuals in their individual and in their official capacity. They were acting

under color of state law during the events described in this Complaint.

## JURISDICTION AND VENUE

19.     This cause of action arises under the United States Constitution,

particularly under the provisions of the First, Fourth and Fourteenth Amendments to the

United States Constitution, and under the laws of the United States, particularly under the

Civil Rights Act, Title 42 of the United States Code, Section 1983 and the laws of the

state of Pennsylvania. Jurisdiction is conferred upon this court under the provisions of

Title 28 of the United States Code, Sections 1331, 1334, 1343, 1346 and 1367 (a).  The

allegations in the Causes of Action below are examined under the First Amendment, the

Fourth Amendment's prohibition on unreasonable seizures applicable to the States and

individuals acting in their official and individual capacity by the Fourteenth Amendment

of the United States Constitution, the Fourteenth Amendments guarantee of Due Process.

20.     This complaint is for money damages and punitive damages based upon

civil rights violations committed by Federal and State officials contrary to the First,

Fourth and Fourteenth Amendments to the United States Constitution. This action is

authorized and instituted pursuant to Bivens v. Six Unknown Named Agents, 403 U.S.

388 (1971) and 42 U.S.C. § 1983. This Court has authority to award costs and attorney's

fees pursuant to 42 U.S.C. § 1988 and 28 U.S.C. § 2412.  Venue is proper pursuant to 28

USC Section 1391.

21.     The Plaintiff filed the appropriate Administrative Tort Claim under FTCA

to the TSA and the claim being denied.

22.     It is also submitted that the pendant jurisdiction of this Court is invoked

over all State court claims in view of the common nucleus of operative facts as to all claims.

## FACTS COMMON TO ALL COUNTS

23.     Roger Vanderklok alleges and incorporates by reference thereto the averments set forth in Paragraphs Nos. 1-22 of the within Complaint as if more fully set forth herein.

24.     Mr. Vanderklok arrived at Philadelphia International Airport at around 8:00AM on January 26, 2013 for a flight to Miami, where he was scheduled to run a Marathon.  He waited in line, presented his identification and proceeded to the screening area of the Security Checkpoint. His one bag contained running gear, his laptop, a heart-monitoring watch and some Power Bars.  He took his shoes and his jacket off, took his laptop out of his bag, and put his things on the rollers and his items in the plastic containers for processing through the x-ray screening device.

25.     He proceeded through the screening device/metal detector without incident. The detector made no sound.

26.     A TSA official asked him to step to the side.  Apparently, they saw the heart-monitoring watch and the Power Bars and thought they looked like the components of an explosive device.  The TSA officials viewing the screen and handling his bag were talking about the watch and the case it was in.  Mr. Vanderklok volunteered that it was just his heart-monitoring watch and they were welcome to look in the bag and at the watch.

27.     Mr. Vanderklok waited patiently.  The TSA officials indicated that they had to do "further testing" on the bag. Mr. Vanderklok acquiesced.  Later, the TSA

officials started to ask Mr. Vanderklok about "organic material." Mr. Vanderklok stated that they were free to look into his bag that contained "just [his] running stuff." They continued to talk about "organic material" and swabbed something from the bag.

28.     Mr. Vanderklok had plenty of time before his flight departed and was not overly concerned about the delay. He felt unsure of what the TSA officials were talking about when they spoke of "organic materials." When Defendant Kieser walked up to him, Mr. Vanderklok noticed that Kieser was agitated. He was confrontational and impolite; and he asked more questions about the "organic material." Contemplating plants, fresh fruits, or fresh vegetables, Mr. Vanderklok did not think he had any "organic material" in his bag. During this discussion, Mr. Vanderklok communicated that he understood the TSOs had to do their jobs but assured Defendant Kieser that he was not a threat.

29.     Eventually, the TSA officials located the Power Bars (wrapped in "Power Bar" packaging) and indicated, out loud, that the Power Bars were the "organic material." The TSA officials ran an "explosive trace detection test" on the Power Bars. That test came back negative.

30.     Defendant Kieser got more agitated when Vanderklok stated that he didn't know a Power Bar was "organic material" and that someone should have simply told him that wrapped food items were included in the definition of "organic materials."

31.     At no point during this time period was the Security Checkpoint closed down. Other passengers continued to proceed through the security checkpoint and there was no disturbance at the Checkpoint.

32.     At no point during this time period did Mr. Vanderklok raise his voice,

speak disrespectfully, flail or wave his hands or arms around. He did not point in Defendant Kieser's face.

33.     Unbeknownst to Mr. Vanderklok, Defendant Kieser, after giving him his bag and the bag's contents back, called the Philadelphia Police and reported that Mr. Vanderklok, while getting bag checked, said that "anybody can bring a bomb and you wouldn't even know it." He simultaneously directed another TSA Agent to "watch" Mr. Vanderklok, who was putting his shoes on and re-packing his bag, until the Philadelphia Police arrived.

34.     Defendant Raymond Pinckney was the first Officer to arrive at the Checkpoint. Without any investigation, he immediately told Mr. Vanderklok that he was under arrest and took Mr. Vanderklok into police custody.

35.     The City of Philadelphia is a governmental entity organized and existing under the laws of the Commonwealth of Pennsylvania. In turn, the City of Philadelphia is responsible for the development, operation, and supervision of the policing powers.

36.     The City of Philadelphia Police Department is responsible for setting policy, procedures and directives for the operation of its Police Officers and to ensure that policies, procedures and directives established are enforced for the exercise of their police duties; and, are responsible for the development and implementation of policies and procedures concerning the selection, evaluation, training and supervision of individuals employed as police officers.  This includes when and under what circumstances, an officer is permitted to detain or arrest a citizen.

37.     The City of Philadelphia Police Department has intact a series of policies and procedures that govern the actions of police officers regarding probable cause to

arrest. While there are a variety of Policies/Protocols which dictate the actions of officers, all police officers who are employed as City of Philadelphia Police Officers are expected to follow the mandates promulgated within each and every Protocol.

38.     Defendants Pinckney, Wojciechowski and Flaville are officers of the City of Philadelphia Police Department assigned to Southwest Philadelphia and/or Philadelphia International Airport during the relevant time periods. In such capacity, Defendants Pinckney, Wojciechowski and Flaville are charged with the enforcement of the laws of the Commonwealth of Pennsylvania, in a fair, just and equitable manner consistent with the rights afforded all individuals by the Constitutions of the United States of America and the Commonwealth of Pennsylvania; and, were acting, at all times relevant hereto, under color of law and color of their authority as  police officers of the City of Philadelphia.

39.     The City of Philadelphia Police Department should have had established or enforced established policies, procedures and/or guidelines concerning the nature of the conduct and interaction of any Police Officer has with any individual in the discharge of their duties; and, in particular, in the manner in which incidents are investigated; when individuals are to be taken into custody and or arrested; when arrests should be made, and when probable cause to arrest exists.. Additionally, policies, procedure and/or guidelines exist or should have existed concerning the review and supervision of the actions of individual officers to insure that they were conforming to established Police Department policies, procedures and/or guidelines and were discharging their duties in an appropriate and lawful manner.

40.     The City of Philadelphia Police Department should have ensured that the

established policies and procedures that are outlined in the Philadelphia Police Department Procedures/Protocols were being followed. Alternatively, if such Policies/Protocols were not being followed by Officers during the exercise of their official duties, appropriate disciplinary action should have been taken by the City of Philadelphia against the specific officers found to be in noncompliance. The failure by the City of Philadelphia Police Department to ensure that the established policies and procedures found in the Philadelphia Police Department Order were being followed by all Officers during the discharge of their official duties rendered the policies and procedures "window dressing," and demonstrates a deliberate indifference by the City of Philadelphia Police Department to thwart the custom or practice of officers' noncompliance of the noted Procedures/Protocols, and therein resulting in the violation of the constitutional rights ensured to the citizens of the City of Philadelphia, such as the Plaintiff, and other individuals referenced herein.

41.    On or about January 26, 2013, Officers Pinckney and Detective Wojciechowski were on duty as Philadelphia Police Officers. They should have known or had the ability to learn the elements of the relevant crimes. They should not have entered into any agreement with the TSA that, if the TSA wants someone taken into custody, they would take that person into custody. The Philadelphia Police should not have allowed the say-so of a TSA Supervisor to replace their independent evaluation of whether there was probable cause or the need to detain.

42.    Defendant Pinckney, in taking Mr. Vanderklok into custody, did so without probable cause. Even taking the words of Defendant Kieser as true (which they were not), there is no probable cause to believe that any offense/crimes code violation

had occurred and there was no exigent reason for detention of Mr. Vanderklok.  Instead of evaluating the situation and acting properly, defendant Pinckney took away Mr. Vanderklok's liberty based on Kieser's identification of him as a person who said something completely non-criminal about what "anybody" could do without Kieser "knowing."  Defendant Pinkney did not ask if the bag was searched.  He did not inquire as to whether the passenger had created a disturbance.  He did not ask if the screening devices found anything unusual in Mr. Vanderklok's belongings.  He did nothing other than to take Mr. Vanderklok into custody.

43.      The video footage clearly establishes that there was no commotion, no disturbance, no interruption of Airport business occurring at any point – and certainly not when Officer Pinckney arrived.  Nothing like that was reported to Officer Pinckney.  The alleged words of Mr. Vanderklok, reported by Charles Kieser, do not come close to establishing probable cause to arrest for any of the crimes charged – or any other crimes.  The words reported - "anybody can bring a bomb and you wouldn't even know it" – would more appropriately be categorized as an insult to the TSA Supervisor than a threat to anyone's safety.  No other passenger heard the alleged statement and no other witness, TSA or otherwise, came forward.  And the words alleged to have been spoken were spoken after the TSA officials knew that the watch was just a watch (and not a component to an explosive devise).

44.      When he arrived at the checkpoint, Defendant Pinkney immediately took Mr. Vanderklok into custody and informed him that he was under arrest. Pinkney went on to prepare two documents – a "75-48" and a "Uniform Police Memo to S.W.D.D."  It is clear from these documents that the only information Defendant Pinckney had when he

arrested Mr. Vanderklok was the information provided by Charles Kieser. It is not clear

if he even had first-hand information or if he was acting on hearsay. No other witnesses

are named. No other evidence – direct or circumstantial – is mentioned. No other

investigation is performed. No other witnesses are sought out or interviewed. In both

police reports, Defendant Pinkney indicates that he spoke only to Defendant Kieser. The

reports indicate that the Officer made the arrest at the time he arrived at the Security

Checkpoint.

45.     In the report, there is a line that reads: "Details of Arrest (What you did in

the investigation or arrest; be precise as to details!)." Under that, Police Officer Pinckney

wrote:

"TSA Supervisor Kieser called Police and stated Passenger was getting his carry on bag
checked and said Anybody can bring a bomb and you wouldn't even know it. Police took
passenger to H.Q. for further investigation. "

46.     After handcuffing Mr. Vanderklok, Defendant Pinkney walked him to an

elevator, which they rode to a basement cell-room. He took Mr. Vanderklok's

belongings, including his bag, its contents, his phone, and his belt. Mr. Vanderklok sat,

locked in that cell, for hours. There was no "further investigation" done.

47.     Mr. Vanderklok was then led outside to a police/TSA vehicle and

transported, with his hands cuffed behind his back, to a Philadelphia Police District

where he was thrown in another cell. Aside from hearing things about being sent to

"Guantanamo," Mr. Vanderklok also overheard a conversation amongst Defendant

Wojciechowski and other Police Personnel where they were talking about making sure

they got "the right A.D.A." to review their case to assure that they got approval for the

criminal charges they wanted brought against Mr. Vanderklok. No one from the FBI,

NSA, JTTF, or any other federal or local agency questioned Mr. Vanderklok. No one seemed concerned that he might be dangerous – most likely because it was abundantly clear that he was not. In fact, that was abundantly clear before Defendant Kieser called the Philadelphia Police.

48.     Mr. Vanderklok was held in that cell room for many more hours. He was fingerprinted and photographed by Police like a criminal. Almost 24 (twenty four) hours passed before he got released from custody.

49.     Based on the false statements of Defendant Kieser, the improper and illegal arrest and detention by the Philadelphia Police Defendants, their ridiculous decision to charge Mr. Vanderklok and the influence/manipulation they exerted over the prosecuting agency to get those charges approved, Mr. Vanderklok had $40,000.00 bail set on him. He was forced to post bond, hire counsel, and be subject to, among other things, travel restrictions.

50.     As a direct and proximate result of the actions of the Defendants, Roger Vanderklok has sustained emotional and psychological difficulties; he sustained a loss of earnings and his earning power may have been permanently impaired; he sustained other injuries, losses and damages. He has experienced grief, anxiety, sleeplessness and nervousness. He has incurred and may hereafter incur expenditures for medical care, drugs, and kindred expenditures.

51.     The City of Philadelphia, City of Philadelphia Police Department, United States of America, TSA failed to have established  and/or enforced established policies, procedures and/or guidelines concerning the nature of the conduct and interaction any Police Officer/TSA Agent has with any individual in the discharge of their duties; and, in

particular, in the manner in which incidents are investigated; when Police are to be called, when individuals are to be taken into custody and or arrested; when probable cause has been established including the use of a TSA Supervisor's statements. Additionally, it failed to enforce policies, procedure and/or guidelines which existed or should have existed concerning the review and supervision of the actions of individual officers to insure that they were conforming to established policies, procedures and/or guidelines and were discharging their duties in an appropriate and lawful manner.

52.     The City of Philadelphia, City of Philadelphia Police Department, United States of America, TSA should have ensured that their established policies and procedures that are outlined in their Procedures/Protocols were being followed. Specifically, they should have ensured that their procedures/protocols were being followed by all individuals employed by them. Alternatively, if such Policies/Protocols were not being followed by officers/agents during the exercise of their official duties, appropriate disciplinary action should have been taken by the Defendants against the specific officers/agents found to be in noncompliance. The failure by the City of Philadelphia Police Department to ensure that the established policies and procedures were being followed by all officers/agents during the discharge of their official duties rendered the policies and procedures "window dressing," and demonstrates a deliberate indifference by the Defendants to thwart the custom or practice of officers' or agents' noncompliance of the Order, and therein resulting in the violation of the constitutional rights ensured to the citizens of the City of Philadelphia, such as the Plaintiff.

53.     The City of Philadelphia, City of Philadelphia Police Department, United States of America, TSA failed to have established and/or enforced established policies,

procedures and/or guidelines concerning the nature of the conduct and interaction any

officer/agent has with any individual in the discharge of their duties; and, in particular, in

the manner in which incidents are investigated;  when Police are to be called; when

individuals are to be taken into custody and or arrested; when probable cause has been

established. Additionally, it failed to enforce policies, procedure and/or guidelines which

existed or should have existed concerning the review and supervision of the actions of

individual officers to insure that they were conforming to established policies, procedures

and/or guidelines and were discharging their duties in an appropriate and lawful manner.

54.      The City of Philadelphia, City of Philadelphia Police Department, United

States of America, TSA should have ensured that the established policies and procedures

that are outlined in their guidelines were being followed. Alternatively, if such

Policies/Protocols were not being followed by officers/agents during the exercise of their

official duties, appropriate disciplinary action should have been taken by the Defendants

against the specific officers/agents found to be in noncompliance.

55.      The errors, omissions and failures of the City of Philadelphia Police

Department were the direct or proximate cause that allowed the false arrest, unlawful

seizure, and illegal detention of Roger Vanderklok in violation of the rights and

immunities guaranteed to him by the First, Fourth, and Fourteenth Amendments of the

United States Constitution to have occurred.

56.      The errors, omissions and failures of the City of Philadelphia were the

direct or proximate cause that allowed the false arrest, unlawful seizure, and illegal

detention of Roger Vanderklok in violation of the rights and immunities guaranteed to

him by the First, Fourth, and Fourteenth Amendments of the United States Constitution

to have occurred.

57.    The errors, omissions and failures of Raymond Pinckney in his official capacity were the direct or proximate cause that allowed the false arrest, unlawful seizure, and illegal detention of Roger Vanderklok in violation of the rights and immunities guaranteed to him by the First, Fourth, and Fourteenth Amendments of the United States Constitution to have occurred.

58.    The errors, omissions and failures of Detective M. Wojciechowski in his official capacity in his official capacity were the direct or proximate cause that allowed the false arrest, unlawful seizure, and illegal detention of Roger Vanderklok in violation of the rights and immunities guaranteed to him by the First, Fourth, and Fourteenth Amendments of the United States Constitution to have occurred.

59.    The errors, omissions and failures of the Kenneth Flaville in his official capacity were the direct or proximate cause that allowed the false arrest, unlawful seizure, and illegal detention of Roger Vanderklok in violation of the rights and immunities guaranteed to him by the First, Fourth, and Fourteenth Amendments of the United States Constitution to have occurred.

60.    The errors, omissions and failures of the TSA were the direct or proximate cause that allowed the false arrest, unlawful seizure, and illegal detention of Roger Vanderklok in violation of the rights and immunities guaranteed to him by the First, Fourth, and Fourteenth Amendments of the United States Constitution to have occurred.

61.    The errors, omissions and failures of the United States Of America were the direct or proximate cause that allowed the false arrest, unlawful seizure, and illegal detention of Roger Vanderklok in violation of the rights and immunities guaranteed to

him by the First, Fourth, and Fourteenth Amendments of the United States Constitution to have occurred.

62.    The errors, omissions, falsehoods and failures of Charles Kieser in his official capacity were the direct or proximate cause that allowed the false arrest, unlawful seizure, and illegal detention of Roger Vanderklok in violation of the rights and immunities guaranteed to him by the First, Fourth, and Fourteenth Amendments of the United States Constitution to have occurred.

63.    At all times relevant hereto, the named Defendants were acting under color of state law.

64.    At all times relevant whereto, the Defendants were acting directly or through their agents, servants and employees.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF:

Unconstitutional Search and Seizure – Fourth Amendment to the U.S. Constitution,

§1983, and Bivens

65.    The detention, arrest, unnecessary and extended restraint, incarceration of the Plaintiff by the Defendants, as described in paragraphs 1-64, constituted an unreasonable search and seizure in violation of clearly established rights under the Fourth and Fourteenth Amendments to the United States Constitution.

### SECOND CLAIM FOR RELIEF:

Excessive Use of Force – Fourth Amendment to the U.S. Constitution and § 1983

66.     The detention, arrest, unnecessary and extended restraint, and incarceration of the Plaintiff by Defendants, as described in paragraphs 1-65, constituted an excessive use of force in violation of clearly established rights under the Fourth and Fourteenth Amendments to the United States Constitution.

### THIRD CLAIM FOR RELIEF:

Unconstitutional Infringement of the Freedom of Speech – First Amendment to the U.S. Constitution, § 1983, and Bivens

67.     The detention, arrest, unnecessary and extended restraint, incarceration, and search of the Plaintiff by the Defendants on the basis of the alleged non-criminal, non-threatening, non-suspicious words of the Plaintiff, as described in paragraphs 1-66, infringed Plaintiff's freedom of speech and constituted unconstitutional retaliation in violation of clearly established rights guaranteed by the First and Fourteenth Amendments to the United States Constitution.

### FOURTH CLAIM FOR RELIEF:

Federal Tort Claims Act – False Arrest

68.     Plaintiff's detention and arrest without probable cause or any other lawful grounds, as described in paragraphs 1-67, constitute the tort of false arrest under the laws of the Commonwealth of Pennsylvania.

69.     Under the Federal Tort Claims Act, Defendant United States of America is liable for these actions.

### FIFTH CLAIM FOR RELIEF:

Federal Tort Claims Act – False Imprisonment

70.     Plaintiff's detention and imprisonment without probable cause or any other lawful grounds, as described in paragraphs 1-69, constitute the tort of false imprisonment under the laws of the Commonwealth of Pennsylvania.

71.     Under the Federal Tort Claims Act, Defendant United States of America is liable for these actions.

### SIXTH CLAIM FOR RELIEF:

Federal Tort Claims Act – Battery and Assault

72.     The handcuffing, pat-down and other unauthorized contacts with Plaintiff's person, as well as the imminent apprehension of such unauthorized contacts, as described in paragraphs 1-71, constitute the torts of battery and assault under the laws of the Commonwealth of Pennsylvania. Under the Federal Tort Claims Act, Defendant United States of America is liable for these actions.

### SEVENTH CLAIM FOR RELIEF:

Federal Tort Claims Act – False Light

73.     Plaintiff was detained, abusively touched, handcuffed, transported, arrested, and forced to walk to the airport police station in plain view of numerous members of the public, as described in paragraphs 1-72. Plaintiff was also forced to appear in Criminal Court and sit at the Defendant's table in front of numerous members of the public in a crowded courtroom in Philadelphia's Criminal Justice Center.  These actions constitute the tort of false light under the laws of the Commonwealth of Pennsylvania.

74.     Under the Federal Tort Claims Act, Defendant United States of America is liable for these actions.

## EIGHTH CLAIM FOR RELIEF:

### Failure To Train, Enact And Implement Policies And Procedures And To Supervise Properly

Plaintiff alleges and incorporates by reference thereto the averments set forth in Paragraphs Nos. 1-73 of the within Complaint as if more fully set forth herein.

75.     The Defendants failed to adequately train, supervise and/or discipline its employees or agents in the performance of their duties and/or undertook actions which were improper or illegal and demonstrated indifference to the constitutional rights of Individuals, such as Roger Vanderklok.

76.     The Defendants had policies and/or customs in place and/or failed to insure that policies, procedures and protocols which existed were properly enforced and personnel supervised in the performance of their duties that enabled their employees, servants or agents to act with deliberate indifference to the constitutional rights of individuals, such as Roger Vanderklok.

77.     The Defendants failed to develop and implement policies, procedures and protocols that then enabled their employees and agents to act with deliberate indifference to the constitutional rights of individuals, such as Roger Vanderklok.

78.     The Defendants have established policies and procedures to act as a safeguard against constitutional infractions and restraints upon officers/agents affecting the detention and arrests of citizens.

79.     Within this action, the conduct of Defendants were violative of the policies and procedures promulgated by the Defendants and the rights and privileges guaranteed to the Plaintiff by the Constitution of the United States and the Constitution of the state of Pennsylvania.  Said rights, privileges and immunities include the right to body integrity; the right to exercise freedom of speech; the right to be free from the use of excessive fore; the right to be free from unreasonable seizures and searches.

80.     The acts of the Defendants were done with the purpose and intent of depriving Roger Vanderklok of his rights secured to him by the First, Fourth and Fourteenth Amendments to the United States Constitution. Under the Federal Tort Claims Act, Defendant United States of America is liable for these actions.

## NINTH CLAIM FOR RELIEF:

PA State Malicious Prosecution and § 1983 Malicious Prosecution

Plaintiff's detention, imprisonment, arrest and criminal prosecution without probable cause or any other lawful grounds constituted the tort of malicious prosecution under the laws of the Commonwealth of Pennsylvania and Section 1983. Plaintiff alleges and incorporates by reference thereto the averments set forth in Paragraphs Nos. 1-80 of the within Complaint as if more fully set forth herein.

81.     Under the Federal Tort Claims Act, Defendant United States of America is liable for these actions.

82.     The TSA officials were "state actors" in that the Police and the TSA have a pre-approved plan and the Police routinely take into custody anyone identified by the

TSA without independently evaluating the presence of probable cause (which also occurred in Nicholas George v. U.S. and other cases).

### TENTH CLAIM FOR RELIEF:

PA State Retaliatory Prosecution and § 1983 Retaliatory Prosecution

Plaintiff's detention, imprisonment, arrest and criminal prosecution without probable cause or any other lawful grounds constituted the tort of retaliatory prosecution under the laws of the Commonwealth of Pennsylvania and Section 1983. Plaintiff alleges and incorporates by reference thereto the averments set forth in Paragraphs Nos. 1-82 of the within Complaint as if more fully set forth herein.

83.     Under the Federal Tort Claims Act, Defendant United States of America is liable for these actions. The TSA officials were "state actors" in that the Police and the TSA have a pre-approved plan and the Police routinely take into custody anyone identified by the TSA without independently evaluating the presence of probable cause.

### ELEVENTH CLAIM FOR RELIEF:

Violation Of Plaintiff's Fourteenth Amendment Rights

Plaintiff alleges and incorporates by reference thereto the averments set forth in Paragraphs Nos. 1-83 of the within Complaint as if more fully set forth herein.

84.     Defendants' actions errors and omissions, as more fully described in the factual section of the within complaint, constituted violations of Plaintiff's rights,

privileges and immunities, as secured by the Fourteenth Amendment to the United States Constitution. Said rights, privileges and immunities include the right to due process and equal protection of the law which encompasses his right to body integrity; the right to be free from the use of excessive fore; the right to be free from unreasonable seizures and searches; and the prohibitions against arrests, detentions, and prosecutions based on fabricated evidence.

85.     The acts of the Defendants were done with the purpose and intent of depriving Plaintiff of his rights secured to him by the Fourteenth Amendment to the United States Constitution.

86.     The acts of the Defendants, as set forth in this complaint, were done willfully, maliciously and/or with a callous disregard and reckless indifference to and disregard of the rights, immunities and privileges guaranteed to Roger Vanderklok by the Fourteenth Amendment to the United States Constitution.

Under the Federal Tort Claims Act, Defendant United States of America is liable for these actions.

## PRAYER FOR RELIEF

WHEREFORE, Roger Vanderklok asks for the entrance of judgment against the Defendant as follows:

(a) Compensatory damages in an amount to be determined at trial;

(b) Punitive damages in an amount to be determined at trial as to all Defendants except the United States of America;

(c) Reasonable attorneys' fees and costs of suit;

(d) Prejudgment and postjudgment interest; and

(e) Such other relief as the Court deems appropriate and just.

## PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUS SO TRIABLE

Respectfully submitted by:

/s/ *Thomas B. Malone*
Thomas B. Malone, Esquire
PA. ID No. 77291
The Malone Firm, LLC
1650 Arch St., Su. 1903
Philadelphia, PA 19103