# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ROGER VANDERKLOK          :
                                 :
            v.              :   NO. 15-370
                                 :

UNITED STATES OF AMERICA, et al.  :

## ORDER

      AND NOW, on this        day of                , 2015, upon consideration of the

Motion to Dismiss Pursuant to Fed. R. Civ. Pro. 12(b)(6) of defendants, Raymond Pinkney, Kenneth

Flaville, and Michael Wojciechowski, and any response thereto, it is hereby ORDERED and

DECREED that the motion is GRANTED, and all claims against Raymond Pinkney, Kenneth

Flaville, and Michael Wojciechowski are DISMISSED WITH PREJUDICE.

**BY THE COURT:**

_____

**Hon. William H. Yohn, Jr., U.S.D.J.**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ROGER VANDERKLOK                               :
                                               :
                    v.                         :  NO. 15-370
                                               :
UNITED STATES OF AMERICA, et                   :
al.                                            :

## MOTION TO DISMISS AMENDED COMPLAINT PURSUANT TO FED. R. CIV. PRO. 12(b)(6) ON BEHALF OF DEFENDANTS, RAYMOND PINKNEY, KENNETH FLAVILLE, AND MICHAEL WOJCIECHOWSKI

Defendants, Raymond Pinkney, Kenneth Flaville, and Michael Wojciechowski (collectively, "Individual Police Officers"), by and through their attorneys, Bennett, Bricklin & Saltzburg LLC, move to dismiss plaintiff's amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), and aver as follows in support of their motion:

1.      In this civil rights action under 42 U.S.C.A. § 1983, plaintiff, Roger Vanderklok, alleges that he was arrested by Philadelphia Police Officer Raymond Pinkney, after Officer Pinkney received a credible report from a TSA Supervisor that plaintiff, while in possession of capped piece of PVC piping containing a timing device and undergoing heightened TSA screening in Philadelphia International Airport on suspicion of having an explosive device, angrily told the screener that anybody could bring a bomb through the check point and it would never be found. See Exhibit A, Amended Complaint.

2.      Plaintiff's amended complaint fails to plead any involvement in the incident by Sergeant Kenneth Flaville or Detective Michael Wojciechowski, and fails to plead Officer Pinkney's involvement in plaintiff's prosecution.

3.      All section 1983 claims against the Individual Police Officers should be dismissed because the Individual Police Officers are entitled to qualified immunity. This is because the

Individual Police Officers had probable cause to detain the plaintiff given the substantial likelihood that his angry comments, while possession of a device that so obviously resembled a pipe bomb, could cause a disturbance in the screening checkpoint; because his comments could reasonably be interpreted as an implied, if not expressed, threat; and because his possession of the device in question suggested that he may have been in the process of "testing the system" or carrying out a hoax bomb scare. At the very least, it was not reasonably established at the time of the arrest that such conduct did not rise to the level of, at least, disorderly conduct.

3. In addition to the absence of probable cause, which defeats all of plaintiff's section 1983 claims, plaintiff's section 1983 claims under the 14th Amendment should be dismissed, because claims based on pre-trial deprivations of liberty properly fall under the Fourth Amendment.

4. Plaintiff's state common law claims for false arrest/false imprisonment, malicious prosecution, and assault and battery all fail because there was probable cause for the arrest, all of plaintiff's common law claims are barred by the Political Subdivision Tort Claims Act, and plaintiff's claims against the Individual Police Officers for common law false arrest, false imprisonment, and assault and battery are barred by the statute of limitations.

5. Finally, all claims against Sergeant Flaville and Detective Wojciechowski should be dismissed because they are not alleged to have been involved in the arrest or prosecution.

6. In the alternative, to the extent the qualified immunity determination cannot be made from the face the complaint, moving defendants request a more specific statement as the to basis for the claims against them.

6. For these reasons, and those more fully set out in the attached brief, all claims against Raymond Pinkney, Kenneth Flaville, and Michael Wojciechowski should be dismissed with

prejudice.

WHEREFORE, defendants, Raymond Pinkney, Kenneth Flaville, and Michael Wojciechowski, respectfully request that their motion be GRANTED, and that all claims against them be DISMISSED WITH PREJUDICE.

<div style="margin-left: 40%;">

Respectfully submitted,

**BENNETT, BRICKLIN & SALTZBURG LLC**

**BY:** _/s/ Nicholas A. Cummins_
Charity C. Hyde
Attorney I.D. No. 82022
hyde@bbs-law.com
Nicholas A. Cummins
Attorney I.D. No. 203238
cummins@bbs-law.com
1601 Market Street, 16th Floor
Philadelphia, PA 19102
(215) 561-4300
(215) 561-6661 (Fax)
Attorneys for Defendants, City of Philadelphia, Raymond Pinkney, Detective Michael Wojciechowski, and Sergeant Kenneth Flaville

</div>

Date: June 10, 2015

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ROGER VANDERKLOK | : | |
| | : | |
| v. | : | NO. 15-370 |
| | : | |
| UNITED STATES OF AMERICA, et al. | : | |

**BRIEF IN SUPPORT OF MOTION TO DISMISS AMENDED COMPLAINT PURSUANT TO FED. R. CIV. PRO. 12(b)(6) ON BEHALF OF DEFENDANTS, RAYMOND PINKNEY, KENNETH FLAVILLE, AND MICHAEL WOJCIECHOWSKI**

Defendants, Raymond Pinkney, Kenneth Flaville, and Michael Wojciechowski, by and through their attorneys, Bennett, Bricklin & Saltzburg LLC, move to dismiss plaintiff's amended complaint, and submit this brief in support of their motion.

## I.      STATEMENT OF FACTS

According to plaintiff's amended complaint, on January 26, 2013, Roger Vanderklok was traveling to Miami from Philadelphia by way of the Philadelphia International Airport. See Exhibit A at ¶ 25, Amended Complaint (Exhibit E Omitted). While passing through the TSA security checkpoint, a TSA agent alerted to his bag because his heart monitoring watch "and the case it was in" resembled an explosive device. Id. at ¶ 27. As can be seen from the security camera footage attached as an exhibit to plaintiff's amended complaint, the "case" was a capped piece of PVC piping which resembled a pipe bomb. See Exhibit B to Amended Complaint. A still image taken from the security footage showing the agent examining the pipe is attached as Exhibit B. A larger photograph of this object is attached as Exhibit C[1]. According to the amended complaint, the PVC pipe containing plaintiff's heart rate watch was packed along with Power Bars. Id. at ¶ 30. On an x-ray scanner, the Power Bars resemble bricks of explosive. When asked about the "organic material" in

---

[1]The photograph attached as Exhibit C is not a part of the pleadings, and is offered only to provide a better view of the object depicted in the surveillance footage. The surveillance footage is attached to the amended complaint.

his bag (Power Bars) plaintiff said he did not have any such items with him. Id. at 29-31. Plaintiff alleges he did not understand the agents were asking about the Power Bars. Id. at 31.

Plaintiff alleges that he was questioned by unidentified TSA agents, and, eventually, TSA supervisor, defendant, Charles Kieser. Id. at ¶¶ 27-29. Plaintiff alleges that Agent Kieser was agitated, while plaintiff was calm and respectful. Id. at ¶¶ 29-31. Plaintiff alleges that his bag was searched, and an explosives trace test was negative. Id. at ¶¶ 29-30. During this period, plaintiff alleges that the security check point remained open, and that "there was no disturbance at the Checkpoint." Id. at ¶ 32.

After returning his items to him, plaintiff alleges that Agent Kieser "called the Philadelphia Police and reported that Mr. Vanderklok, while getting [his] bag checked, said that 'anybody can bring a bomb and you wouldn't event know it.'" Id. At ¶ 35. Philadelphia Police Officer, defendant, Raymond Pinkney, responded to the call. Id. at ¶ 37. On arrival, Agent Kieser relayed plaintiff's comment to Officer Pinkney. Id. at ¶61-62. Specifically, the complaint alleges:

> The TSA Supervisor [Kieser] told the first Police Officer [Pinkney] that Mr. Vanderklok had angrily said to him that "anybody can bring a bomb and you wouldn't event know it." Later, he [Kieser] told the Detective that the words were: "I could bring a bomb through here any day of the week and you would never find it."

Exhibit A at ¶ 7. Plaintiff alleges that he was then handcuffed by Officer Pinkney, and taken to a room in the Philadelphia International Airport for further investigation. Id. at ¶ 64. Plaintiff alleges that Officer Pinkney undertook no additional investigation prior to detaining plaintiff, and that Officer Pinkney relied solely on the information relayed to him by Agent Kieser. Id. at ¶ 64. Plaintiff's complaint does not allege that Officer Pinkney played any further role in his detention and prosecution, beyond escorting plaintiff to the holding room in the airport, and preparing a "75-48" Incident Report Form, and Uniform Police Memo to S.W.D.D.. Id. at 61; See Exhibit A to Amended

Complaint.

The 75-48 Incident Report Form completed by Officer Pinkney reports:

> Below passenger's carry on bag was being check by TSA because he had a PCP [sic] pipe [with] watch inside. Passenger became frustrated and said anybody can bring a bomb in here and nobody would know. ...TSA Supervisor Kieser heard the comment.

See Exhibit A to Complaint. The Uniform Police Memo states, "TSA Supervisor Kieser called police and stated passenger was getting his carry on bag checked and said anybody can bring a bomb and you wouldn't even know it." See Exhibit A to Amended Complaint. The Philadelphia Police Department Arrest Report ("PARS Report"), completed by Detective Wojciechowski, also attached to the amended complaint, relays:

> The complainant [Agent Kieser] states that he is a screening supervisor for the TSA. On 1/26/13 ... [a]t approximately 8:15 AM, one of his officers began dealing with a passenger who was becoming irate. He checked the x-ray image and saw several anomalies which appeared to be components of a pipe bomb. After the passenger became loud towards the screening officer, the complainant went to try and calm the situation. The complainant explained what they were looking for and why the bag had to be checked. The passenger (the defendant) then stated, "I could bring a bomb through here any day of the week, and you would never know it." The bag check was completed and no traces of explosives were found. The police were notified of the remark ... . The comment was made in a public area with several other passengers nearby. Since the passenger's bag had already been thoroughly checked, there was no evacuation of the area. P/O Pinkney responded to the checkpoint and was met by the complainant. After the facts were related to the Officer, Officer Pinkney took the defendant to the airport unit HQ for further investigation.

See Exhibit A to Amended Complaint. Significantly, plaintiff does not dispute that this information was conveyed to Officer Pinkney and Detective Wojciechowski by Agent Kieser, and does not allege that any Philadelphia Police Officer fabricated the information contained in these documents.

Although the PARS Report lists only charges for threatening the placement of a bomb and disorderly conduct, see Exhibit A to Amended Complaint, the District Attorney ultimately charged and prosecuted plaintiff for these two offenses, plus terroristic threats. Id. at ¶ 8. Plaintiff alleges that

all charges against him were dismissed at trial. Id. at ¶ 12. None of the Individual Police Officers testified at the trial. Id. at ¶ 12. Plaintiff's complaint contains nine counts under 42 U.S.C.A. § 1983, Pennsylvania common law, the Federal Tort Claims Act, and Bivens.

## II.     ARGUMENT

All of plaintiff's claims against the Individual Police Officers should be dismissed because the officers are entitled to qualified immunity, and because plaintiff has otherwise failed to plead a viable cause of action. To the extent the qualified immunity determination cannot be made from the face the complaint, moving defendants request a more specific statement as to the claims against them. See Fed. R. Civ. Pro. 12(e); Thomas v. Independence Twp., 463 F.3d 285, 301 (3d Cir. 2006).

### A.     All Section 1983 Claims Against the Individual Police Officers Should Be Dismissed Because They Are Entitled to Qualified Immunity.

All section 1983 claims against the Individual Police Officers should be dismissed with prejudice because they are entitled to qualified immunity. This is for the dual reasons that plaintiff's complaint does establish that the officers[2] violated any of his constitutional rights, and even if it did so, it was not clearly established at the time of the incident their conduct was unconstitutional (indeed, it was not).

Section 1983 provides a private cause of action to citizens for deprivations of their constitutional rights by a person acting under the color of state law. 42 U.S.C.A. § 1983. "By itself, Section 1983 does not create any rights, but provides a remedy for violations of those rights created by the Constitution or federal law." Morse v. Lower Merion School Dist., 132 F.3d 902, 906-07 (3d

---

[2]The complaint alleges only Officer Pinkney's involvement in the arrest, and makes no specific allegations regarding Detective Wojciechowski and Sergeant Flaville. To the extent plaintiff intended to allege their involvement in the arrest and prosecution, the arguments in this brief apply to them in equal measure.

Cir. 1997), citing, Baker v. McCollan, 443 U.S. 137, 99 S.Ct. 2689 (1979). "In order to state a claim, plaintiff must show that the defendants, acting under color of state law, deprived him of a right secured by the Constitution or the laws of the United States." Id., citing, Parratt v. Taylor, 451 U.S. 527, 101 S.Ct. 1908 (1981).

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Kelly v. Borough of Carlisle, 622 F.3d 248, 253 (3d Cir. 2010), quoting, Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). In resolving a qualified immunity question, the analysis proceeds in two steps. The court is to ask "(1) whether the facts alleged by the plaintiff show a violation of a constitutional right, and (2) whether the law was clearly established at the time of the violation." Id., citing, Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). "[C]ourts may grant qualified immunity on the ground that a purported right was not 'clearly' established by prior case law, without resolving the often more difficult question whether the purported right exists at all." Reichle v. Howards, 132 S.Ct. 2088, 2093, 182 L.Ed.2d 985 (2012) (citations omitted).

A right is clearly established only if "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Kelly, 622 F.3d at 253, citing, Saucier, 533 U.S. at 202, 121 S.Ct. 2151.

> The Supreme Court has recognized that "it is inevitable that law enforcement officials will in some cases **reasonably but mistakenly conclude that probable cause is present**, and [the Supreme Court has] indicated that in such cases those officials - like other officials who **act in ways they reasonably believe to be lawful - should not be held personally liable**." [Anderson v. Creighton, 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)]. "The qualified immunity standard 'gives **ample room for mistaken judgments** by protecting all but the plainly incompetent or those who knowingly violate the law.'" *Gilles v. Davis*, 427 F.3d 197, 203 (3d. Cir 2005)

5

[additional citations omitted].

Kelly, 622 F.3d at 254 (emphasis added). Thus, police officers are entitled to qualified immunity "if a **reasonable officer could have believed** that probable cause existed," even if that decision is ultimately mistaken. Hunter v. Bryant, 502 U.S. 224, 228-29, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (emphasis added).

In order to determine whether a right was clearly established, "a court must consider the state of the existing law at the time of the alleged violation and the circumstances confronting the officer to determine whether a reasonable state actor could have believed his conduct was lawful." Id. at 253 (citations omitted). It is not sufficient that the right be established in the general sense (i.e. the Fourth Amendment prohibits unreasonable search and seizure). Rather, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). While it is not necessary that "the very action in question was previously held unlawful" to avoid qualified immunity, it must be true that "in light of pre-existing law the unlawfulness must be apparent." Id. (citations omitted). Thus "the question is whether a reasonable public official would know that his or her *specific conduct* violated clearly established rights." Grant v. City of Pittsburgh, 98 F.3d 116, 121 (3d Cir. 1996). (emphasis original).

Finally, "qualified immunity is an immunity from suit rather than a mere defense to liability." Pearson, 555 U.S. at 237, 129 S.Ct. 808. "[O]ne of the purposes of the... qualified immunity standard is to protect public officials from 'broad-ranging discovery' that can be 'peculiarly disruptive of effective government.'" Anderson, 107 S.Ct. at 646 n. 6, 97 L.Ed.2d 523 (citations omitted). As such, the Supreme Court "ha[s] emphasized that qualified immunity questions should be resolved at the

earliest possible stage of litigation." Pearson, 555 U.S. at 237, 129 S.Ct. 808.

Applying these principles, it is clear that the Individual Police Officers are entitled to qualified immunity, because they have not violated any of plaintiff's constitutional rights, let alone a right that had been clearly established. Each of plaintiff's section 1983 claims will be discussed in turn.

### 1. Fourth Amendment False Arrest Claim (Count I).

Count I alleges that plaintiff was falsely arrested in violation of the Fourth Amendment. To prevail on a section 1983 claim based upon false arrest under the Fourth Amendment, the plaintiff must show that the arrest was made without probable cause. Johnson v. Bingnear, 441 Fed. Appx. 848, 851 (3d Cir. 2011); Groman v. Twp. of Manalapan, 47 F.3d 628, 634 (3d Cir. 1995). The same is true for section 1983 claims based on false imprisonment arising from an alleged false arrest. Groman, 47 F.3d at 636. The inquiry "is not whether the person arrested in fact committed the offense but whether the arresting officers had probable cause to believe the person arrested had committed the offense." Id. at 634, quoting, Dowling v. City of Phila., 855 F.3d 136, 141 (3d Cir. 1988). Furthermore, the existence of probable cause to arrest on any one offense, defeats claims for false arrest and false imprisonment as to all charges. Barna v. City of Perth Amboy, 42 F.3d 809, 819 (3d Cir. 1994); Wright v. City of Phila., 409 F.3d 595, 602 (3d Cir. 2005).

"Probable cause does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction." Wright, 409 F.3d at 602, quoting, Adams v. Williams, 407 U.S. 143, 149, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). For this reason, "the evidentiary standard for probable cause is **significantly lower than the standard which is required for a conviction.**" Id. (emphasis added), citing, Michigan v. DeFillippo, 443 U.S. 31, 36, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979) (citation omitted). "Probable cause to arrest exists when the facts and

circumstances **within the arresting officer's knowledge** are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." Shelley v. Wilson, 339 Fed. Appx. 136, 138 (3d Cir. 2009) (emphasis added), quoting, Orsatti v. N.J. State Police, 71 F.3d 480, 483 (3d Cir. 1995).

"...[T]he law recognizes that probable cause determinations have to be made 'on the spot' under pressure and do **'not require the fine resolution of conflicting evidence** that a reasonable doubt or even a preponderance standard demands.'" Paff v. Kaltenbach, 204 F.3d 425, 436 (3d Cir. 2000) (emphasis added), quoting, Gerstein v. Pugh, 420 U.S. 103, 121, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975). "[T]he [probable cause] standard **does not require that officers correctly resolve conflicting evidence or that their determinations of credibility, were, in retrospect, accurate**." Paff, 204 F.3d at 436 (emphasis added). So long as the officer's belief "was not unreasonable in light of the information the officers possessed at the time," probable cause exists. Id. Moreover, "officers are entitled to draw reasonable inferences" based on their knowledge and prior experience. U.S. v. Ortiz, 422 U.S. 891, 897, 95 S.Ct. 2585, 2589, L. Ed.2d 623 (1975).

Importantly, the Fourth Amendment does not impose any particular burden of additional investigation upon a police officer once confronted by evidence establishing probable cause. "[A] positive identification by a victim witness, without more, would usually be sufficient to establish probable cause ... ." Wilson v. Russo, 212 F.3d 781, 790 (3d Cir. 2000). It is only where "[i]ndependent exculpatory evidence or substantial evidence of the witness's own unreliability **that is known by the arresting officers** could outweigh the identification such that probable cause would not exist." Id. (emphasis added); see Merkle v. Upper Dublin School Dist., 211 F.3d 782, 790 (3d Cir. 2000) (credible witness report to officer sufficient to establish probable cause).

In this case, plaintiff was charged with disorderly conduct, threatening the placement of a bomb, and terroristic threats. Probable cause as to any one of these charges defeats plaintiff's Fourth Amendment false arrest claim in full.

A person is guilty of disorderly conduct "if, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he ... creates a hazardous or physically offensive condition by any act which serves no legitimate purpose of the actor." 18 Pa. Cons. Stat. Ann. § 5503 (a)(4). As used in the statute "the word 'public' means affecting or likely to affect persons in a place to which the public or a substantial group has access; among the places included are ... transport facilities ... ." 18 Pa. Cons. Stat. § 5503(c). A "hazardous" condition is one which engenders "danger or risk." Com. v. Roth, 531 A.2d 1133, 1137 (Pa. Super. 1987). Such a condition is created when one acts in a way that puts others in fear of danger, and thereby creates the possibility of a physical confrontation or injury. Id. at 1137 (threat by protestors to enter church service despite direct request of church that they not do so, and then peacefully beginning to move toward church, created danger of resultant altercations, thereby establishing a hazardous condition).

There seems to be little question that the conduct reported to Officer Pinkney and Detective Wojciechowski established probable cause for, at a minimum, disorderly conduct. While plaintiff's complaint focuses on the literal meaning of the words he spoke (that *anybody*, and not necessarily the plaintiff, could bring a bomb through security), "[t]he probable cause inquiry looks to the totality of the circumstances...." Wright, 409 F.3d at 603. Thus, the police officers are also entitled to consider the context in which the statements were made, and the implications of those statements.

This incident took place at a TSA security check point in Philadelphia International Airport. For many citizens, air travel is a stressful event. Major airports are commonly believed to be high

value targets for terrorist activity. Indeed, this is the very reason for the high level of security present in an airport. Many air travel passengers are hypersensitive to the risk that someone may bring weapons, and more particularly, bombs, onto an airplane. The most likely place for any confrontation with a terrorist to occur is at a security checkpoint, where searches are conducted for dangerous items. Thus, the security check point presents one of the most stressful locations in the airport for passengers concerned with personal safety.

Plaintiff's conduct took place within this environment, so his actions must be measured against this back drop. There is no dispute that plaintiff was stopped in the security check point on suspicion of having an explosive device, consisting of a capped PVC pipe filled with a watch and halter monitor, packed alongside dense, rectangular organic bars (Power Bars) which resemble bricks of explosives. These objects so obviously resemble a pipe bomb that it would be reasonable to conclude that plaintiff had brought these items through intentionally, either for an attempted hoax, or to "test the system." Then, while being subjected to additional screening, there is no dispute that Officer Pinkney was told Mr. Vanderklok "angrily" said to the TSA Supervisor, "anybody can bring a bomb and you wouldn't event know it." The video surveillance attached to the amended complaint shows that additional screening was conducted in the open, while other passengers walked past, only steps away from plaintiff. See Exhibit B to Amended Complaint. Such conduct clearly creates the danger of panic or unrest and a resulting physical confrontation, or injury to a panicked passenger, when spoken in a security checkpoint.

The mere fact that plaintiff had been pulled aside by TSA screeners could cause other travelers to look to Mr. Vanderklok with heightened concern. When this person then makes an angry reference to the word "bomb" while undergoing additional TSA screening at an airport security checkpoint, it

creates the significant risk of causing a panic, and creates a hazardous condition for everyone in the area. While plaintiff will undoubtedly contend that his exact words did not expressly convey a threat to bring a bomb through security (i.e. "anybody" could bring a bomb in), it does not follow that other people passing through the screening area would have heard the entirety of plaintiff's comments. It is likely that a nearby passenger would hear only the angrily uttered word "bomb" by a man undergoing additional screening, and be pushed into a panicked state. The risk, in fact, does not even end at the security checkpoint. One can only imagine the potential reaction of a passenger who finds himself on a flight with the man who had been pulled aside by TSA screeners in security, and had been angrily talking about bombs. Even if a commotion did not result in the checkpoint, the risk of a later confrontation still remains.

Moreover, even if the entire sentence plaintiff spoke was heard by those passing by, one must consider the motivations of a person who would make any statement regarding a bomb in a TSA checkpoint, let alone to a TSA supervisor while undergoing heightened screening for packing an object that obviously appears to be an explosive device. Indeed, it is not unreasonable to believe that plaintiff's comments were, in fact, intended to be threats. Threats need not be explicit, and can be implied. It is reasonable to conclude that a person who angrily tells a TSA supervisor that "anybody" could bring a bomb through the checkpoint, is actually implying that he could, would or may attempt to do so. In fact, in telling the TSA supervisor that TSA would never be able to find a bomb somebody were to have hidden, it implies that plaintiff may actually have been in possession of an explosive which TSA had not located. Indeed, this statement, in conjunction with the device plaintiff attempted to bring through security, could lead a reasonable police officer t conclude that plaintiff was "testing the system" by bringing through a device that so obviously appeared to be a bomb. Perhaps

this was not plaintiff's intent, but Officer Pinkney, given the information conveyed to him, had probable cause to believe that it was.

Further, there is little question that Officer Pinkney had cause to believe that this statement was spoken with the intent to cause public inconvenience or alarm, or, at the very least, **in reckless disregard** of the risk that he would do so. Frankly, there seems to be no conceivable reason for anybody to make reference to a bomb in an airport security check point if that person did not intend to cause "inconvenience, annoyance, or alarm." Even if plaintiff did not intend to cause a panic or commotion by his actions, he clearly disregarded the very substantial danger that he would do so.

Simply put, Officer Pinkney, and the other officers to the extent involved, received a credible report from a TSA Supervisor that a man undergoing heightened TSA screening on suspicion of having an explosive device, while in possession of what appeared to be a mock up of a pipe bomb, angrily told the screener that anybody could bring a bomb through the checkpoint and it would never be found. Such statements, particularly when spoken angrily, create the real danger of causing a panic, commotion, or physical altercation, and are spoken, at least, with reckless disregard of the risk of public alarm. As such, the Individual Police Officers had probable cause to detain plaintiff for disorderly conduct.

Plaintiff is expected to contend that the officers should have made a more thorough investigation by reviewing the video surveillance of the incident. First, as discussed above, the police are under no constitutional obligation to conduct additional investigation once given information from a reliable eye witness that establishes probable cause. Wilson, 212 F.3d at 790; see Greene v. City of Philadelphia, No. 97-CV-4264, 1998 WL 254062 at *8 (E.D. Pa. 1998), aff'd., 185 F.3d 861 (3d Cir. 1999) (rejecting contention that police were required to affirmatively seek out evidence to

undermine probable cause established by a positive witness identification). Second, even if the police had reviewed the surveillance video, the video has no audio. See Exhibit B to Amended Complaint. It would neither confirm nor refute the allegation that plaintiff said he or anybody could bring a bomb through security. All the officers would have seen, as evidenced by the video, is plaintiff speaking to several TSA agents, in an apparently agitated state. Such conduct would do nothing to undermine probable cause. Furthermore, since there is no dispute that the police officers were not told that plaintiff was waiving his arms or pointing, the fact that this conduct is not shown in the video is irrelevant to the probable cause determination.

While probable cause for the disorderly conduct charge alone is sufficient to defeat plaintiff's Fourth Amendment false arrest claim, the same facts supporting probable cause for the disorderly conduct charge also provide probable cause for the threatening the placement of a bomb, and terroristic threats charges. One is guilty of a "threat to use weapons of mass destruction" if the person "intentionally ... threatens by any means the placement of a weapon of mass destruction." 18 Pa. Cons. Stat. Ann. § 2715(a)(4). The statute defines a bomb as a "weapon of mass destruction." 18 Pa. Cons. Stat. Ann. § 2715(d). A person is guilty of making a terroristic threat if he "communicates, either directly or indirectly, a threat to: (1) commit any crime of violence with the intent to terrorize another; (2) cause evacuation of a ... facility of public transportation; or (3) otherwise cause serious public inconvenience, or cause terror or serious public inconvenience with reckless disregard of the risk of causing such terror or inconvenience." 18 Pa. Cons. Stat. Ann. § 2706(a).

As more fully discussed above, even if the literal meaning of plaintiff's words was not a express threat to attempt to bring a bomb through security, it was reasonable given the circumstances to conclude that plaintiff's statements were intended as an implicit threat to do so. Indeed, the very

fact that plaintiff was attempting to bring a capped PVC pipe containing a watch through security suggests plaintiff may have even intended to create some type of bomb scare on that very trip to the airport. A police officer arriving on scene does not have the luxury of extended deliberation as to his or her course of action, nor does he or she have the ability to read plaintiff's mind and determine his actual intent. Given the context, location, angry nature of the statements, and the object plaintiff attempted to bring through security, there was probable cause to detain plaintiff for threatening the placement of a bomb and terroristic threats.

Perhaps most significantly, even if this court were to conclude that plaintiff's statements did not create probable cause to arrest plaintiff for, at a minimum, disorderly conduct, the Individual Police Officers are still entitled to qualified immunity because it was not clearly established that such statements, made in an airport, do not rise to the level of probable cause. Stated differently, it cannot be said that "every reasonable officer" would have known that probable cause was lacking. Ashcroft v. Al-Kidd, 131 S.Ct. 2074, 2083, 179 L.Ed.2d 1149 (2011) (qualified immunity applies unless "'every reasonable official would have understood that what he is doing violates that right.'").

Research has not revealed any case law addressing the question of when or under what circumstances a reference to a bomb in an airport screening checkpoint rises to the level of disorderly conduct under Pennsylvania law. As noted above, however, the Superior Court of Pennsylvania has found that peaceful conduct which puts people in fear and risks a resultant physical confrontation supports a disorderly conduct *conviction*.

In Roth, *supra*, a protest group told a church congregation that they intended to hold a protest at their property, which would involve dumping pieces of iron in front of the church. Roth, 531 A.2d at 136. To avoid the protests, the protestors asked permission to address the congregation during a

service. Id. The church refused the request, and told the protestors that they would not permitted to enter the church. Id. On the planned day, the protestors arrived with an iron beam, which they intended to place on the alter of the church. Id. at 580-81. After being told by the church leaders that they were not welcome in the church, one of the protestor members said, "let's go," and took a step towards the church. When he did so, he was arrested, charged, and convicted of disorderly conduct. Id. at 581. In upholding the conviction, the Superior Court noted that many congregation members had been to frightened to come to church that day, and that church members were on alert for fear that their church would be invaded. Id. at 1137. The Superior Court concluded that when the protestor then took a step towards the church in an attempt to peacefully take the piece of iron into the church, they created the risk of a physical confrontation, thereby creating a "hazardous condition" sufficient to support the disorderly conduct conviction. Id.

While the facts of Roth are admittedly different from those at issue in this case, the underlying rationale of the case is that peaceful conduct which causes the risk of a physical danger or commotion is sufficient to support a disorderly conduct charge. In light of this precedent, it is clear that a reasonable officer in Officer Pinkney's situation could believe that plaintiff's statement to the TSA supervisors in the security screening checkpoint created the same hazard and was supported by the law. Even if this conclusion was in error, the error was not clearly established by existing law.

Also of significance, the Seventh Circuit Court of Appeals addressed a similar incident under Illinois law in Mustafa v. City of Chicago, 442 F.3d 544 (7th Cir. 2006). In that case, the plaintiff was selected for heightened security screening in O'Hare International Airport. Id. at 546. After she was checked and cleared, plaintiff complained that she was being racially profiled. Id. In response to her complaints, an airline manager offered to escort the plaintiff to her gate. Id. On the way, plaintiff was

yelling at the manager in a crowded area. Id. At some point, plaintiff realized that her purse had not been checked in security. Id. In an attempt to point out that her bag had not been searched, the plaintiff said to the manager, "You already checked my luggage. Maybe I have a bomb in my purse. Nobody has checked that." Id. Another employee, hearing the word bomb, called the police, alerting them to an unruly passenger saying the word "bomb." Id. When the officer arrived she noticed a commotion, and was told of the plaintiff's comment. Id.

Plaintiff was arrested and charged with felony disorderly conduct for a "bomb threat." Id. at 547. Similar to the statutes at issue in this case, the Illinois statute made it a crime to "transmit[] in any manner to another a false alarm to the effect that a bomb ... is concealed in such place that its explosion ... would endanger human life, knowing at the time of such transmission that there is no reasonable ground for believing that such bomb ... is concealed in such place." Id. at 547 n. 1. When plaintiff was later acquitted, she filed a § 1983 claim against the arresting police officers.

In finding probable cause, the Seventh Circuit emphasized that the officer was entitled to rely on the manager's report of plaintiff's statements. The Seventh Circuit gave short shrift to the plaintiff's arguments that the officers never actually believed she had a bomb, and that her statement was couched in the hypothetical, "maybe." The Court emphasized that the statute criminalized the threat, whether actual or false, of the placement of a bomb. Id. at 548. The court further explained that, "in light of the time and place of the event, which occurred in an international airport three months after the September 11 attacks, and the understandable sensitivity of air travelers and airport security personnel at that time, it was reasonable for the officers to conclude that Mustafa had committed disorderly conduct by stating that she might have a bomb in her purse." Id.

Going further, the Seventh Circuit also held that the officers would have been protected by

qualified immunity, even if there had not been probable cause for the arrest. Even if no reasonable person would have believed that plaintiff was serious about having a bomb, the Court found that at the time of the arrest, it was at least "arguable" that joking or sarcastic bomb threats fell within the scope of the statute. Id. at 549. Since "qualified immunity protects officers who reasonably interpret an unclear statute[, r]eviewing courts must ask 'whether X is a crime under the statute that the police arrested her for violating. If the answer to that question was unclear when the arrest is made, the police are entitled to qualified immunity." Id. at 549 (citations omitted). Since the most the plaintiff could do was "plausibly claim ... that the criminality of her conditional statement was unclear," and that "no case clearly established that implausible threats fell outside of its reach," the officers were entitled to qualified immunity. Id.

The words spoken in Mustafa and the statutes at issue in that case are sufficiently similar to the allegations in this case to lead a reasonable police officer to believe that plaintiff's statement constituted a bomb threat, or, at the very least, rose to the level of disorderly conduct. Indeed, more so than in Mustafa, here plaintiff had actually attempted to bring a device through security that any reasonable person would realize appeared to be a bomb. Thus, in this case, plaintiff may very well have been caught in the attempt to create a bomb scare. In light of the Seventh Circuit's decision in Mustafa, and the contours of disorderly conduct as set out in Roth, it cannot be said that "every reasonable officer" would have known that there was no probable cause to detain plaintiff. As such, the Individual Police Officers are entitled to qualified immunity, and the Fourth Amendment false arrest claims against them should be dismissed.

### 2. *Fourth Amendment Malicious Prosecution (Count VI Repeated)*

To succeed on a section 1983 claim based on alleged malicious prosecution, the plaintiff must

show that "(1) the defendants initiated a criminal proceeding; (2) the criminal proceeding ended in plaintiff's favor; (3) the proceeding was initiated without probable cause; (4) the defendants acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered a deprivation of liberty consistent with the concept of a seizure as a consequence of a legal proceeding." Kossler v. Crisanti, 564 F.3d 181, 186 (3d Cir. 2009) (en banc) (citations omitted). Plaintiff's claims against the individual officers fail because the complaint does not establish that the proceeding were initiated without probable cause.

As set out above, plaintiff's malicious prosecution claim fails because there was probable cause for the charges asserted against him, or, at a minimum, it was not clearly established that probable cause was lacking, as more fully set out above. This is true even if the Court concludes that there was probable cause for only one of the charges asserted. In Wright v. City of Philadelphia, 409 F.3d 595, 604 (3d Cir. 2005), the Third Circuit Court of Appeals held that the presence of probable cause as to any one offense charged, defeats a malicious prosecution claim for all offenses charged.

In the interest of candor, in the later decision, Johnson v. Knorr, 477 F.3d 75 (3d Cir. 2007), a different Third Circuit panel permitted a malicious prosecution claim to proceed on charges of aggravated and simple assault, despite finding that there was probable cause for a charge of terroristic threats. In a third decision by the Third Circuit en banc, in Kossler, supra, the court observed that "considerable tension exists between our treatment of the probable cause element in Johnson and our treatment of that element in the earlier case of Wright..," Kossler, 564 F.3d at 193, and that "the holdings of these two cases are difficult to reconcile." The en banc panel then observed in a footnote that, if the cases were in unavoidable conflict, the earlier rule of Wright (probable cause as to any charge, defeats the malicious prosecution claim in full) would control. Id. at 194 n. 8. Significantly,

"[t]he majority of lower court decisions following and considering *Kossler* have held that *Wright* does indeed control." Posey v. Swissvale Borough, 2013 WL 989953 at *10 (W.D. Pa. Mar. 13, 2013) (collecting cases; probable cause for filing a false police report charge defeats malicious prosecution claim for theft by deception); Turosik v. Hougue, 2011 WL 1044648 at *7 n. 4 (W.D. Pa. Mar. 18, 2011) (rejecting Johnson; probable cause for disorderly conduct offense defeats malicious prosecution claims for resisting arrest, simple assault, and harassment); See Griffin v. Walbert, 2012 WL 123560 at *5 n.4 (M.D. Pa. Jan. 17, 2012) (noting that the vitality of Johnson had been questioned, while the precedential authority of Wright had been confirmed).

Perhaps more importantly, however, the presence of the Third Circuit's divergent case law dictates that a police officer is entitled to qualified immunity on a malicious prosecution claim provided there is probable cause for any one charge, because it is not clearly established (and, indeed, there is a dispute in the Third Circuit) that probable cause is required for all charges. At least one District Court has reached this same conclusion. See Posey, 2013 WL 989953 at *10. Thus, whether analyzed for the presence of a constitutional violation, or the lack of a clearly established constitutional violation, the Individual Police Officers are entitled to qualified immunity on the malicious prosecution claim if there was probable cause for any one charge asserted.

Since there was probable cause for the arrest, and/or the absence of probable cause was not clearly established, all section 1983 malicious prosecution claims against the Individual Police Officers must be dismissed, either on their merits or on qualified immunity grounds.

### 3. First Amendment Freedom of Speech Claim (Count II) and Retaliatory Prosecution Claim (Count VII).

Count II of plaintiff's complaint alleges that plaintiff's arrest and prosecution was made in retaliation for exercising his right to freedom of speed under the First Amendment. See Exhibit A

19

at ¶ 67. Count VII of plaintiff's complaint alleges simply that plaintiff's arrest and prosecution constituted retaliatory prosecution. See Exhibit A at Count VII. As a section 1983 claim must be premised on a violation of a constitutional right, a section 1983 claim alleging retaliation must involve retaliation for the exercise of a constitutionally protected right. Since the First Amendment is the only basis for retaliation alleged in the complaint, moving defendants assume the "retaliatory prosecution" claim (Count VII) is duplicative of the First Amendment retaliation claim (Count II).

To make out a First Amendment retaliation claim, plaintiff must plead "(1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link between the constitutionally protected conduct and the retaliatory action." Favata v. Seidel, 511 Fed. Appx. 155, 158 (3d Cir. 2013), quoting, Thomas v. Ind. Twp., 463 F.3d 285, 296 (3d Cir. 2006). "Additionally, in a case of retaliatory prosecution, Appellant must allege and prove 'an absence of probable cause to support the underlying criminal charge.'" Id., quoting, Hartman v. Moore, 547 U.S. 252, 126 S.Ct. 1695, 164 L.Ed.2d 441 (2006) (additional citations omitted). Likewise, in Reichle v. Howards, 132 S.Ct. 2088, 2093, 182 L.Ed.2d 985 (2012), the Supreme Court held that a police officer who makes an arrest based upon probable cause is entitled to qualified immunity on a First Amendment retaliation claim. Ickes v. Grassmeyer, 30 F. Supp.3d 375, 382 (W.D. Pa. 2014); Posey v. Swissvale Borough, 2013 WL 989953 at *8 (W.D. Pa. Mar. 12, 2013).

In summary, the Individual Officers are entitled to qualified immunity on the First Amendment retaliation claim if plaintiff's detention and prosecution was based upon probable cause. Since, as more fully discussed above, probable cause existed to detain and prosecute plaintiff, the individual officers are entitled to qualified immunity on plaintiff's retaliatory prosecution claims.

### 4.    *Fourteenth Amendment Violations (Count VIII).*

Count VIII of plaintiff's complaint reiterates the allegations of the other counts, but recasts them as violations of the Fourteenth Amendment by violating his rights to "bodily integrity, the right to be free from the excessive use of force; the right to be free from unreasonable seizures; and the prohibitions against arrests, detentions, and prosecutions based on fabricated evidence." See Exhibit A at ¶ 131. Plaintiff's Fourteenth Amendment claims must be dismissed, because plaintiff's claims lie exclusively under the Fourth Amendment.

Claims based on alleged "pre-trial deprivations of liberty," such as police stops, are governed by the Fourth Amendment, and "not the more generalized notion of substantive due process" embodied in the Fourteenth Amendment. Albright v. Oliver, 510 U.S. 266, 273-74, 114 S.Ct. 807, 813 (1994) (plurality); Verdier v. Borough, 796 F. Supp.2d 606, 619 (E.D. Pa. 2011) (Fourth Amendment governed claims for search, seizure, and excessive use of force, and not Fourteenth Amendment); see Graham v. Connor, 490 U.S. 386, 395, 109 S. Ct. 1865, 1871 (1989) (all claims for use of excessive force in conjunction with an arrest, investigatory stop, or other seizure by a police officer are analyzed under the Fourth Amendment).  This is because, "the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive government conduct...." Graham, 490 U.S. at 395, 109 S. Ct. at 1871.

Since plaintiff's claims all arise out of his detention, arrest, and prosecution, his claims fall exclusively within the Fourth Amendment, and his Fourteenth Amendment claims must be dismissed.

### B.    <u>All State Law Claims Must Be Dismissed.</u>

Plaintiff's complaint attempts to plead a state law claims for false arrest (Count III), false imprisonment (Count IV), assault and battery (Count V), malicious prosecution (Count VI Repeated),

and retaliatory prosecution (Count VII). All of these claims must also be dismissed for failure to plead a sufficient claim, because the officers are immune from state tort suits under the Political Subdivision Tort Claims Act, and because Counts III, IV and V are barred by the statute of limitations.

Preliminary, plaintiff's original complaint did not assert claims against the Individual Police Officers for false arrest, false imprisonment, or assault and battery. See Exhibit D at Counts IV to VI, Plaintiff's Original Complaint. Those claims, asserted only under Bivens, were directed solely against the federal defendants. Since the statute of limitations on those claims is two years, 42 Pa. Cons. Stat. Ann. § 5524(1), the arrest occurred January 26, 2013, and plaintiff was acquitted April 8, 2013, the statute of limitations on all claims expired not later than April 8, 2015[3]. As plaintiff's amended complaint was not filed until May 27, 2015, the state law claims for false arrest, false imprisonment, and assault and battery against the Individual Police Officers are barred by the statute of limitations.

Turning to the merits, common law claims for false arrest, false imprisonment, and malicious prosecution are all defeated by the presence of probable cause. Renk v. City of Pittsburgh, 537 Pa 68, 76, 641 A,2d 289, 293 (1994) (false arrest and false imprisonment); Tomaskevitch v. Spec. Records Corp., 717 A.2d 30, 33 (Pa. Cmwlth. 1998) (malicious prosecution). The same is true of the assault and battery claim, which is premised only on handcuffing and escorting plaintiff without any overt force. See 18 Pa. Cons. Stat. Ann. § 508(a) (peace officer may use "any force which he believes to be necessary to effect the arrest"). Since there was probable cause for the arrest, as more fully

---

[3]The statute of limitations on claims for false arrest, assault and battery begin to run on the date of the arrest, LeBlanc v. Snavely, 453 Fed. Appx. 140, 141 (3d Cir. 2011), false imprisonment on the day of arraignment, Wallace. v. Kato, 549 U.S. 384, 390, 127 S.Ct. 1091, 1096, 166 L.Ed.2d 973 (2007), and malicious prosecution on the day of favorable termination of the charges. Rose v. Bartle, 817 F.2d 331, 349-50 (3d Cir. 1989).

discussed above, all of these claims must be dismissed.

With respect to the retaliatory prosecution claim, research has not revealed a Pennsylvania common law cause of action for retaliatory prosecution. All cases moving defendants were able to locate on the subject couched the discussion in terms of First Amendment violations. As such, it does not appear that a common law cause of action for retaliatory prosecution exists. To the extent one does exist, there is no reason to believe that the absence of probable cause would not be a necessary element of that claim. As such, the state retaliatory prosecution claim fails, to the extent it exists.

Additionally and alternatively, even if plaintiff had sufficiently pled viable state law claims, the Individual Police Officers are immune from suit under the Political Subdivision Tort Claims Act (PSTCA). The PSTCA immunizes "local agencies," such as the City of Philadelphia, from liability for all civil damages, unless the claim invokes one of eight waivers to immunity set out in the statute. 42 Pa. Cons. Stat. Ann. § 8541 *et seq.*; 42 Pa. Cons. Stat. Ann. § 8501. Claims for false arrest/imprisonment, assault and battery, and malicious prosecution do not fall within any of the defined waivers of immunity. 42 Pa. Cons. Stat. Ann. § 8542(b)(1-8). This immunity also extends to employees of local agencies, such as police officers, acting within the scope of their duties for that agency. 42 Pa. Cons. Stat. Ann. § 8545. Thus, police officers are also generally immune from liability for plaintiff's state common law claims.

The PSTCA contains a "willful misconduct" exception to the employee's immunity. 42 Pa. Cons. Stat. Ann. § 8550. Under this exception, the employee is not entitled to immunity for damages "caused by an act of the employee in which it is judicially determined that the act of the employee caused the injury and that such act constituted a crime, actual fraud, actual malice or willful misconduct...." 42 Pa. Cons. Stat. Ann. § 8550.

While the commission of an intentional tort is generally sufficient to invoke the willful misconduct exception, the Supreme Court of Pennsylvania has applied a heightened standard to police conduct claims. Renk, 537 Pa at 76, 641 A.2d at 293. In police liability cases, it is not sufficient to show merely that an intentional tort was committed. Rather, one must show that the officer "deliberately arrest[ed] a person *knowing* that he lacked probable cause to do so." Id. at 76-77, 641 A.2d at 293-94 (emphasis added). Thus one must show, "not only that the police officer intended to commit the acts that he is accused of carrying out, but also that the officer **understood that the actions he intended to take were unlawful** and chose to take the actions anyway." Brockington v. City of Phila., 354 F. Supp.2d 563, 571 (E.D. Pa. 2005) (emphasis added).

As more fully set out above, the fact that there was probable cause for the arrest precludes a finding of willful misconduct within the meaning of the statute. Furthermore, the application of qualified immunity, which turns on whether the officer was on notice that his conduct was unlawful and the reasonableness of his belief in probable cause, also precludes the invocation of section 8550. If the officers reasonably believed their conduct was lawful, they could not have acted knowing that it was unlawful. As such, the "willful misconduct" exception does not apply, and all state common law claims against Individual Police Officers should be dismissed for this additional reason.

C.   **The Complaint Fails to Adequately Plead Any Conduct by Sergeant Flaville and Detective Wojciechowski, and Fails to Plead Officer Pinkney's Participation in Plaintiff's Prosecution.**

The amended complaint is devoid of allegations that Sergeant Flaville and Detective Wojciechowski played any role in the arrest. The sum total of the allegations against these defendants is that they "initiated criminal proceedings against Plaintiff by affirming affidavits of probable cause." See Exhibit A at ¶ 70. Plaintiff does not allege that the statements contained in any affidavits of

24

probable cause (none of which are referenced in the complaint) falsely conveyed the information supplied to the police. Plaintiff also makes no allegation that these defendants selected the charges to be asserted against plaintiff. Francis v. Harmon, 2014 WL 617138 (E.D. Pa. Feb. 18, 2014) (Since prosecutors are typically responsible for initiating criminal proceedings, police officers are generally only "considered to have initiated a criminal proceeding if he or she knowingly provided false information to the prosecutor, ... otherwise interfered with the prosecutor's informed discretion," failed to disclose exculpatory evidence, or omitted material information from their reports). Since Sergeant Flaville and Detective Wojciechowski are not alleged to have taken part in plaintiff's arrest, used any force upon him, selected the charges with which plaintiff was charged, or provided false information, all claims against them should be dismissed for this additional reason.

As to Officer Pinkney, plaintiff's complaint does not allege that he played any role in selecting the charges pursued against plaintiff. As such, plaintiff's malicious prosecution and retaliatory prosecution claims against him should also be dismissed.

III. **CONCLUSIONS**

The Individual Police Officers are entitled to qualified immunity, because there was probable cause to detain plaintiff; or, at a minimum, it was reasonable for the police to believe probable cause existed, and the contrary proposition was not clearly established. The presence of probable cause defeats all of plaintiff's claims. For these reasons, and those additional reasons more fully discussed in the brief, all claims against the Individual Police Officers should be dismissed with prejudice. In the alternative, if the Court concludes that there are not sufficient factual averments of record to make the qualified immunity determination, moving defendant seeks a more specific statement of the claim. See Fed. R. Civ. Pro. 12(e); Thomas v. Independence Twp., 463 F.3d 285, 301 (3d Cir. 2006).

Respectfully submitted,

**BENNETT, BRICKLIN & SALTZBURG LLC**

**BY:** */s/ Nicholas A. Cummins*
Charity C. Hyde/Nicholas A. Cummins
Attorney I.D. No. 82022/203238
hyde@bbs-law.com / cummins@bbs-law.com
1601 Market Street, 16th Floor
Philadelphia, PA 19102
(215) 561-4300 / (215) 561-6661 (Fax)
Attorneys for Defendants, City of Philadelphia, Raymond Pinkney, Detective M. Wojciechowski, and Kenneth Flaville

Date: June 10, 2015

ROGER VANDERKLOK   :
           :
   v.      : NO. 15-370
           :
UNITED STATES OF AMERICA, et al. :

## CERTIFICATE OF SERVICE

   I, Nicholas Cummins, do hereby certify that on this date, a true and correct copy of the Motion to Dismiss Pursuant to Fed. R. Civ. Pro. 12(b)(6) on behalf of Defendant, Raymond Pinkney, was electronically filed and is available for viewing and downloading from the ECF system and has been served this date upon all interested counsel.

Thomas B. Malone, Esquire
The Malone Firm, LLC
1650 Arch Street, Suite 1903
Philadelphia, PA 19103

Anne B. Taylor, Esquire
U.S. Attorney's Office
401 Market Street, 4th Floor
Camden, NJ 08101

Jeffrey M. Scott
Archer & Greiner, P.C.
One Liberty Place, 32nd Floor
1650 Market Street
Philadelphia, PA 19103

### BENNETT, BRICKLIN & SALTZBURG LLC

**BY:** _/s/ Nicholas A. Cummins_
   Charity C. Hyde/Nicholas A. Cummins
   Attorney I.D. No. 82022/203238
   hyde@bbs-law.com / cummins@bbs-law.com
   1601 Market Street, 16th Floor
   Philadelphia, PA 19102
   (215) 561-4300 / (215) 561-6661 (Fax)
   Attorneys for Defendants, City of Philadelphia,
   Raymond Pinkney, Detective M. Wojciechowski,
   and Kenneth Flaville

Date: June 10, 2015

# Exhibit A

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA



ROGER VANDERKLOK

   *Plaintiff*


   *v.*                                    Docket No.: 15-cv-00370


UNITED STATES OF AMERICA,

TRANSPORTATION SAFETY ADMINISTRATION (TSA),

CHARLES KIESER (TSA),

CITY OF PHILADELPHIA,

RAYMOND PINKNEY (PHILADELPHIA POLICE),

DETECTIVE M. WOJCIECHOWSKI (PHILADELPHIA POLICE),

KENNETH FLAVILLE (PHILADELPHIA POLICE),

JEH JOHNSON (DEPARTMENT OF HOMELAND SECURITY),

JOHN S. PISTOLE (TSA)


   *Defendants.*


**AMENDED COMPLAINT**

(Violation of First, Fourth and Fourteenth Amendment Rights; Federal Tort Claims Act)


Plaintiff ROGER VANDERKLOK makes the following representations to this

Court against the named Defendants as follows:

1

1.     Plaintiff Roger Vanderklok, a 56-year old Architect at the time of the events described in this Complaint, was detained, handcuffed, and jailed for over 23 hours because a TSA Supervisor did not like something Mr. Vanderklok said to him and because Philadelphia Police personnel failed to perform their duties and arrested him without probable cause. In short - TSA Supervisor made up a story that involved Mr. Vanderklok becoming irate, pointing in his face and saying something insulting that included the word "bomb." And the Philadelphia Police failed to realize that, even if the TSA Supervisor's claims were accurate, there was no probable cause to arrest Mr. Vanderklok.

2.     Mr. Vanderklok, a married father of three children, was attempting to travel from Philadelphia to Miami in order to run in a Marathon the following day. In the carry-on bag he packed were, amongst other things, a heart-monitoring watch and Power Bars.  He had no weapons, prohibited liquids, sharp items (and no Arabic flash-cards). He had not visited countries known to sponsor terrorism and was not reading a book critical of the U.S. Government.  He said good-bye to his wife and told her he would call her when he landed at his destination – which was his custom when he travelled by air.

3.     At Philadelphia International's Security Screening checkpoint, he was stopped and detained by TSA screeners and repeatedly questioned about the contents of his bag. He politely answered all their questions and invited the TSA personnel to inspect his bag and its contents. After a thorough check of his bag, and after TSA personnel were sure that there was nothing improper, dangerous, or illegal in his bag, the TSA supervisor gave Mr. Vanderklok his bag back.

4.     Mr. Vanderklok did not appreciate the way he was spoken to by the

2

supervisor, Mr. Kieser, and told him he wanted to file a complaint and asked for a complaint form.

5.     It was after this request that Mr. Kieser had an Agent "watch" Mr. Vanderklok while he called Philadelphia Police to have Mr. Vanderklok arrested. Mr. Vanderklok was detained and paraded through the Airport by a Philadelphia Police Officer to the Airport Police Station where he was jailed for countless hours without probable cause. Handcuffed behind his back, he was then put into a vehicle and transported to a Philadelphia Police station outside of the Airport where he was jailed again.

6.     While Mr. Vanderklok languished in jail cells, without access to a telephone, his wife started to worry. His flight had landed in Miami and she had not heard from her husband. After several attempts to reach him on his cell phone over the course of many hours, Elanor, fearing the worst, started to make calls to file a "Missing Person Report." With Mrs. Vanderklok panicking and Mr. Vanderklok toiling in a jail cell, the TSA supervisor was telling Philadelphia Police different versions of the same event – but trying to make sure that Mr. Vanderklok's ordeal would continue.

7.     The TSA Supervisor told the first Police Officer, Officer Pinkney, that Mr. Vanderklok had angrily said to him that "anybody can bring a bomb and you wouldn't even know it." Later, he told the Detective that the words were: "I could bring a bomb through here any day of the week and you would never find it." (See Documents from Police attached hereto as Exhibit "A").

8.     After Officers/Detectives purposefully harassed and scared him, Mr. Vanderklok was charged with crimes he did not commit, including "Threatening the

Placement of a Bomb", "Terroristic Threats" and "Disorderly Conduct". Bail was set at $40,000.00. He was forced to post bail and inform his employer of the criminal charges pending against him. And he was subsequently under the restrictions of all defendants on bail in Philadelphia (which include travel restrictions).

9.      At the criminal trial[1], the TSA Supervisor made up a third version of what Mr. Vanderklok said and did at the Screening Area. Under oath in Municipal Court, the TSA supervisor testified that his attention was directed to Mr. Vanderklok when Mr. Vanderklok became "irate" and started angrily waving his arms and hands in the air. The TSA supervisor demonstrated this for the Court. The TSA supervisor testified that he approached Mr. Vanderklok, who eventually stated: "Let me tell you something – I'll bring a bomb through here any day that I want … you'll never find it."

10.     The TSA supervisor also made up additional facts at the criminal trial. The TSA Supervisor testified that "the passenger [Mr. Vanderklok] put his finger in my face." He went on to demonstrate for the court. He testified that Mr. Vanderklok's finger came within six to eight inches of his face. He testified that Mr. Vanderklok moved his finger towards and away from his face approximately six times. This statement was the first time that the TSA Supervisor, Kieser, ever mentioned a finger pointing. It was never mentioned on any of the police documents.

11.     Philadelphia International Airport has security cameras placed throughout the Security checkpoints and screening areas. Those cameras were functional and recording on January 26, 2013. The video footage acquired by counsel before the criminal trial clearly shows the actions and movements of Mr. Vanderklok at the Security Checkpoint. (See Video attached as Dropbox link Exhibit "B"

---

[1] Since the charges against Mr. Vanderklok were misdemeanors there was no preliminary hearing.

https://www.dropbox.com/sh/x0h0mkniuzstkvz/AAB4Ub6GcsMtaQtxpxG0iO5Pa?dl=0)
[2]. According to his testimony, the TSA Supervisor did not watch the video footage
before testifying against Mr. Vanderklok in Municipal Court. The video captures the
entire interaction between the TSA Supervisor and Mr. Vanderklok. Mr. Vanderklok
does not wave his arms or hands. He does not point his finger in anyone's face (or
anywhere else). He does not once appear irate. The video depicts a calm man engaged in
quiet conversation with TSA personnel who have "alerted" to his bag.

      12.     The District Attorney's Office had two witnesses present at the trial – TSA
Supervisor Charles Kieser and Philadelphia Police Officer Raymond Pinckney. They
called only Kieser in their case-in-chief. No other evidence was submitted. After hearing
the testimony of Kieser, the Honorable Judge Stack granted a Defense Motion for
Judgment of Acquittal. The Court concluded that, viewing the State's evidence in its
entirety, direct and/or circumstantial, in the light most favorable to the Commonwealth,
Mr. Vanderklok could not be found guilty of any of the charges. Mr. Vanderklok denies
doing and saying that to which Kieser testified, and the surveillance footage supports Mr.
Vanderklok's account.

<div align="center">PARTIES</div>

      13.     Plaintiff Roger Vanderklok  is an adult individual who, at all times
Relevant hereto, resided at 834 Chestnut St., Philadelphia, PA 19107

---

[2] Since the videotape cannot be added as a pdf, Plaintiff's counsel will have a copy delivered to the Court
and counsel. By way of assistance, in clip B1 checkpoint 3075, Plaintiff can be found at 8:17-8:22. Plaintiff
is wearing a bright blue jacket and an orange cap. (See Exhibit "C"). In clip B1A-checkpoint 3084,
Plaintiff can be seen from 8:11-8:17. He is wearing a red checkered shirt and jeans. At 8:11 he starts going
through the metal detector/body scanner. (See Exhibit "D"). In clip B2- checkpoint 3077, lane 2, Plaintiff
can be seen at approximately 8:11-8:17 first wearing a red checkered shirt then putting on the blue jacket
and orange cap. In clip, B2A checkpoint 3078, plaintiff can be seen starting at 9:09-8:11 with his jacket
off, in line, approaching the screening. In clip B3, lane 3, checkpoint, 3079, plaintiff can be seen from 8:09-
8:11. In clip B5 overview 3086, Plaintiff can be seen from 3:12-3:23.

14.     Defendant, City of Philadelphia, ("City") is a municipal corporation within the Commonwealth of Pennsylvania, with administrative offices located at One Parkway Building, 17th Floor, 1515 Arch Street, Philadelphia, PA 19102-1595

15.     Defendant, Raymond Pinkney, is an individual who holds the position of Police Officer with the Philadelphia Police Department. During the time in question, he was expected to know and understand the Pennsylvania Crimes Code so that he could make proper decisions on whether to detain and/or arrest citizens for offenses including but not limited to Disorderly Conduct, Terroristic Threats, and Threatening the Placement of a Bomb. This action is brought against the named individual in his individual and in his official capacity as a police officer of the City of Philadelphia.  Defendant Pinckney was acting under color of state law during the events described in this Complaint.

16.     Defendant, M. Wojciechowski, is an individual who was a Detective at the time of this incident. In such capacity as Detective, he was charged with knowing and understanding the Pennsylvania Crimes Code so that he could make proper decisions on whether to detain and/or arrest citizens for offenses including but not limited to Disorderly Conduct, Terroristic Threats, and Threatening the Placement of a Bomb. Additionally, as the "assigned" investigator on a given matter, he was charged with knowing how to conduct, and conducting a proper investigation to make sure innocent people are not detained/charged for crimes for which there is no evidence.  This action is brought against the named individual in his individual and in his official capacity as a police officer of the City of Philadelphia. Defendant Wojciechowski was acting under color of state law during the events described in this Complaint.

17.     Defendant Kenneth Flaville, at all times relevant hereto, is an individual

who is employed as a police officer/detective by the City of Philadelphia. This action is brought against the named individual in his individual and in his official capacity as a police officer of the City of Philadelphia. In such capacity as police officer/detective, he was charged with knowing and understanding the Pennsylvania Crimes Code so that he could make proper decisions on whether to detain and/or arrest citizens for offenses including but not limited to Disorderly Conduct, Terroristic Threats, and Threatening the Placement of a Bomb. Additionally,-as the "assigned" investigator or "approving supervisor" on a given matter, he was charged with knowing how to conduct, and conducting proper investigations to make sure innocent people are not detained/charged for crimes for which there is no evidence. This action is brought against the named individual in his individual and in his official capacity as a police officer of the City of Philadelphia. Defendant Flaville was acting under color of state law during the events described in this Complaint.

18.     Defendant Charles Kieser, at all times material hereto, is an individual who is employed as a TSA Agent/Supervisor by the Transportation Security Administration (hereafter "TSA"). This action is brought against the named individual in his individual and in his official capacity as a TSA Agent/Supervisor.

19.     Defendant, Transportation Safety Administration, ("TSA") and Defendant John S. Pistole (TSA Administrator), employed/continue to employ Defendant Kieser, partner with local law enforcement agencies (like the Philadelphia Police Department) for the safety of Airports and citizens, comes under the auspices of Defendant Jeh Johnson (Secretary - Department of Homeland Security), and have administrative offices located at 601 12th Street South, Arlington, VA 20598. United States of America is the

appropriate defendant under the Federal Tort Claims Act. This action is brought against the named individuals in their individual and in their official capacity. They were acting under color of state law during the events described in this Complaint.

## JURISDICTION AND VENUE

20.     This cause of action arises under the United States Constitution, particularly under the provisions of the First, Fourth and Fourteenth Amendments to the United States Constitution, and under the laws of the United States, particularly under the Civil Rights Act, Title 42 of the United States Code, Section 1983 and the laws of the state of Pennsylvania. Jurisdiction is conferred upon this court under the provisions of Title 28 of the United States Code, Sections 1331, 1334, 1343, 1346 and 1367 (a). The allegations in the Causes of Action below are examined under the First Amendment, the Fourth Amendment's prohibition on unreasonable seizures applicable to the States and individuals acting in their official and individual capacity by the Fourteenth Amendment of the United States Constitution, the Fourteenth Amendments guarantee of Due Process.

21.     This complaint is for money damages and punitive damages based upon civil rights violations committed by Federal and State officials contrary to the First, Fourth and Fourteenth Amendments to the United States Constitution. This action is authorized and instituted pursuant to Bivens v. Six Unknown Named Agents, 403 U.S. 388 (1971) and 42 U.S.C. § 1983. This Court has authority to award costs and attorney's fees pursuant to 42 U.S.C. § 1988 and 28 U.S.C. § 2412. Venue is proper pursuant to 28 USC Section 1391.

22.     The Plaintiff filed the appropriate Administrative Tort Claim under FTCA

to the TSA and the claim being denied.

23.    It is also submitted that the pendant jurisdiction of this Court is invoked over all State court claims in view of the common nucleus of operative facts as to all claims.

## FACTS COMMON TO ALL COUNTS

24.    Roger Vanderklok alleges and incorporates by reference thereto the averments set forth in Paragraphs Nos. 1-23 of the within Complaint as if more fully set forth herein.

25.    Mr. Vanderklok arrived at Philadelphia International Airport at around 8:00AM on January 26, 2013 for a flight to Miami, where he was scheduled to run a Marathon. He waited in line, presented his identification and proceeded to the screening area of the Security Checkpoint. His one bag contained running gear, his laptop, a heart-monitoring watch and some Power Bars. He took his shoes and his jacket off, took his laptop out of his bag, and put his things on the rollers and his items in the plastic containers for processing through the x-ray screening device.

26.    He proceeded through the screening device/metal detector without incident. The detector made no sound.

27.    A TSA official asked him to step to the side. Apparently, they saw the heart-monitoring watch and the Power Bars and thought they looked like the components of an explosive device. The TSA officials viewing the screen and handling his bag were talking about the watch and the case it was in. Mr. Vanderklok volunteered that it was just his heart-monitoring watch and they were welcome to look in the bag and at the watch.

28.    Mr. Vanderklok waited patiently. The TSA officials indicated that they

had to do "further testing" on the bag. Mr. Vanderklok acquiesced. Later, the TSA

officials started to ask Mr. Vanderklok about "organic material." Mr. Vanderklok stated

that they were free to look into his bag that contained "just [his] running stuff." They

continued to talk about "organic material" and swabbed something from the bag.

29.    Mr. Vanderklok had plenty of time before his flight departed and was not

overly concerned about the delay. He felt unsure of what the TSA officials were talking

about when they spoke of "organic materials." When Defendant Kieser walked up to

him, Mr. Vanderklok noticed that Kieser was agitated. Kieser was confrontational and

impolite; and he asked more questions about the "organic material." Contemplating

plants, fresh fruits, or fresh vegetables, Mr. Vanderklok did not think he had any "organic

material" in his bag. During this discussion, Mr. Vanderklok communicated that he

understood the TSOs had to do their jobs but assured Defendant Kieser that he was not a

threat.

30.    Eventually, the TSA officials located the Power Bars (wrapped in "Power

Bar" packaging) and indicated, out loud, that the Power Bars were the "organic material."

The TSA officials ran an "explosive trace detection test" on the Power Bars. That test

came back negative.

31.    Defendant Kieser got more agitated when Vanderklok stated that he did

not know a Power Bar was "organic material" and that someone should have simply told

him that wrapped food items were included in the definition of "organic materials."

32.    At no point during this time period was the Security Checkpoint closed

down. (See Exhibit "B"). Other passengers continued to proceed through the security

10

checkpoint and there was no disturbance at the Checkpoint.

33.     At no point during this time period did Mr. Vanderklok raise his voice, speak disrespectfully, flail or wave his hands or arms around. He did not point in Defendant Kieser's face.

34.     After Plaintiff's bags were checked by the TSA, Mr. Vanderklok told Defendant, Kieser, he wanted to file a Complaint and asked for a complaint form so that he could complete it and detail what he believed was inappropriate and aggressive behavior on the part of Defendant, Kieser.

35.     Due to this request, Defendant Kieser, after giving him his bag and the bag's contents back, called the Philadelphia Police and reported that Mr. Vanderklok, while getting bag checked, said that "anybody can bring a bomb and you wouldn't even know it." He simultaneously directed another TSA Agent to "watch" Mr. Vanderklok, who was putting his shoes on and re-packing his bag, until the Philadelphia Police arrived.

36.     Once the search of Plaintiff's bags revealed nothing, Plaintiff should have been released. Instead, because he exercised his First Amendment right to free speech, and said he wanted to file a Complaint against the TSA; defendant, Kieser, then knowingly made a string of untrue statements claiming Plaintiff made comments that he did not, knowing that it would result in an illegal seizure and arrest of Mr. Vanderklok.

37.     Defendant Raymond Pinckney was the first Officer to arrive at the Checkpoint. Without any investigation, he immediately told Mr. Vanderklok that he was under arrest and took Mr. Vanderklok into police custody.

38.     Defendants, Pinkney, Wojciechowski and Flaville, never watched the

11

videotaped of the incident which clearly showed there was no disruption or disturbance and would have verified the lack of probable cause even though Defendant Wojciechowski's office at the airport had the media capability to watch the video.

39.     Defendant, Kieser, made up the statements identified in paragraphs 7 thru 9 above after Plaintiff requested a complaint form.

40.     Defendants, Pinkney, Wojciechowski, Flaville failed to do their own investigation into probable cause which would have quickly shown that the statement by defendant Kieser were false.

41.     Defendants, Pinkney, Wojciechowski and Flaville, knew or reasonably should have known that the actions they took by arresting Plaintiff, when there were inconsistent statements made by Defendant Kieser, did not meet any element of any crime and would violate the constitutional rights of plaintiff.

42.     Defendants, Pinkney, Wojciechowski and Flaville, by arresting Plaintiff when there was no probable cause acted with malicious intent to cause the Plaintiff to be illegally detained and arrested.

43.     The City of Philadelphia is a governmental entity organized and existing under the laws of the Commonwealth of Pennsylvania. In turn, the City of Philadelphia is responsible for the development, operation, and supervision of the policing powers.

44.     The City of Philadelphia through its Police Department is responsible for setting policy, procedures and directives for the operation of its Police Officers and to ensure that policies, procedures and directives established are enforced for the exercise of their police duties; and, are responsible for the development and implementation of policies and procedures concerning the selection, evaluation, training and supervision of

individuals employed as police officers. This includes when and under what circumstances, an officer is permitted to detain or arrest a citizen.

45.    The City of Philadelphia by and through its Police Department has intact a series of policies and procedures that govern the actions of police officers regarding probable cause to arrest. While there are a variety of Policies/Protocols which dictate the actions of officers, all police officers who are employed as City of Philadelphia Police Officers are expected to follow the mandates promulgated within each and every Protocol.

46.    Defendants Pinckney, Wojciechowski and Flaville are officers of the City of Philadelphia Police Department assigned to Southwest Philadelphia and/or Philadelphia International Airport during the relevant time periods. In such capacity, Defendants Pinckney, Wojciechowski and Flaville are charged with the enforcement of the laws of the Commonwealth of Pennsylvania, in a fair, just and equitable manner consistent with the rights afforded all individuals by the Constitutions of the United States of America and the Commonwealth of Pennsylvania; and, were acting, at all times relevant hereto, under color of law and color of their authority as police officers of the City of Philadelphia.

47.    The City of Philadelphia through its Police Department had a policy, procedure and/or custom of blindly and without any investigation arresting people upon being called by a TSA agent. This custom was shown by the prior actions of the Philadelphia Police in the George (2:10-cv-00586) and Pellegrino (2:09-cv-5505) cases.

48.    The City of Philadelphia by and through but not limited to Police Commissioner Charles A. Ramsey and their Investigations and Homeland Security

Commissioner (responsible for the airport police) knew that their airport police had a policy, agreement, procedure and custom of rubber stamping detentions and arrests upon being notified by the TSA at the airport of an issue.

49.     Furthermore, the City of Philadelphia and Police Commissioner Charles A. Ramsey and their Investigations and Homeland Security Commissioner knew of the custom and policy of the airport police in failing to independently investigate for probable cause resulting in unconstitutional arrests and seizures as evidenced by the not guilty verdicts and subsequent lawsuits of <u>George v. United States, Pellegrino v. United States and Albani v. United States</u>[3] (in which Detective Wojciechowski was a defendant).

50.     Defendants, City of Philadelphia and TSA were aware of unlawful conduct in the past where airport police failed to investigate and determine probable cause after being notified by TSA of an incident and as such the relevant policy makers failed to take precautions against future violations which led to the violation of Plaintiff's constitutional and civil rights.

51.     Defendants, United States of America, TSA, Kieser, and Pistole knew about this policy, procedure, agreement and custom of the Philadelphia Airport Police to detain, arrest and seize anyone that TSA called about and as such contributed to the deprivation of Plaintiff's constitutional rights to be free from unreasonable and unfounded searches and seizures.

52.     The City of Philadelphia should have had established or enforced established policies, procedures and/or guidelines concerning the nature of the conduct

---

[3] Some of these cases were dismissed on immunity issues or failure to adequately plead and are distinguishable from Plaintiff's case. However, in all of the cases, the airport police used the same custom by arresting people at the airport upon notice from TSA of an issue, whether true or not, and without probable cause thereby violating their constitutional rights.

and interaction of any Police Officer has with any individual in the discharge of their

duties; and, in particular, in the manner in which incidents are investigated; when

individuals are to be taken into custody and or arrested; when arrests should be made, and

when probable cause to arrest exists. Additionally, policies, procedure and/or guidelines

exist or should have existed concerning the review and supervision of the actions of

individual officers to insure that they were conforming to established Police Department

policies, procedures and/or guidelines and were discharging their duties in an appropriate

and lawful manner.

53.     Specifically, The City should have communicated to Philadelphia

Police Department officers assigned to the Airport the following:

> Investigative detentions may be made only on reasonable
> suspicion of criminal conduct and any arrest must be based on
> probable cause. A referral by TSA agents is not grounds for
> arrest unless an officer makes a judgment of probable cause;
> similarly, referral by TSA agents is not grounds for detention
> unless an officer makes a judgment that there is reasonable
> suspicion of criminal conduct. Any detentions or arrests should
> be documented on appropriate police paperwork consistent with
> PPD Directives.

54.     In fact, this policy and procedure was put into effect as a result of the

unconstitutional custom or agreement of the police to not independently investigate

probable cause after being called by the TSA agent.

55.     The City of Philadelphia through its Police Department should have

ensured that the established policies and procedures that are outlined in the Philadelphia

Police Department Procedures/Protocols were being followed. Alternatively, if such

Policies/Protocols were not being followed by Officers during the exercise of their

official duties, appropriate disciplinary action should have been taken by the City of

Philadelphia against the specific officers found to be in noncompliance.

56.     The failure by the City of Philadelphia to ensure that the established policies and procedures found in the Philadelphia Police Department Order were being followed by all Officers during the discharge of their official duties rendered the policies and procedures "window dressing," and demonstrates a deliberate indifference by the City of Philadelphia Police Department to thwart the custom or practice of officers' noncompliance of the noted Procedures/Protocols, and therein resulting in the violation of the constitutional rights ensured to the citizens of the City of Philadelphia, such as the Plaintiff, and other individuals referenced herein.

57.     On or about January 26, 2013, Officers Pinckney and Detective Wojciechowski were on duty as Philadelphia Police Officers. They should have known or had the ability to learn the elements of the relevant crimes.

58.     The City of Philadelphia, TSA, Pistole, Johnson and the United States of America and Officer Pinckney and Detective Wojciechowski and Defendant Flaville should not have entered into any agreement or established a custom that, if the TSA wants someone taken into custody and arrested, the Philadelphia Police Department would take that person into custody without doing their own investigation into probable cause. The Philadelphia Police should not have allowed the comment of a TSA Supervisor alone to replace their independent evaluation of whether there was probable cause or the need to detain plaintiff.

59.     Defendant Pinckney, in taking Mr. Vanderklok into custody, did so without probable cause. Even taking the words of Defendant Kieser as true (which they were not), there is no probable cause to believe that any offense/crimes code violation

had occurred and there was no exigent reason for detention of Mr. Vanderklok. Instead of evaluating the situation and acting properly, defendant Pinckney took away Mr. Vanderklok's liberty based on Kieser's identification of him as a person who said something completely non-criminal about what "anybody" could do without Kieser "knowing." Defendant Pinkney did not ask if the bag was searched. He did not inquire as to whether the passenger had created a disturbance. He did not ask if the screening devices found anything unusual in Mr. Vanderklok's belongings. He did nothing other than to take Mr. Vanderklok into custody.

60.     The video footage clearly establishes that there was no commotion, no disturbance, no interruption of Airport business occurring at any point – and certainly not when Officer Pinckney arrived. Nothing like that was reported to Officer Pinckney. The actual words spoken by Mr. Vanderklok stating he wanted to file a Complaint undeniably do not establish probable cause. The alleged words of Mr. Vanderklok, reported by Charles Kieser, do not come close to establishing probable cause to arrest for any of the crimes charged – or any other crimes. The words reported - "anybody can bring a bomb and you wouldn't even know it" – would more appropriately be categorized as an insult to the TSA Supervisor than a threat to anyone's safety. No other passenger heard the alleged statement and no other witness, TSA or otherwise, came forward. And the words alleged to have been spoken were spoken after the TSA officials knew that the watch was just a watch (and not a component to an explosive devise).

61.     When he arrived at the checkpoint, Defendant Pinkney immediately took Mr. Vanderklok into custody and informed him that he was under arrest. Pinkney went on to prepare two documents – a "75-48" and a "Uniform Police Memo to S.W.D.D." (See

Exhibit "A"). It is clear from these documents that the only information Defendant

Pinckney had when he arrested Mr. Vanderklok was the information provided by Charles

Kieser. It is not clear if he even had first-hand information or if he was acting on

hearsay. No other witnesses are named. No other evidence – direct or circumstantial – is

mentioned. No other investigation is performed. No other witnesses are sought out or

interviewed. In both police reports, Defendant Pinkney indicates that he spoke only to

Defendant Kieser. The reports indicate that the Officer made the arrest at the time he

arrived at the Security Checkpoint.

62.     In the report, there is a line that reads: "Details of Arrest (What you did in

the investigation or arrest; be precise as to details!)." Under that, Police Officer Pinckney

wrote:

"TSA Supervisor Kieser called Police and stated Passenger was getting his carry on bag
checked and said Anybody can bring a bomb and you wouldn't even know it. Police took
passenger to H.Q. for further investigation. "

63.     These details of arrest do not rise to the level of any crime, including those

Plaintiff was charged and acquitted of.

64.     After handcuffing Mr. Vanderklok, Defendant Pinkney walked him to an

elevator, which they rode to a basement cell-room. He took Mr. Vanderklok's

belongings, including his bag, its contents, his phone, and his belt. Mr. Vanderklok sat,

locked in that cell, for hours. There was no "further investigation" done.

65.     Officer Pinkney began the paperwork that led to the charging of Plaintiff

with baseless and unsubstantiated crimes.

66.     Mr. Vanderklok was then led outside to a police/TSA vehicle and

transported, with his hands cuffed behind his back, to a Philadelphia Police District

where he was thrown in another cell.  Aside from hearing things about being sent to "Guantanamo," Mr. Vanderklok also overheard a conversation amongst Defendant Wojciechowski and other Police Personnel where they were talking about making sure they got "the right A.D.A." to review their case to assure that they got approval for the criminal charges they wanted brought against Mr. Vanderklok.  No one from the FBI, NSA, JTTF, or any other federal or local agency questioned Mr. Vanderklok.  No one seemed concerned that he might be dangerous – most likely because it was abundantly clear that he was not.  In fact, that was abundantly clear before Defendant Kieser called the Philadelphia Police.

67.     Mr. Vanderklok was held in that cell room for many more hours.  He was fingerprinted and photographed by Police like a criminal.  Almost 24 (twenty four) hours passed before he got released from custody.

68.     Based on the false statements of Defendant Kieser, the improper and illegal arrest and detention by the Philadelphia Police Defendants, their ridiculous decision to charge Mr. Vanderklok and the influence/manipulation they exerted over the prosecuting agency to get those charges approved, Mr. Vanderklok had $40,000.00 bail set on him.  He was forced to post bond, hire counsel, and be subject to, among other things, travel restrictions.

69.     As a direct and proximate result of the actions of the Defendants, Roger Vanderklok has sustained emotional and psychological difficulties; he sustained a loss of earnings and his earning power may have been permanently impaired; he sustained other injuries, losses and damages. He has experienced grief, anxiety, sleeplessness and nervousness. He has incurred and may hereafter incur expenditures for medical care,

drugs, and kindred expenditures.

70. Defendants, Pinckney, Wojciechowski and Flaville initiated criminal proceedings against Plaintiff by affirming affidavits of probable cause; the criminal trial resulted in a Judgment of Acquittal in Plaintiff's favor; there was no probable cause for any of the charges; the defendants acted with malice and a purpose other than to bring plaintiff to justice and as a result the plaintiff suffered a deprivation of liberty.

71. Defendants, Pinckney, Wojciechowski and Flaville, initiated criminal proceedings against Plaintiff without probable cause because none of the alleged statements ("anybody could bring a bomb and you wouldn't even know it to, I could bring a bomb through here any day of the week and you would never find out, to Let me tell you something- I'll bring a bomb through here any day that I want...you'll never find it) alleged by defendant Kieser amount to probable cause for any element of the crimes of disorderly conduct, terroristic threats or threatening the placement of a bomb.

72. At trial, the first opportunity the Court had to evaluate whether probable cause existed, the court entered a Judgment of Acquittal after the prosecution's case. (See Transcript attached as Exhibit "E").

73. The defendants, Pinckney, Wojciechowski, Flaville and Kieser, acted maliciously and in retaliation for Plaintiff stating he wanted to file a Complaint and asking for a complaint form with no purpose other than to falsely charge and arrest plaintiff.

74. The result was the plaintiff suffered a deprivation of his liberty by being held for almost 24 hours, loss of the cost of his plane ticket to Florida, expense of bail and the restriction imposed by bail such as no traveling for over 2 months.

75.    The City of Philadelphia, United States of America and the TSA failed to have established and/or enforced established policies, procedures and/or guidelines concerning the nature of the conduct and interaction any Police Officer/TSA Agent has with any individual in the discharge of their duties; and, in particular, in the manner in which incidents are investigated; when Police are to be called, when individuals are to be taken into custody and or arrested; when probable cause has been established including the use of a TSA Supervisor's statements. Additionally, it failed to enforce policies, procedure and/or guidelines which existed or should have existed concerning the review and supervision of the actions of individual officers to insure that they were conforming to established policies, procedures and/or guidelines and were discharging their duties in an appropriate and lawful manner.

76.    The City of Philadelphia, United States of America and the TSA should have ensured that their established policies and procedures that are outlined in their Procedures/Protocols were being followed. Specifically, they should have ensured that their procedures/protocols were being followed by all individuals employed by them. Alternatively, if such Policies/Protocols were not being followed by officers/agents during the exercise of their official duties, appropriate disciplinary action should have been taken by the Defendants against the specific officers/agents found to be in noncompliance. The failure by the City of Philadelphia Police Department to ensure that the established policies and procedures were being followed by all officers/agents during the discharge of their official duties rendered the policies and procedures "window dressing," and demonstrates a deliberate indifference by the Defendants to thwart the custom or practice of officers' or agents' noncompliance of the Order, and therein

resulting in the violation of the constitutional rights ensured to the citizens of the City of Philadelphia, such as the Plaintiff.

77.     The City of Philadelphia, United States of America, and the TSA failed to have established and/or enforced established policies, procedures and/or guidelines concerning the nature of the conduct and interaction any officer/agent has with any individual in the discharge of their duties; and, in particular, in the manner in which incidents are investigated; when Police are to be called; when individuals are to be taken into custody and or arrested; when probable cause has been established. Additionally, it failed to enforce policies, procedure and/or guidelines which existed or should have existed concerning the review and supervision of the actions of individual officers to insure that they were conforming to established policies, procedures and/or guidelines and were discharging their duties in an appropriate and lawful manner.

78.     The City of Philadelphia, United States of America and the TSA should have ensured that the established policies and procedures that are outlined in their guidelines were being followed. Alternatively, if such Policies/Protocols were not being followed by officers/agents during the exercise of their official duties, appropriate disciplinary action should have been taken by the Defendants against the specific officers/agents found to be in noncompliance.

79.     The City of Philadelphia, United States of America and the TSA had a policy, procedure, agreement and at the very least had established a custom whereby police officers would arrest any person that TSA called them about, without independently establishing whether probable cause existed thereby violating their constitutional rights.

80.     The errors, omissions and failures of the City of Philadelphia were the direct or proximate cause that allowed the false arrest, unlawful seizure, and illegal detention of Roger Vanderklok in violation of the rights and immunities guaranteed to him by the First, Fourth, and Fourteenth Amendments of the United States Constitution to have occurred.

81.     The errors, omissions and failures of the City of Philadelphia were the direct or proximate cause that allowed the false arrest, unlawful seizure, and illegal detention of Roger Vanderklok in violation of the rights and immunities guaranteed to him by the First, Fourth, and Fourteenth Amendments of the United States Constitution to have occurred.

82.     The errors, omissions and failures of Raymond Pinckney in his official capacity were the direct or proximate cause that allowed the false arrest, unlawful seizure, and illegal detention of Roger Vanderklok in violation of the rights and immunities guaranteed to him by the First, Fourth, and Fourteenth Amendments of the United States Constitution to have occurred.

83.     The errors, omissions and failures of Detective M. Wojciechowski in his official capacity in his official capacity were the direct or proximate cause that allowed the false arrest, unlawful seizure, and illegal detention of Roger Vanderklok in violation of the rights and immunities guaranteed to him by the First, Fourth, and Fourteenth Amendments of the United States Constitution to have occurred.

84.     The errors, omissions and failures of the Kenneth Flaville in his official capacity were the direct or proximate cause that allowed the false arrest, unlawful seizure, and illegal detention of Roger Vanderklok in violation of the rights and

23

immunities guaranteed to him by the First, Fourth, and Fourteenth Amendments of the United States Constitution to have occurred.

85.     The errors, omissions and failures of the Defendants, Kieser and TSA, were the direct or proximate cause that allowed the false arrest, unlawful seizure, and illegal detention of Roger Vanderklok in violation of the rights and immunities guaranteed to him by the First, Fourth, and Fourteenth Amendments of the United States Constitution to have occurred.

86.     Defendant, Kieser, set about the process of initiating criminal proceedings against Plaintiff by retaliating against him for utilizing his first amendment rights by stating he wanted to file a complaint against Kieser and the TSA and asking for a complaint form to fill out.

87.     As a result, Defendant Kieser, began telling untruths (that plaintiff stated "anybody could bring a bomb in here and you wouldn't even know it") and making up information with the purpose to have plaintiff arrested and deprived of his liberty knowing Plaintiff never made these statements, resulting in a criminal trial where the court entered a Judgment of Acquittal in Plaintiff's favor.

88.     Defendant, Kieser, knew because of the policy, agreement, procedure and custom between the TSA and the Philadelphia Police Department that once he called the police, Plaintiff would be arrested.

89.     Furthermore, there was no probable cause for any of the charges against Plaintiff and said defendants, Kieser, Pinkney, Wojciechowski and Flaville acted with malice and a purpose other than to bring plaintiff to justice and as a result the plaintiff suffered a deprivation of liberty.

90.     Plaintiff exercised free speech when he stated he wanted to make a complaint and asked for a complaint form to complain about defendant Kieser's attitude and conduct.  Although, Plaintiff denies saying "anybody could bring a bomb in here" and pointing his finger, these statements and expressive conduct would also be considered protected free speech.

91.     As a result of Plaintiff utilizing his First Amendments rights, defendants, Kieser and TSA had Plaintiff arrested because of his speech and/or gestures and as such this action would clearly deter an ordinary person from exercising his or her right.

92.     As a result of Plaintiff utilizing his First Amendments rights, defendants, Pinkney, Wojciechowski and Flaville had Plaintiff arrested without probable cause because of his speech and/or gestures and as such this action would clearly deter an ordinary person from exercising his or her right.

93.     Due to Kieser's untrue statements about Plaintiff using the word bomb and becoming irate, Kieser played a role in the protracted seizure of Plaintiff.

94.     Defendant Kieser's conduct and untrue statements about Plaintiff's words and actions can only by motivated by evil motive or intent and it involves reckless or callous indifference to the federally protected rights of Plaintiff.

95.     The TSA and the United States adopted and implemented a policy, procedure, and custom with the Philadelphia Police whereby whenever the TSA called the police, the person at issue would be arrested, regardless of probable cause and as a result violating the individual's constitutional right to be free from false arrest and seizure.

96.     The errors, omissions and failures of the United States Of America were

the direct or proximate cause that allowed the false arrest, unlawful seizure, and illegal detention of Roger Vanderklok in violation of the rights and immunities guaranteed to him by the First, Fourth, and Fourteenth Amendments of the United States Constitution to have occurred.

97.    The errors, omissions, falsehoods and failures of Charles Kieser in his official capacity were the direct or proximate cause that allowed the false arrest, unlawful seizure, and illegal detention of Roger Vanderklok in violation of the rights and immunities guaranteed to him by the First, Fourth, and Fourteenth Amendments of the United States Constitution to have occurred.

98.    Defendants, TSA, United State of America, Kieser and Pistole were acting under color of state law since they had "police power" to detain and search.

99.    Defendant Kieser acting under color of state law when he knowingly, intentionally and with reckless disabandonment made up a string of untruths to intentionally have Plaintiff arrested, including stating that Plaintiff said "Anybody can bring a bomb and you wouldn't even know it to" to changing his story to Plaintiff stating "I could bring a bomb through here any day of the week, and you would never know it" to at trial stating Plaintiff said "Let me tell you something-I'll bring a bomb trough here any day that I want.. you'll never find it.)" These statement each getting more threatening show willful conduct on the part of defendant Kieser to make up a story to fit the elements of a crime so that Plaintiff would be arrested, prosecuted and sentenced.

100.   Defendant, Pinkney,Wojciechowski and Flaville, should have recognized immediately that there was an inconsistency in Kieser's story and that his description did not meet any elements of any crime, including disorderly conduct. Instead, they willfully

ignored this inconsistency and arrested and confine Plaintiff with the intent he be charged and prosecuted even knowing there was no probable cause for his arrest.

101.    Defendants, Pinckney, Wojciechowski and Flaville, are not entitled to qualified immunity under state law because they acted with willful misconduct with the intent to imprison, arrest and charge Plaintiff when they arrested him without probable cause.

102.    At all times relevant hereto, the named Defendants were acting under color of state law.

103.    At all times relevant whereto, the Defendants were acting directly or through their agents, servants and employees.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF:

Unconstitutional Search and Seizure – Fourth Amendment to the U.S. Constitution,

§1983, and Bivens

104.    The detention, arrest, unnecessary and extended restraint, incarceration of the Plaintiff by the Defendants, as described in paragraphs 1-103, constituted an unreasonable search and seizure in violation of clearly established rights under the Fourth and Fourteenth Amendments to the United States Constitution.

### SECOND CLAIM FOR RELIEF:

Unconstitutional Infringement of the Freedom of Speech – First Amendment to the

U.S. Constitution, § 1983, and Bivens

105.    The detention, arrest, unnecessary and extended restraint, incarceration,

and search of the Plaintiff by the Defendants on the basis of the alleged non-criminal, non-threatening, non-suspicious words of the Plaintiff, as described in paragraphs 1-104, infringed Plaintiff's freedom of speech and constituted unconstitutional retaliation in violation of clearly established rights guaranteed by the First and Fourteenth Amendments to the United States Constitution.

### THIRD CLAIM FOR RELIEF:

#### False Arrest

106.   Plaintiff's detention and arrest without probable cause or any other lawful grounds, as described in paragraphs 1-105, constitute the tort of false arrest under the laws of the Commonwealth of Pennsylvania and the Federal Tort Claims Act.

107.   Defendants, Kieser, Pinkney, Wojciechowski, Flaville, City of Philadelphia, TSA and the United States of America are liable for these actions.

### FOURTH CLAIM FOR RELIEF:

#### False Imprisonment

108.   Plaintiff's detention and imprisonment without probable cause or any other lawful grounds, as described in paragraphs 1-107, constitute the tort of false imprisonment under the laws of the Commonwealth of Pennsylvania and the Federal Tort Claims Act.

109.   Defendants, Kieser, Pinkney, Wojciechowski, Flaville, City of Philadelphia, TSA and the United States of America are liable for these actions.

### FIFTH CLAIM FOR RELIEF:

#### Battery and Assault

110.   The handcuffing, pat-down and other unauthorized contacts with

28

Plaintiff's person, as well as the imminent apprehension of such unauthorized contacts, as described in paragraphs 1-109, constitute the torts of battery and assault under the laws of the Commonwealth of Pennsylvania and the Federal Tort Claims Act, Defendants, Kieser, Pinkney, Wojciechowski, Flaville , City of Philadelphia, TSA and the United States of America are liable for these actions.

## SIXTH CLAIM FOR RELIEF

### Monell Claims

111.    Plaintiff alleges and incorporates by reference thereto the averments set forth in Paragraphs Nos. 1-110 of the within Complaint as if more fully set forth herein.

112.    The policy, procedure and custom of Defendant TSA and the City of Philadelphia to detain any person the TSA called the Philadelphia Police Department about without an independent investigation or determination of probable cause resulted in the detention, incarceration, and search of the Plaintiff by the Defendants on the basis of the alleged non-criminal, non-threatening, non-suspicious words of the Plaintiff, as described in paragraphs 1-111, infringed Plaintiff's freedom of speech and constituted unconstitutional retaliation in violation of clearly established rights guaranteed by the First and Fourteenth Amendments to the United States Constitution.

113.    The Defendant, City of Philadelphia, failed to adequately train, supervise and/or discipline its employees or agents in the performance of their duties and/or undertook actions which  were improper or illegal and demonstrated indifference to the constitutional rights of Individuals, such as Roger Vanderklok.

114.    The Defendant, City of Philadelphia, had policies and/or customs in place

29

and/or failed to insure that policies, procedures and protocols which existed were properly enforced and personnel supervised in the performance of their duties that enabled their employees, servants or agents to act with deliberate indifference to the constitutional rights of individuals, such as Roger Vanderklok.

115. The Defendant, City of Philadelphia, failed to develop and implement policies, procedures and protocols that then enabled their employees and agents to act with deliberate indifference to the constitutional rights of individuals, such as Roger Vanderklok.

116. The Defendant, City of Philadelphia, has established policies and procedures to act as a safeguard against constitutional infractions and restraints upon officers/agents affecting the detention and arrests of citizens.

117. Defendant, the City of Philadelphia, should have trained their airport officers to:

> Investigative detentions may be made only on reasonable suspicion of criminal conduct and any arrest must be based on probable cause. A referral by TSA agents is not grounds for arrest unless an officer makes a judgment of probable cause; similarly, referral by TSA agents is not grounds for detention unless an officer makes a judgment that there is reasonable suspicion of criminal conduct. Any detentions or arrests should be documented on appropriate police paperwork consistent with PPD Directives.

118. Within this action, the conduct of Defendant, City of Philadelphia, were violative of the policies and procedures promulgated by the Defendant, City of Philadelphia, and the rights and privileges guaranteed to the Plaintiff by the Constitution of the United States and the Constitution of the state of Pennsylvania. Said rights, privileges and immunities include the right to body integrity; the right to exercise

30

freedom of speech; the right to be free from the use of excessive fore; the right to be free from unreasonable seizures and searches.

119.    The acts of the Defendant, City of Philadelphia, were done with the purpose and intent of depriving Roger Vanderklok of his rights secured to him by the First, Fourth and Fourteenth Amendments to the United States Constitution.

### SIXTH CLAIM FOR RELIEF:

PA State Malicious Prosecution and § 1983 Malicious Prosecution

120.    Plaintiff's detention, imprisonment, arrest and criminal prosecution without probable cause or any other lawful grounds constituted the tort of malicious prosecution under the laws of the Commonwealth of Pennsylvania and Section 1983. Plaintiff alleges and incorporates by reference thereto the averments set forth in Paragraphs Nos. 1-119 of the within Complaint as if more fully set forth herein.

121.    Under the Federal Tort Claims Act and the law of the Commonwealth of Pennsylvania, Defendants, Kieser, Pinkney, Wojciechowski, Flaville, City of Philadelphia, TSA and the United States of America are liable for these actions.

122.    The defendants initiated criminal proceedings against Plaintiff without probable cause because none of the statements ("anybody could bring a bomb and you wouldn't even know it to, I could bring a bomb through here any day of the week and you would never find out, to Let me tell you something- I'll bring a bomb through here any day that I want...you'll never find it) made by defendant Kieser amount to probable cause for any element of the crimes of disorderly conduct, terroristic threats or threatening the placement of a bomb.

31

123. Additionally, the only statement made by Plaintiff in stating he wanted to file a Complaint about how he was treated and asking for a form, is clearly not a crime.

124. At trial, the court entered a Judgment of Acquittal, after the prosecution rested, on the charges of disorderly conduct, terroristic threats or threatening the placement of a bomb.

125. The defendants acted maliciously and in retaliation for Plaintiff asking for a Complaint with no probable cause or purpose other than to falsely charge and arrest plaintiff.

126. The maliciousness of making up the untrue statements about the bomb and attributing them to Plaintiff was for plaintiff to be wrongly and unjustly charged without probable cause and prosecuted for disorderly conduct, terroristic threats or threatening the placement of a bomb.

127. The result was the plaintiff suffered a deprivation of his liberty by being held for almost 24 hours, loss of the cost of his plane ticket to Florida, bail and the restriction imposed by bail such as no traveling for over 2 months.

### SEVENTH CLAIM FOR RELIEF:

PA State Retaliatory Prosecution and § 1983 Retaliatory Prosecution

128. Plaintiff's detention, imprisonment, arrest and criminal prosecution without probable cause or any other lawful grounds constituted the tort of retaliatory prosecution under the laws of the Commonwealth of Pennsylvania and Section 1983. Plaintiff alleges and incorporates by reference thereto the averments set forth in Paragraphs Nos. 1-127 of the within Complaint as if more fully set forth herein.

128.    Under the Federal Tort Claims Act, Defendant United States of America is liable for these actions. The TSA officials were "state actors" in that the Police and the TSA have a pre-approved plan and the Police routinely take into custody anyone identified by the TSA without independently evaluating the presence of probable cause.

129.    Under the Federal Tort Claims Act and the law of the Commonwealth of Pennsylvania, Defendants, Kieser, Pinkney, Wojciechowski, Flaville, City of Philadelphia, TSA and the United States of America are liable for these actions.

### EIGHTH CLAIM FOR RELIEF:

Violation Of Plaintiff's Fourteenth Amendment Rights

130.    Plaintiff alleges and incorporates by reference thereto the averments set forth in Paragraphs Nos. 1-128 of the within Complaint as if more fully set forth herein.

131.    Defendants' actions errors and omissions, as more fully described in the factual section of the within complaint, constituted violations of Plaintiff's rights, privileges and immunities, as secured by the Fourteenth Amendment to the United States Constitution. Said rights, privileges and immunities include the right to due process and equal protection of the law which encompasses his right to body integrity; the right to be free from the use of excessive force; the right to be free from unreasonable seizures and searches; and the prohibitions against arrests, detentions, and prosecutions based on fabricated evidence.

132.    The acts of the Defendants were done with the purpose and intent of depriving Plaintiff of his rights secured to him by the Fourteenth Amendment to the United States Constitution.

133.    The acts of the Defendants, as set forth in this complaint, were done

willfully, maliciously and/or with a callous disregard and reckless indifference to and

disregard of the rights, immunities and privileges guaranteed to Roger Vanderklok by the

Fourteenth Amendment to the United States Constitution.

134.    Under the Federal Tort Claims Act, Defendant United States of America is

liable for these actions.


## PRAYER FOR RELIEF

WHEREFORE, Roger Vanderklok asks for the entrance of judgment against the

Defendant as follows:

(a) Compensatory damages in an amount to be determined at trial;

(b) Punitive damages in an amount to be determined at trial as to all Defendants except

the United States of America and the City of Philadelphia;

(c) Reasonable attorneys' fees and costs of suit;

(d) Prejudgment and postjudgment interest; and

(e) Such other relief as the Court deems appropriate and just.

**FILED**

MAY 27 2015

MICHAEL E. KUNZ, Clerk
By_____ Dep. Clerk


## PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE

Respectfully submitted by:

/s/ Thomas B. Malone
Thomas B. Malone, Esquire
PA. ID No. 77291
The Malone Firm, LLC
1650 Arch St., Su. 1903
Philadelphia, PA 19103

EXHIBIT "A"



# DISCOVERY COVER SHEET
# Philadelphia Police Department

DA Office Copy

**DC Number:** 2013-77-000457                                    Printed: 2/13/2013 14:20
**Docket Number(s):**
**Next Court Date:**                                              Court Room:
**Case Subject:** Bomb Scare at 8800 ESSINGTON AVE on 01/26/2013
**Assigned Investigator:** WOJCIECHOWSKI, MICHAEL (PR# 219667, # 9065)
**Approving Supervisor:** DOERR, GREGORY (PR# 241410, # 8667)     Discovery Approved On: 2/13/2013 11:22
**Assigned Unit:** 6500

| Defendant Name(s) | PID | Arrest Date |
|---|---|---|
| VANDERKLOCK, ROGER | 1133394 | 1/26/2013 8:20 |

## ENCLOSED REPORTS
### Case Reports:
☑ 2013-77-000457.1 Investigation Report (75-49) Bomb Scare at 8800 ESSINGTON AVE on 01/26/2013
### Interviews:
☑ TSA STATEMENT
☑ ARREST MEMO
☐ _____
### Attachments:
☑ Arrest Report Arrest Report for ROGER B B VANDERKLOCK 01272013
☑ Incident Report 48
☑ Other Attachments 229
### Other Enclosures:
☐ Seizure Analysis
☐ Ballistics Report
☐ Certificate of Non-Licensure
☐ _____
☐ _____
☐ _____

| Needed For Court: | | |
|---|---|---|
| Court Reason | Entity Information | Contact Information |
| Victim | KIESER, CHARLES ~~████████████~~ | |
| Arresting Officer | PINKNEY, RAYMOND (PR# 201083, # 4718)<br>Vacation:<br>7/26/2013 - 8/14/2013<br>Vacation:<br>2/21/2013 - 2/21/2013 | 7700, 1C |

DA'S OFFICE REPRESENTATIVE _____    Date_____

DEFENSE COUNSEL _____    Date _____

| **Philadelphia Police Department Investigation Report** | **A - Approved** |
|---|---|
| DC Number  2013-77-000457 | Page 1 of 3 |
| Report No  2013-77-000457.1 | |
| Report Date  2/12/2013 1:17:12 PM | |
| Report Type  Investigation Report (75-49) | |

**Unit Control#:**

| | | | | |
|---|---|---|---|---|
| Classification | 0809 - ASSAULT TERRORIST THREATS | | Occurred On | 1/26/2013 8:20:00 AM |
| Previous Classification | 3128 - BOMB SCARE | | Reported On | 1/26/2013 8:26:13 AM |
| Location of Occurrence | 8800 Easington Ave | | Disposition / Status | 2 - Arrest |
| Dist/Sect of Occurrence | 77th District Sector A | | Clearing Unit | 7700 - Airport District |
| Responding Officer | P/O RAYMOND PINKNEY (PR 201083 / #4718) | | Investigating Officer | Det MICHAEL WOJCIECHOWSKI(PR 219667/ #9065) |
| Assisted By | | | Dist/Unit Preparing | 6500 - Southwest Detective Division |
| Related Cases | | | | |

**Report Approval**

| | | | |
|---|---|---|---|
| Completed | 2/12/2013 1:17:12 PM | | Det MICHAEL WOJCIECHOWSKI (PR 219667 / #9065) |
| Approved | 2/12/2013 2:36:51 PM | | Sgt GREGORY DOERR (PR 241410 / #8667) |

**Report Summary**

ROGER VANDERKLOCK WAS ARRESTED FOR THREATENING TO BRING A BOMB TO THE AIRPORT.

**Classification Detail: 0809 - ASSAULT TERRORIST THREATS**

| | | | | |
|---|---|---|---|---|
| Location | 098 - Airport | | No. Prem Entered | |
| Offense Completed? | YES | Using | Entry Method | |
| Hate/Bias | None (No Bias) | Criminal Activity | Type Security | |
| Domestic Violence | NO | Weapons/Force | Tools | |

**Victim / Complainant V1: KIESER, CHARLES**

| | | | | |
|---|---|---|---|---|
| Address | | DOB | Officer Payroll # | |
| CSZ | | Age / Race / Sex | 39 / White / Male | District / Unit | |
| Home Phone | | Ethnicity | Not of Hispanic Origin | SSN | |
| Cell Phone | | Occupation/Grade | SCREENING OFFICER | OLN | |
| Beeper | | Employer/School | TSA | OLN State / Country | / |
| Email | | Emp/Sch Address | 2 International Pz, Ste 640 | Injury | |
| Work Phone | | Emp/Sch CSZ | Philadelphia, PA  19113 | Circumstances | |
| Found Date | | Found Location | | Reason for Absence | |
| Reason for Cancellation | | Found City | | | |
| PCIC/NCIC Notification | | | | | |
| Victim Notes | | | | | |

**Interview Section**

| | | | |
|---|---|---|---|
| Interview Date | | Interviewed By | (PR / #) |
| Interview Location | | Others Present | 75-483 Completed |

Interview Summary    THE COMPLAINANT STATED THAT HE IS A SCREENING SUPERVISOR FOR THE TSA. ON 1/26/13, HE WAS WORKING AT THE B TERMINAL SECURITY CHECKPOINT OF THE PHILADELPHIA INTERNATIONAL AIRPORT. AT APPROXIMATELY 8:15 AM, ONE OF HIS OFFICERS BEGAN DEALING WITH A PASSENGER WHO WAS BECOMING IRATE.

HE CHECKED THE X-RAY IMAGE AND SAW SEVERAL ANOMALIES WHICH APPEARED TO BE COMPONENTS OF A PIPE BOMB. AFTER THE PASSENGER BECAME LOUD TOWARDS THE SCREENING OFFICER, THE COMPLAINANT WENT TO TRY AND CALM THE SITUATION. THE COMPLAINANT EXPLAINED WHAT THEY WERE LOOKING FOR AND WHY THE BAG HAD TO BE CHECKED. THE PASSENGER (THE DEFENDANT)
THEN STATED, " I COULD BRING A BOMB THROUGH HERE ANY DAY OF THE WEEK, AND YOU WOULD NEVER KNOW IT."
THE BAG CHECK WAS COMPLETED AND NO TRACES OF EXPLOSIVES WERE FOUND. THE POLICE WERE NOTIFIED OF THE REMARK, AND THE DEFENDANT WAS WATCHED UNTIL THE OFFICERS ARRIVED.
THE COMMENT WAS MADE IN A PUBLIC AREA WITH SEVERAL OTHER PASSENGERS NEARBY.
SINCE THE PASSENGER'S BAG HAD ALREADY BEEN THOROUGHLY CHECKED, THERE WAS NO EVACUATION OF THE AREA.

**Property**

| Description | | | Reported Value | Recovered Value |
|---|---|---|---|---|
| | | TOTAL | $0 | $0 |

NetRMS_CR.rtf v2f

Printed For:
Printed: February 13, 2013 - 2:20 PM

| **Philadelphia Police Department Investigation Report** | **A - Approved** |
|---|---|
| DC Number  2013-77-000457 | Page 2 of 3 |
| Report No  2013-77-000457.1 | |
| Report Date  2/12/2013 1:17:12 PM | |
| Report Type  **Investigation Report (75-49)** | |

### Witness W1: P/O RAYMOND PINKNEY (PR 201083 / #4718)

| | | | | | |
|---|---|---|---|---|---|
| Address | | DOB | | Officer Payroll # | 201083 |
| CSZ | | Age / Race / Sex | / / | District / Unit | 7700 - Airport District |
| Home Phone | | Ethnicity | | SSN | |
| Cell Phone | | Occupation/Grade | | OLN | |
| Beeper | | Employer/School | Philadelphia Police | OLN State / Country | / |
| | | | Department | | |
| Email | | Emp/Sch Address | One Franklin Sq | | |
| Work Phone | 215 686-1776 | Emp/Sch CSZ | Philadelphia, PA 19106 | | |
| Witness Notes | | | | | |

**Interview Section**

| | | | |
|---|---|---|---|
| Interview Date | | Interviewed By | (PR / #) | 75-483 Completed |
| Interview Location | | Others Present | |
| Interview Summary | P/O PINKNEY RESPONDED TO THE CHECKPOINT AND WAS MET BY THE COMPLAINANT. AFTER THE FACTS WERE RELATED TO THE OFFICER, OFFICER PINKEY TOOK THE DEFENDANT TO THE AIRPORT UNIT HQ FOR FURTHER INVESTIGATION. | | |

### Arrestee A1: VANDERKLOCK, ROGER B

| | | | | | |
|---|---|---|---|---|---|
| AKA | | DOB | 4/13/1956 | SSN | 2-70-7668 |
| Alert(s) | | Age / Race / Sex | 56 / White / Male | OLN | |
| Address | 834 Chestnut St Apt Ph117 | Ethnicity | Not of Hispanic Origin | OLN State / Country | / United States of America |
| CSZ | Philadelphia, PA 19107 | Place of Birth | | Build | |
| Home Phone | | Occupation/Grade | | Scars/Marks/Tattoos | |
| Cell Phone | | Employer/School | | Teeth | |
| Beeper | | Emp/Sch Address | | Facial Hair | |
| Email | | Emp/Sch CSZ | | Complexion | |
| Work Phone | | Height / Weight | / | Hair Style / Length | / |
| Attire | | Eye / Hair Color | / | Blood Type | |
| Jewelry | | Artif. Body Parts/Aids | | | |
| Offender PID | 1133394 | CBN | 1187921 | Arrested Date | 1/26/2013 8:20:00 AM |
| Arrest Type | Sight Arrest | Arrested For | 0809 - ASSAULT | Arrest Location | B Checkpoint, P. I. A. |
| | | | TERRORIST THREATS | | |
| FBI No. | 678847TD6 | Arresting Officer 1 | W1 | Booked On | |
| PA SID. | 40486062 | Arresting Officer 2 | | Booked Location | |
| Armed With | 01 - Unarmed | Number of Warrants | | Released Location | |
| Multi. Clearance | Not Applicable | Notified | | Released On | |
| Prev. Suspect No. | | Juvenile Disposition | | Released By | (PR / #) |
| | | | | Release Reason | |
| | | | | Held For | |
| Arrest Notes | | | | | |

**Interview Section**

| | | | |
|---|---|---|---|
| Interview Date | | Interviewed By | (PR / #) | 75-483 Completed |
| Interview Location | | Guardian Present | | Miranda Read |
| | | Others Present | | Miranda Waived |
| Interview Summary | | | |

### Case Facts

### MO

### Actions Taken

| | | |
|---|---|---|
| 1. Defendant Statement Taken | NO |
| 2. Defendant Debriefed | NO |

Printed: February 13, 2013 - 2:20 PM

| **Philadelphia Police Department Investigation Report** | **A - Approved** |
|---|---|
| DC Number   2013-77-000457 | Page 3 of 3 |
| Report No    2013-77-000457.1 | |
| Report Date   2/12/2013 1:17:12 PM | |
| Report Type   Investigation Report (75-49) | |

3.  PA Crimes Code Charges Placed for Defendant          2715,5503

4.  Bomb Squad Notified                                              YES

5.  Detective Division Notified                                       YES

6.  District Attorney's Office Notified                             YES

7.  ATF Notified                                                         YES

8.  Div/Dist Commander Notified                                   YES

9.  FBI Notified                                                          YES

10.  BMV Records Check                                             YES

11.  Criminal History Through Federal, State and Local          YES
Systems Records Check

12.  Defendant Checked Through PA State Police for           YES
Number of Guns Owned

13.  FBI Records Check                                                YES

14.  NCIC/PCIC Offender Records Check                         YES

## *Philadelphia Police Department Arrest Report*

| Defendant: last name: **VANDERKLOCK** | Sex: Male | SSN: 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 | DOB: 04/13/1956 |
|---|---|---|---|

first name: **ROGER B**    middle initial: **B**    Race: White    Birth Place: GRAND RAPIDS

Address: 834 CHESTNUT    ST  I/PT/Suite: PH117 Philadelphia PA 19107-    Phone #: 215-000-0000

| Year: 2013 | District: 77 | DC#: **13-77-000457** | Sector: 1 | Ctrl#: 00000 |
|---|---|---|---|---|
| PID: **1133394** | SID: 40486062 | OTN: N8448716 | Event: 161821429 | CBN: **1187921** |
| Crime Class: 809 | | Desc: Other assaults terroristic threats | Authority: Philadelphia Police Department | |
| DFJ: N | | | FBI / FID: 678847TD6 | |

Arrest Name: ROGER VANDERKLOCK    DOB: 04/13/1956    SSN:

**ARREST INFORMATION:**

Date / Time: 01/26/2013 08:25AM    District: 77    Inside/Outside: I    Arrest Type:  SA

B CHECKPOINT, PIA  WY  Philadelphia PA 19153-

Slating Date: 01/26/2013    Slating Time: 11:22AM    Sum/Warr:    Issued By AC Magistrate:

**OCCURRENCE:**

Date / Time: 01/26/2013 08:20AM    Date reported: 01/26/2013 08:20AM    Inside/Outside: I    Codefendants?: N

B CHECKPOINT, PIA  WY  Philadelphia PA 19153-

**FACTS OF THE CASE:**

THE COMPLAINANT STATED THAT HE IS A SCREENING SUPERVISOR FOR THE TSA.  ON 1/26/13, HE WAS WORKING AT THE B TERMINAL
SECURITY CHECKPOINT OF THE PHILADELPHIA INTERNATIONAL AIRPORT.  AT APPROXIMATELY 8:15 AM, ONE OF HIS OFFICERS BEGAN
DEALING WITH A PASSENGER WHO WAS BECOMING IRATE.

HE CHECKED THE X-RAY IMAGE AND SAW SEVERAL ANOMALIES WHICH APPEARED TO BE COMPONENTS OF A PIPE BOMB.  AFTER THE
PASSENGER BECAME LOUD TOWARDS THE SCREENING OFFICER, THE COMPLAINANT WENT TO TRY AND CALM THE SITUATION.  THE
COMPLAINANT EXPLAINED WHAT THEY WERE LOOKING FOR AND WHY THE BAG HAD TO BE CHECKED.  THE PASSENGER (THE DEFENDANT)
THEN STATED, "I COULD BRING A BOMB THROUGH HERE ANY DAY OF THE WEEK, AND YOU WOULD NEVER KNOW IT."  THE BAG CHECK WAS
COMPLETED AND NO TRACES OF EXPLOSIVES WERE FOUND.  THE POLICE WERE NOTIFIED OF THE REMARK, AND THE DEFENDANT WAS
WATCHED UNTIL THE OFFICERS ARRIVED.

THE COMMENT WAS MADE IN A PUBLIC AREA WITH SEVERAL OTHER PASSENGERS NEARBY.

SINCE THE PASSENGER'S BAG HAD ALREADY BEEN THOROUGHLY CHECKED, THERE WAS NO EVACUATION OF THE AREA.

P/O PINKNEY RESPONDED TO THE CHECKPOINT AND WAS MET BY THE COMPLAINANT.  AFTER THE FACTS WERE RELATED TO THE OFFICER,
OFFICER PINKEY TOOK THE DEFENDANT TO THE AIRPORT UNIT HQ FOR FURTHER INVESTIGATION.

**CHARGES:**

| Code | OC | Description | Grade | Counts |
|---|---|---|---|---|
| CC2715 | | BOMB THREATS | M1 | 001 |
| CC5503A4 | | DISORDERLY CONDUCT-HAZARD | S | 001 |

**REQUESTED HEARING DATE:**    REQUESTED HEARING LOCATION:

02/26/2013 00:00

**COMPLAINANTS AND WITNESSES:**

*Complainant(s)*

CHARLES KIESER    Age:    Phone(H):    Phone(W): 215-000-0000 SSN:  - -

**ARREST REPORT BY:**    Badge  Description    Unit Id  Platoon  Squad  Group Id

219667    WOJCIECHOWSKI M    9065  65 Southwest Detective Division    0    5    0

**ARREST REPORT APPROVED BY:**

Supervisor- payroll no:    FLAVILLE KENNET KENNETH    246377    Approval Code: Approved

**POLICE PERSONNEL:**

| Employee Name | Payroll Number | Badge | Dist/Unit | Platoon/Group | Vacation Dates | Vacation Description | Needed At Hearing Police/Sup | Arrest OPC. |
|---|---|---|---|---|---|---|---|---|
| PINKNEY RAYMOND | 201083 | 4718 | 77/0 | 1 C | 02/21/2013 to 02/21/2013 | Vacation | N / Y | Y |
| PINKNEY RAYMOND | | | | C | 07/26/2013 to 08/14/2013 | Vacation | N / Y | Y |

Rev. 11/1996    SW    01/27/2013 01:44:41

## *Philadelphia Police Department Arrest Report*

*Page 2 of 2 PARS*

| Defendant: last name: **VANDERKLOCK** | | Sex: Male | SSN: 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 | DOB: 04/13/1956 |
|---|---|---|---|---|
| first name: **ROGER B** | middle initial: **B** | Race: White | | Birth Place: GRAND RAPIDS |

**ADDITIONAL INFORMATION:**

Hits: Y          Statement?:                Lab User Fees Requested?: N          ADA Concerns?:

**EMPLOYER INFORMATION:**

Occupation: ARCHITECT                      Employer: SELF                          Phone: 215-000-0000

Philadelphia PA    -

**DESCRIPTIVE DATA:**

| Complexion | CLEAR | Eye Characteristics | NORMAL |
|---|---|---|---|
| Eye Color | BLU | Facial Hair | NONE |
| Glasses (Y=Yes) | 0 | Hair Color | GRY |
| Hair Length | ABOVE EARS | Hair Style | STRAIGHT |
| Teeth | NORMAL | | |

Rev. 11/1996                          SW            01/27/2013 01:44:41

# BIOGRAPHICAL INFORMATION REPORT

☐ ARREST   ☒ INVESTIGATION   ☐ OTHER

*(CHECK BLOCKS WHERE DOCUMENTATION EXISTS)*

PHILADELPHIA POLICE DEPARTMENT

| DATE | TIME | LOCATION OF INITIAL CONTACT | DISTRICT | B.C. NO. |
|---|---|---|---|---|
| 1-26-13 | 825 AM | PHL Terminal B CKPT | 77th | 13-77-00457 |

| NAME LAST | FIRST | MIDDLE | D.O.B. | SEX | RACE |
|---|---|---|---|---|---|
| Vanderklok | Roger | Bruce | 4-13-56 | Male | White |

| HEIGHT | WEIGHT | HAIR COLOR | EYE COLOR | COMPLEXION | BUILD | GLASSES (YES/NO) | FACIAL HAIR |
|---|---|---|---|---|---|---|---|
| 6'2 | 160 | Gray | Blue | Light | Med | No | None |

| NICKNAME | ALIASES | MARITAL STATUS |
|---|---|---|
| None | None | Yes |

| RESIDENCE STREET NUMBER/NAME | CITY/STATE (OTHER THAN PHILA.) | DIST |
|---|---|---|
| 834 Chestnut St Apt PH117 | Phila PA 19107 | |

| TYPE OF RESIDENCE | RESIDES WITH | DRIVER NUMBER | STATE |
|---|---|---|---|
| House | ~~Architect~~ Wife | 2931 4163 | PA |

| SOCIAL SECURITY NUMBER | OCCUPATION | EMPLOYER/ADDRESS |
|---|---|---|
| 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 | Architect | Unknown |

| PLACE OF BIRTH (CITY/STATE) | GROUP AFFILIATION | ETHNIC BACKGROUND |
|---|---|---|
| Grand Rapids Michigan | | |

| SCARS TATTOOS DEFORMITIES | CLOTHING DESCRIPTION | JEWELRY WORN |
|---|---|---|
| None | Orange cap/Blue Jkt/Plaid shirt/Blue Jeans/Brn loafer shoes | Watch |

## VEHICLE INFORMATION

| | YEAR | MAKE | MODEL | COLOR | STATE | TAG | VIN |
|---|---|---|---|---|---|---|---|
| 1 | | | | | | | |
| 2 | | | | | | | |

| | OWNER—LAST NAME, FIRST | ADDRESS | CITY | STATE |
|---|---|---|---|---|
| 1 | | | | |
| 2 | | | | |

| MODUS OPERANDI *(METHODS, TRAITS, ETC.)* | AREAS FREQUENTED |
|---|---|
| | |
| | |
| | |

75-229 (Rev. 3/92)

AREAS MARKED WITH ▶ MUST BE FILLED IN.
CHECK RELIABILITY BOXES WHEN APPROPRIATE

| RELATIVES | | | | | |
|---|---|---|---|---|---|
| | LAST | MAIDEN | FIRST | ADDRESS | CITY/STATE |
| SPOUSE | VanderKlok | Visser | Ellenor | 834 Chestnut St Apt PN 117 | Phila Pa 19107 |
| | LAST | MAIDEN | FIRST | ADDRESS | CITY/STATE |
| MOTHER | Boeresen | | Loretta | Deceased | |
| | LAST | FIRST | ADDRESS | | CITY/STATE |
| FATHER | | | | | |
| BROTHER SISTER | | | | | |
| BROTHER SISTER | | | | | |
| BROTHER SISTER | | | | | |

| ASSOCIATES | | | | |
|---|---|---|---|---|
| LAST NAME | FIRST NAME | ADDRESS | CITY/STATE | PPN |
| | | | | |
| | | | | |
| | | | | |

| EDUCATION | | | |
|---|---|---|---|
| SCHOOL | ADDRESS | CITY/STATE | YEARS |
| Jenison | UNKNOWN ~~Michigan~~ | Michigan | 4 YRs |

| CRIMINAL RECORD INFORMATION | | | |
|---|---|---|---|
| PPN NRF | FBI NUMBER NRF | PA NUMBER NRF | OTHER NUMBER (STATE, DMV/OTHER) |
| PAROLE NUMBER | PAROLE OFFICER | | TELEPHONE NUMBER(S) |
| PROBATION NUMBER | PROBATION OFFICER | | TELEPHONE NUMBER(S) |

➤ CHIEF CRIMINAL ACTIVITY   Threats

| INITIATING OFFICER, LAST NAME Pinkney | BADGE 4718 | RANK P/O | DISTRICT/UNIT/PLATOON 77th Airport |
|---|---|---|---|
| ASSIGNED INVESTIGATOR Wojciechowski | BADGE 9065 | RANK DET | DISTRICT/UNIT/PLATOON 77/5 |

| ADDITIONAL REMARKS |
|---|
| |

75-229 (Revised) (Rev 3/82)

PHILADELPHIA POLICE DEPARTMENT
## COMPLAINT OR INCIDENT REPORT

| YEAR | DIST/DIV | D.C. NO. | SECT. | DIST | VEH. NO. | REND./DATE |
|------|----------|----------|-------|------|----------|------------|
| 13 | 77 | 00457 | A | 77 | F631 | 1-26-13 |

CRIME OR INCIDENT CLASSIFICATION
Invest: Bomb Scare

TIME OUT / TIME IN: 1328   825 P

LOCATION OF OCCURRENCE
Terminal B CKPT

TYPE OF PREM: 

DATE OF OCCUR: 1-26-13   DAY CODE: 6   TIME OF OCCUR: 815

NATURE OF INJURY

COMPLAINANT: Police

AGE / RACE / SEX / PHONE (HOME)

ADDRESS: 77th Airport

PHONE (BUSINESS)

| ASSIGNED | PRIMARY TO FOLLOW | UNIT | CODE | INV CONT NO |
|----------|-------------------|------|------|-------------|
| ☑Yes ☐No | ☐Yes ☐No | ☐Kept Out | | |

WITNESS: ☐Yes ☑No   TRACEABLE PROP: ☐Yes ☑No   UNIQUE DESCRIPTION OF OFFENDER?: ☐Yes ☑No   OTHER EVIDENCE: ☐Yes ☑No

DESCRIPTION OF INCIDENT (Include Description of Crime Scene if Applicable)

R/C Threats

Below passenger's carry on bag
was being checked by TSA because he
had a PCP pipe w/watch inside. Passenger
became Frustrated and said Anybody
can bring a bomb in here and Nobody
would know. Police was called and
Passenger was taken into custody for
investigation. TSA Supervisor
Kresir heard the comment.

OFFENDER INFORMATION

PROPERTY DESCRIPTION (Include Make

PROP CODE   PICTURES: ☐Yes ☐No   $

Roger Bruce VanderKlck
234 Chestnut St Apt Ph17
Phila PA 19107 OLN 29314463
DOB 4-13-56 W/M 6'2 160

VEHICLE 1 - OWNER'S NAME   VEHICLE 2 - OWNER'S NAME

INTERDISTRICT MESSAGE SENT   DEPT/UNIT: Terminal   VEHICLE 2 - WHAT? NAME

PRINT PREPARED BY: Pinkney   201083

RECOVERED?: 4718   DIST/OUT: 77

REVIEWED BY: 1593

PURSUANT TO ACT 58 OF 1999, THE DISTRICT ATTORNEY AND COURTS REQUIRE PROOF OF THE NOTIFICATION OF VICTIM SERVICES/OVA

## *UNIFORM POLICE MEMO TO S.W.D.D.*

District _77ᵗʰ_   Car/Wagon# _FB3_   Sector _A_   DC# _13.77.00457_

Date _1-26-13_   Time Out: _825AM_   Time of Occurrence: _815AM_

Location of Occurrence: _PHL Terminal B CKPT_   (Inside)/Outside:

Location of Arrest: _PHL Terminal B CKPT_   Time of Arrest: _840AM_

#1 Arresting/Reporting Officer: _RAYMOND_ (FIRST) _PINKNEY_ (LAST)   Badge# _4718_   Dist: _77ᵗʰ_

PR# _201083_   Plt.: _1C_   Vacation: _____

#2 Arresting/Reporting Officer: _____ (FIRST) _____ (LAST)   Badge# _____   Dist: _____

PR# _____   Plt.: _____   Vacation: _____

#1: Offender/Defendant: _____   Age: _____ Sex: _____

Address: _____   D.O.B.: __/__/__

#2: Offender/Defendant: _____   Age: _____ Sex: _____

Address: _____   D.O.B.: __/__/__

#3: Offender/Defendant: _____   Age: _____ Sex: _____

Address: _____   D.O.B.: __/__/__

Property Receipt # _____   Item Description: _____

Property Receipt # _____   Item Description: _____

Property Receipt # _____   Item Description: _____

**Details of Arrest:** *(What you did in the investigation or arrest, be precise as to details!):*

TSA Supervisor Kieser called Police and stated Passenger was getting his carry on bag checked and said Anybody can bring a bomb and you wouldn't ever Know it. Police was called took passenger to H.Q. for further investigation

*Use reverse side for additional space if needed*

EXHIBIT

"B"


https://www.dropbox.com/sh/x0h0mkniuzstkvz/AAB4Ub6Gcs
MtaQtxpxG0iO5Pa?dl=0

# EXHIBIT "C"



EXHIBIT "D"



# Exhibit B



# Exhibit C

# Exhibit D

# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

2015 JAN 23 ᴾ ᵍ 2ⁱ

ROGER VANDERKLOK

*Plaintiff*

*v.*

Docket No.:

UNITED STATES OF AMERICA,

TRANSPORTATION SAFETY ADMINISTRATION (TSA),

CHARLES KIESER (TSA),

CITY OF PHILADELPHIA,

CITY OF PHILADELPHIA POLICE DEPARTMENT,

RAYMOND PINKNEY (PHILADELPHIA POLICE),

DETECTIVE M. WOJCIECHOWSKI (PHILADELPHIA POLICE),

KENNETH FLAVILLE (PHILADELPHIA POLICE),

JEH JOHNSON (DEPARTMENT OF HOMELAND SECURITY),

JOHN S. PISTOLE (TSA)

*Defendants.*

## COMPLAINT

(Violation of First, Fourth and Fourteenth Amendment Rights; Federal Tort Claims Act)

Plaintiff ROGER VANDERKLOK makes the following representations to this

Court against the named Defendants as follows:

1.     Plaintiff Roger Vanderklok, a 56-year old Architect at the time of the events described in this Complaint, was detained, handcuffed, and jailed for over 23 hours because a TSA Supervisor did not like something Mr. Vanderklok said to him and because Philadelphia Police personnel failed to perform their duties and arrested him without probable cause. In short - TSA Supervisor made up a story that involved Mr. Vanderklok becoming irate, pointing in his face and saying something insulting that included the word "bomb." And the Philadelphia Police failed to realize that, even if the TSA Supervisor's claims were accurate, there was no probable cause to arrest Mr. Vanderklok.

2.     Mr. Vanderklok, a married father of three children, was attempting to travel from Philadelphia to Miami in order to run in a Marathon the following day. In the carry-on bag he packed were, amongst other things, a heart-monitoring watch and Power Bars. He had no weapons, prohibited liquids, sharp items (and no Arabic flash-cards). He had not visited countries known to sponsor terrorism and was not reading a book critical of the U.S. Government. He said good-bye to his wife and told her he would call her when he landed at his destination -- which was his custom when he travelled by air.

3.     At Philadelphia International's Security Screening checkpoint, he was stopped and detained by TSA screeners and repeatedly questioned about the contents of his bag. He politely answered all their questions and invited the TSA personnel to inspect his bag and its contents. After a thorough check of his bag, and after TSA personnel were sure that there was nothing improper, dangerous, or illegal in his bag, the TSA supervisor gave Mr. Vanderklok his bag back - but had an Agent "watch" Mr.

Vanderklok while he called Philadelphia Police to have Mr. Vanderklok arrested. Mr. Vanderklok was then handcuffed, without explanation, and paraded through the Airport by a Philadelphia Police Officer to the Airport Police Station where he was jailed for countless hours. Handcuffed behind his back, he was then put into a vehicle and transported to a Philadelphia Police station outside of the Airport where he was jailed again.

4.     While Mr. Vanderklok languished in jail cells, without access to a telephone, his wife started to worry. His flight had landed in Miami and she had not heard from her husband. After several attempts to reach him on his cell phone over the course of many hours, Elanor, fearing the worst, started to make calls to file a "Missing Person Report." With Mrs. Vanderklok panicking and Mr. Vanderklok toiling in a jail cell, the TSA supervisor was telling Philadelphia Police different versions of the same event – but trying to make sure that Mr. Vanderklok's ordeal would continue.

5.     The TSA Supervisor told the first Police Officer that Mr. Vanderklok had angrily said to him that "anybody can bring a bomb and you wouldn't even know it." Later, he told the Detective that the words were: "I could bring a bomb through here any day of the week and you would never find it."

6.     After Officers/Detectives purposefully harassed and scared him, Mr. Vanderklok was charged with crimes he did not commit, including "Threatening the Placement of a Bomb" and "Terroristic Threats." Bail was set at $40,000.00. He was forced to post bail and inform his employer of the criminal charges pending against him. And he was subsequently under the restrictions of all defendants on bail in Philadelphia (which include travel restrictions).

7.     At the criminal trial, the TSA Supervisor made up a third version of what Mr. Vanderklok said and did at the Screening Area. Under oath in Municipal Court, the TSA supervisor testified that his attention was directed to Mr. Vanderklok when Mr. Vanderklok became "irate" and started angrily waving his arms and hands in the air. The TSA supervisor demonstrated this for the Court. The TSA supervisor testified that he approached Mr. Vanderklok, who eventually stated: "Let me tell you something – I'll bring a bomb through here any day that I want … you'll never find it."

8.     The TSA supervisor also made up additional facts at the criminal trial. The TSA Supervisor testified that "the passenger [Mr. Vanderklok] put his finger in my face." He went on to demonstrate for the court. He testified that Mr. Vanderklok's finger came within six to eight inches of his face. He testified that Mr. Vanderklok moved his finger towards and away from his face approximately six times.

9.     Philadelphia International Airport has security cameras placed throughout the Security checkpoints and screening areas. Those cameras were functional and recording on January 26, 2013. The video footage acquired by counsel before the criminal trial clearly shows the actions and movements of Mr. Vanderklok at the Security Checkpoint. According to his testimony, the TSA Supervisor did not watch the video footage before testifying against Mr. Vanderklok in Municipal Court. The video captures the entire interaction between the TSA Supervisor and Mr. Vanderklok. Mr. Vanderklok does not wave his arms or hands. He does not point his finger in anyone's face (or anywhere else). He does not once appear irate. The video depicts a calm man engaged in quiet conversation with TSA personnel who have "alerted" to his bag.

10.     The District Attorney's Office had two witnesses present at the trial – TSA

Supervisor Charles Kieser and Philadelphia Police Officer Raymond Pinckney. They called only Kieser in their case-in-chief. No other evidence was submitted. After hearing the testimony of Kieser, the Honorable Judge Stack granted a Defense Motion for Judgment of Acquittal. The Court concluded that, viewing the State's evidence in its entirety, direct and/or circumstantial, in the light most favorable to the Commonwealth, Mr. Vanderklok could not be found guilty of any of the charges. Mr. Vanderklok denies doing and saying that to which Kieser testified, and the surveillance footage supports Mr. Vanderklok's account.

## PARTIES

11.     Plaintiff Roger Vanderklok is an adult individual who, at all times Relevant hereto, resided at 834 Chestnut St., Philadelphia, PA 19107

12.     Defendant, City of Philadelphia, ("City") is a municipal corporation within the Commonwealth of Pennsylvania, with administrative offices located at One Parkway Building, 17th Floor, 1515 Arch Street, Philadelphia, PA 19102-1595

13.     Defendant City of Philadelphia Police Department is a governmental entity which is organized and exists under the laws of the Commonwealth of Pennsylvania, having its principal office located at One Franklin Square, Philadelphia, PA 19106. Its police officers have jurisdiction on and adjacent in Philadelphia County and at Philadelphia International Airport. The police officers of such force should have been trained on and expected to understand the Pennsylvania Crimes Code so that they can faithfully and fairly execute their duties including, but not limited to probable cause,

the detention/arrest and charging of citizens.

14.     Defendant, Raymond Pinkney, is an individual who holds the position of Police Officer with the Philadelphia Police Department. During the time in question, he was expected to know and understand the Pennsylvania Crimes Code so that he could make proper decisions on whether to detain and/or arrest citizens for offenses including but not limited to Disorderly Conduct, Terroristic Threats, and Threatening the Placement of a Bomb. This action is brought against the named individual in his individual and in his official capacity as a police officer of the City of Philadelphia. Defendant Pinckney was acting under color of state law during the events described in this Complaint.

15.     Defendant, M. Wojciechowski, is an individual who was a Detective at the time of this incident. In such capacity as Detective, he was charged with knowing and understanding the Pennsylvania Crimes Code so that he could make proper decisions on whether to detain and/or arrest citizens for offenses including but not limited to Disorderly Conduct, Terroristic Threats, and Threatening the Placement of a Bomb. Additionally, if he was the "assigned" investigator on a given matter, he was charged with knowing how to conduct, and conducting a proper investigation to make sure innocent people are not detained/charged for crimes for which there is no evidence. This action is brought against the named individual in his individual and in his official capacity as a police officer of the City of Philadelphia. Defendant Wojciechowski was acting under color of state law during the events described in this Complaint.

16.     Defendant Kenneth Flaville, at all times relevant hereto, is an individual who is employed as a police officer/detective by the City of Philadelphia. This action is brought against the named individual in his individual and in his official capacity as a

police officer of the City of Philadelphia. In such capacity as police officer/detective, he was charged with knowing and understanding the Pennsylvania Crimes Code so that he could make proper decisions on whether to detain and/or arrest citizens for offenses including but not limited to Disorderly Conduct, Terroristic Threats, and Threatening the Placement of a Bomb. Additionally, if he was the "assigned" investigator or "approving supervisor" on a given matter, he was charged with knowing how to conduct, and conducting proper investigations to make sure innocent people are not detained/charged for crimes for which there is no evidence. This action is brought against the named individual in his individual and in his official capacity as a police officer of the City of Philadelphia. Defendant Flaville was acting under color of state law during the events described in this Complaint.

17.     Defendant Charles Kieser, at all times material hereto, is an individual who is employed as a TSA Agent/Supervisor by the Transportation Security Administration (hereafter "TSA"). This action is brought against the named individual in his individual and in his official capacity as a TSA Agent/Supervisor.

18.     Defendant, Transportation Safety Administration, ("TSA") and Defendant John S. Pistole (TSA Administrator), employed/continue to employ Defendant Kieser, partner with local law enforcement agencies (like the Philadelphia Police Department) for the safety of Airoports and citizens, comes under the auspices of Defendant Jeh Johnson (Secretary - Department of Homeland Security), and have administrative offices located at 601 12th Street South, Arlington, VA 20598. United States of America is the appropriate defendant under the Federal Tort Claims Act. This action is brought against the named individuals in their individual and in their official capacity. They were acting

under color of state law during the events described in this Complaint.

## JURISDICTION AND VENUE

19.     This cause of action arises under the United States Constitution,
particularly under the provisions of the First, Fourth and Fourteenth Amendments to the
United States Constitution, and under the laws of the United States, particularly under the
Civil Rights Act, Title 42 of the United States Code, Section 1983 and the laws of the
state of Pennsylvania. Jurisdiction is conferred upon this court under the provisions of
Title 28 of the United States Code, Sections 1331, 1334, 1343, 1346 and 1367 (a). The
allegations in the Causes of Action below are examined under the First Amendment, the
Fourth Amendment's prohibition on unreasonable seizures applicable to the States and
individuals acting in their official and individual capacity by the Fourteenth Amendment
of the United States Constitution, the Fourteenth Amendments guarantee of Due Process.

20.     This complaint is for money damages and punitive damages based upon
civil rights violations committed by Federal and State officials contrary to the First,
Fourth and Fourteenth Amendments to the United States Constitution. This action is
authorized and instituted pursuant to Bivens v. Six Unknown Named Agents, 403 U.S.·
388 (1971) and 42 U.S.C. § 1983. This Court has authority to award costs and attorney's
fees pursuant to 42 U.S.C. § 1988 and 28 U.S.C. § 2412. Venue is proper pursuant to 28
USC Section 1391.

21.     The Plaintiff filed the appropriate Administrative Tort Claim under FTCA
to the TSA and the claim being denied.

22.     It is also submitted that the pendant jurisdiction of this Court is invoked

over all State court claims in view of the common nucleus of operative facts as to all claims.

## FACTS COMMON TO ALL COUNTS

23. Roger Vanderklok alleges and incorporates by reference thereto the averments set forth in Paragraphs Nos. 1-22 of the within Complaint as if more fully set forth herein.

24. Mr. Vanderklok arrived at Philadelphia International Airport at around 8:00AM on January 26, 2013 for a flight to Miami, where he was scheduled to run a Marathon. He waited in line, presented his identification and proceeded to the screening area of the Security Checkpoint. His one bag contained running gear, his laptop, a heart-monitoring watch and some Power Bars. He took his shoes and his jacket off, took his laptop out of his bag, and put his things on the rollers and his items in the plastic containers for processing through the x-ray screening device.

25. He proceeded through the screening device/metal detector without incident. The detector made no sound.

26. A TSA official asked him to step to the side. Apparently, they saw the heart-monitoring watch and the Power Bars and thought they looked like the components of an explosive device. The TSA officials viewing the screen and handling his bag were talking about the watch and the case it was in. Mr. Vanderklok volunteered that it was just his heart-monitoring watch and they were welcome to look in the bag and at the watch.

27. Mr. Vanderklok waited patiently. The TSA officials indicated that they had to do "further testing" on the bag. Mr. Vanderklok acquiesced. Later, the TSA

officials started to ask Mr. Vanderklok about "organic material." Mr. Vanderklok stated that they were free to look into his bag that contained "just [his] running stuff." They continued to talk about "organic material" and swabbed something from the bag.

28.     Mr. Vanderklok had plenty of time before his flight departed and was not overly concerned about the delay. He felt unsure of what the TSA officials were talking about when they spoke of "organic materials." When Defendant Kieser walked up to him, Mr. Vanderklok noticed that Kieser was agitated. He was confrontational and impolite; and he asked more questions about the "organic material." Contemplating plants, fresh fruits, or fresh vegetables, Mr. Vanderklok did not think he had any "organic material" in his bag. During this discussion, Mr. Vanderklok communicated that he understood the TSOs had to do their jobs but assured Defendant Kieser that he was not a threat.

29.     Eventually, the TSA officials located the Power Bars (wrapped in "Power Bar" packaging) and indicated, out loud, that the Power Bars were the "organic material." The TSA officials ran an "explosive trace detection test" on the Power Bars. That test came back negative.

30.     Defendant Kieser got more agitated when Vanderklok stated that he didn't know a Power Bar was "organic material" and that someone should have simply told him that wrapped food items were included in the definition of "organic materials."

31.     At no point during this time period was the Security Checkpoint closed down. Other passengers continued to proceed through the security checkpoint and there was no disturbance at the Checkpoint.

32.     At no point during this time period did Mr. Vanderklok raise his voice,

speak disrespectfully, flail or wave his hands or arms around. He did not point in Defendant Kieser's face.

      33.    Unbeknownst to Mr. Vanderklok, Defendant Kieser, after giving him his bag and the bag's contents back, called the Philadelphia Police and reported that Mr. Vanderklok, while getting bag checked, said that "anybody can bring a bomb and you wouldn't even know it." He simultaneously directed another TSA Agent to "watch" Mr. Vanderklok, who was putting his shoes on and re-packing his bag, until the Philadelphia Police arrived.

      34.    Defendant Raymond Pinckney was the first Officer to arrive at the Checkpoint. Without any investigation, he immediately told Mr. Vanderklok that he was under arrest and took Mr. Vanderklok into police custody.

      35.    The City of Philadelphia is a governmental entity organized and existing under the laws of the Commonwealth of Pennsylvania. In turn, the City of Philadelphia is responsible for the development, operation, and supervision of the policing powers.

      36.    The City of Philadelphia Police Department is responsible for setting policy, procedures and directives for the operation of its Police Officers and to ensure that policies, procedures and directives established are enforced for the exercise of their police duties; and, are responsible for the development and implementation of policies and procedures concerning the selection, evaluation, training and supervision of individuals employed as police officers. This includes when and under what circumstances, an officer is permitted to detain or arrest a citizen.

      37.    The City of Philadelphia Police Department has intact a series of policies and procedures that govern the actions of police officers regarding probable cause to

arrest. While there are a variety of Policies/Protocols which dictate the actions of officers, all police officers who are employed as City of Philadelphia Police Officers are expected to follow the mandates promulgated within each and every Protocol.

38.     Defendants Pinckney, Wojciechowski and Flaville are officers of the City of Philadelphia Police Department assigned to Southwest Philadelphia and/or Philadelphia International Airport during the relevant time periods. In such capacity, Defendants Pinckney, Wojciechowski and Flaville are charged with the enforcement of the laws of the Commonwealth of Pennsylvania, in a fair, just and equitable manner consistent with the rights afforded all individuals by the Constitutions of the United States of America and the Commonwealth of Pennsylvania; and, were acting, at all times relevant hereto, under color of law and color of their authority as police officers of the City of Philadelphia.

39.     The City of Philadelphia Police Department should have had established or enforced established policies, procedures and/or guidelines concerning the nature of the conduct and interaction of any Police Officer has with any individual in the discharge of their duties; and, in particular, in the manner in which incidents are investigated; when individuals are to be taken into custody and or arrested; when arrests should be made, and when probable cause to arrest exists.. Additionally, policies, procedure and/or guidelines exist or should have existed concerning the review and supervision of the actions of individual officers to insure that they were conforming to established Police Department policies, procedures and/or guidelines and were discharging their duties in an appropriate and lawful manner.

40.     The City of Philadelphia Police Department should have ensured that the

established policies and procedures that are outlined in the Philadelphia Police Department Procedures/Protocols were being followed. Alternatively, if such Policies/Protocols were not being followed by Officers during the exercise of their official duties, appropriate disciplinary action should have been taken by the City of Philadelphia against the specific officers found to be in noncompliance. The failure by the City of Philadelphia Police Department to ensure that the established policies and procedures found in the Philadelphia Police Department Order were being followed by all Officers during the discharge of their official duties rendered the policies and procedures "window dressing," and demonstrates a deliberate indifference by the City of Philadelphia Police Department to thwart the custom or practice of officers' noncompliance of the noted Procedures/Protocols, and therein resulting in the violation of the constitutional rights ensured to the citizens of the City of Philadelphia, such as the Plaintiff, and other individuals referenced herein.

41.     On or about January 26, 2013, Officers Pinckney and Detective Wojciechowski were on duty as Philadelphia Police Officers. They should have known or had the ability to learn the elements of the relevant crimes. They should not have entered into any agreement with the TSA that, if the TSA wants someone taken into custody, they would take that person into custody. The Philadelphia Police should not have allowed the say-so of a TSA Supervisor to replace their independent evaluation of whether there was probable cause or the need to detain.

42.     Defendant Pinckney, in taking Mr. Vanderklok into custody, did so without probable cause. Even taking the words of Defendant Kieser as true (which they were not), there is no probable cause to believe that any offense/crimes code violation

had occurred and there was no exigent reason for detention of Mr. Vanderklok. Instead of evaluating the situation and acting properly, defendant Pinckney took away Mr. Vanderklok's liberty based on Kieser's identification of him as a person who said something completely non-criminal about what "anybody" could do without Kieser "knowing." Defendant Pinkney did not ask if the bag was searched. He did not inquire as to whether the passenger had created a disturbance. He did not ask if the screening devices found anything unusual in Mr. Vanderklok's belongings. He did nothing other than to take Mr. Vanderklok into custody.

43.     The video footage clearly establishes that there was no commotion, no disturbance, no interruption of Airport business occurring at any point – and certainly not when Officer Pinckney arrived. Nothing like that was reported to Officer Pinckney. The alleged words of Mr. Vanderklok, reported by Charles Kieser, do not come close to establishing probable cause to arrest for any of the crimes charged – or any other crimes. The words reported - "anybody can bring a bomb and you wouldn't even know it" – would more appropriately be categorized as an insult to the TSA Supervisor than a threat to anyone's safety. No other passenger heard the alleged statement and no other witness, TSA or otherwise, came forward. And the words alleged to have been spoken were spoken after the TSA officials knew that the watch was just a watch (and not a component to an explosive devise).

44.     When he arrived at the checkpoint, Defendant Pinkney immediately took Mr. Vanderklok into custody and informed him that he was under arrest. Pinkney went on to prepare two documents – a "75-48" and a "Uniform Police Memo to S.W.D.D." It is clear from these documents that the only information Defendant Pinckney had when he

arrested Mr. Vanderklok was the information provided by Charles Kieser. It is not clear if he even had first-hand information or if he was acting on hearsay. No other witnesses are named. No other evidence – direct or circumstantial – is mentioned. No other investigation is performed. No other witnesses are sought out or interviewed. In both police reports, Defendant Pinkney indicates that he spoke only to Defendant Kieser. The reports indicate that the Officer made the arrest at the time he arrived at the Security Checkpoint.

45.     In the report, there is a line that reads: "Details of Arrest (What you did in the investigation or arrest; be precise as to details!)." Under that, Police Officer Pinckney wrote:

"TSA Supervisor Kieser called Police and stated Passenger was getting his carry on bag checked and said Anybody can bring a bomb and you wouldn't even know it. Police took passenger to H.Q. for further investigation. "

46.     After handcuffing Mr. Vanderklok, Defendant Pinkney walked him to an elevator, which they rode to a basement cell-room. He took Mr. Vanderklok's belongings, including his bag, its contents, his phone, and his belt. Mr. Vanderklok sat, locked in that cell, for hours. There was no "further investigation" done.

47.     Mr. Vanderklok was then led outside to a police/TSA vehicle and transported, with his hands cuffed behind his back, to a Philadelphia Police District where he was thrown in another cell. Aside from hearing things about being sent to "Guantanamo," Mr. Vanderklok also overheard a conversation amongst Defendant Wojciechowski and other Police Personnel where they were talking about making sure they got "the right A.D.A." to review their case to assure that they got approval for the

criminal charges they wanted brought against Mr. Vanderklok. No one from the FBI,

NSA, JTTF, or any other federal or local agency questioned Mr. Vanderklok. No one seemed concerned that he might be dangerous – most likely because it was abundantly clear that he was not. In fact, that was abundantly clear before Defendant Kieser called the Philadelphia Police.

48.     Mr. Vanderklok was held in that cell room for many more hours. He was fingerprinted and photographed by Police like a criminal. Almost 24 (twenty four) hours passed before he got released from custody.

49.     Based on the false statements of Defendant Kieser, the improper and illegal arrest and detention by the Philadelphia Police Defendants, their ridiculous decision to charge Mr. Vanderklok and the influence/manipulation they exerted over the prosecuting agency to get those charges approved, Mr. Vanderklok had $40,000.00 bail set on him. He was forced to post bond, hire counsel, and be subject to, among other things, travel restrictions.

50.     As a direct and proximate result of the actions of the Defendants, Roger Vanderklok has sustained emotional and psychological difficulties; he sustained a loss of earnings and his earning power may have been permanently impaired; he sustained other injuries, losses and damages. He has experienced grief, anxiety, sleeplessness and nervousness. He has incurred and may hereafter incur expenditures for medical care, drugs, and kindred expenditures.

51.     The City of Philadelphia, City of Philadelphia Police Department, United States of America, TSA failed to have established and/or enforced established policies, procedures and/or guidelines concerning the nature of the conduct and interaction any Police Officer/TSA Agent has with any individual in the discharge of their duties; and, in

particular, in the manner in which incidents are investigated; when Police are to be called, when individuals are to be taken into custody and or arrested; when probable cause has been established including the use of a TSA Supervisor's statements. Additionally, it failed to enforce policies, procedure and/or guidelines which existed or should have existed concerning the review and supervision of the actions of individual officers to insure that they were conforming to established policies, procedures and/or guidelines and were discharging their duties in an appropriate and lawful manner.

52.    The City of Philadelphia, City of Philadelphia Police Department, United States of America, TSA should have ensured that their established policies and procedures that are outlined in their Procedures/Protocols were being followed. Specifically, they should have ensured that their procedures/protocols were being followed by all individuals employed by them. Alternatively, if such Policies/Protocols were not being followed by officers/agents during the exercise of their official duties, appropriate disciplinary action should have been taken by the Defendants against the specific officers/agents found to be in noncompliance. The failure by the City of Philadelphia Police Department to ensure that the established policies and procedures were being followed by all officers/agents during the discharge of their official duties rendered the policies and procedures "window dressing," and demonstrates a deliberate indifference by the Defendants to thwart the custom or practice of officers' or agents' noncompliance of the Order, and therein resulting in the violation of the constitutional rights ensured to the citizens of the City of Philadelphia, such as the Plaintiff.

53.    The City of Philadelphia, City of Philadelphia Police Department, United States of America, TSA failed to have established and/or enforced established policies,

procedures and/or guidelines concerning the nature of the conduct and interaction any officer/agent has with any individual in the discharge of their duties; and, in particular, in the manner in which incidents are investigated; when Police are to be called; when individuals are to be taken into custody and or arrested; when probable cause has been established. Additionally, it failed to enforce policies, procedure and/or guidelines which existed or should have existed concerning the review and supervision of the actions of individual officers to insure that they were conforming to established policies, procedures and/or guidelines and were discharging their duties in an appropriate and lawful manner.

54. The City of Philadelphia, City of Philadelphia Police Department, United States of America, TSA should have ensured that the established policies and procedures that are outlined in their guidelines were being followed. Alternatively, if such Policies/Protocols were not being followed by officers/agents during the exercise of their official duties, appropriate disciplinary action should have been taken by the Defendants against the specific officers/agents found to be in noncompliance.

55. The errors, omissions and failures of the City of Philadelphia Police Department were the direct or proximate cause that allowed the false arrest, unlawful seizure, and illegal detention of Roger Vanderklok in violation of the rights and immunities guaranteed to him by the First, Fourth, and Fourteenth Amendments of the United States Constitution to have occurred.

56. The errors, omissions and failures of the City of Philadelphia were the direct or proximate cause that allowed the false arrest, unlawful seizure, and illegal detention of Roger Vanderklok in violation of the rights and immunities guaranteed to him by the First, Fourth, and Fourteenth Amendments of the United States Constitution

to have occurred.

57.     The errors, omissions and failures of Raymond Pinckney in his official capacity were the direct or proximate cause that allowed the false arrest, unlawful seizure, and illegal detention of Roger Vanderklok in violation of the rights and immunities guaranteed to him by the First, Fourth, and Fourteenth Amendments of the United States Constitution to have occurred.

58.     The errors, omissions and failures of Detective M. Wojciechowski in his official capacity in his official capacity were the direct or proximate cause that allowed the false arrest, unlawful seizure, and illegal detention of Roger Vanderklok in violation of the rights and immunities guaranteed to him by the First, Fourth, and Fourteenth Amendments of the United States Constitution to have occurred.

59.     The errors, omissions and failures of the Kenneth Flaville in his official capacity were the direct or proximate cause that allowed the false arrest, unlawful seizure, and illegal detention of Roger Vanderklok in violation of the rights and immunities guaranteed to him by the First, Fourth, and Fourteenth Amendments of the United States Constitution to have occurred.

60.     The errors, omissions and failures of the TSA were the direct or proximate cause that allowed the false arrest, unlawful seizure, and illegal detention of Roger Vanderklok in violation of the rights and immunities guaranteed to him by the First, Fourth, and Fourteenth Amendments of the United States Constitution to have occurred.

61.     The errors, omissions and failures of the United States Of America were the direct or proximate cause that allowed the false arrest, unlawful seizure, and illegal detention of Roger Vanderklok in violation of the rights and immunities guaranteed to

him by the First, Fourth, and Fourteenth Amendments of the United States Constitution to have occurred.

62. The errors, omissions, falsehoods and failures of Charles Kieser in his official capacity were the direct or proximate cause that allowed the false arrest, unlawful seizure, and illegal detention of Roger Vanderklok in violation of the rights and immunities guaranteed to him by the First, Fourth, and Fourteenth Amendments of the United States Constitution to have occurred.

63. At all times relevant hereto, the named Defendants were acting under color of state law.

64. At all times relevant whereto, the Defendants were acting directly or through their agents, servants and employees.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF:

Unconstitutional Search and Seizure – Fourth Amendment to the U.S. Constitution,

§1983, and Bivens

65. The detention, arrest, unnecessary and extended restraint, incarceration of the Plaintiff by the Defendants, as described in paragraphs 1-64, constituted an unreasonable search and seizure in violation of clearly established rights under the Fourth and Fourteenth Amendments to the United States Constitution.

### SECOND CLAIM FOR RELIEF:

Excessive Use of Force – Fourth Amendment to the U.S. Constitution and § 1983

66.     The detention, arrest, unnecessary and extended restraint, and incarceration of the Plaintiff by Defendants, as described in paragraphs 1-65, constituted an excessive use of force in violation of clearly established rights under the Fourth and Fourteenth Amendments to the United States Constitution.

### THIRD CLAIM FOR RELIEF:

Unconstitutional Infringement of the Freedom of Speech – First Amendment to the

U.S. Constitution, § 1983, and Bivens

67.     The detention, arrest, unnecessary and extended restraint, incarceration, and search of the Plaintiff by the Defendants on the basis of the alleged non-criminal, non-threatening, non-suspicious words of the Plaintiff, as described in paragraphs 1-66, infringed Plaintiff's freedom of speech and constituted unconstitutional retaliation in violation of clearly established rights guaranteed by the First and Fourteenth Amendments to the United States Constitution.

### FOURTH CLAIM FOR RELIEF:

Federal Tort Claims Act – False Arrest

68.     Plaintiff's detention and arrest without probable cause or any other lawful grounds, as described in paragraphs 1-67, constitute the tort of false arrest under the laws of the Commonwealth of Pennsylvania.

69.     Under the Federal Tort Claims Act, Defendant United States of America is liable for these actions.

FIFTH CLAIM FOR RELIEF:

Federal Tort Claims Act – False Imprisonment

70.     Plaintiff's detention and imprisonment without probable cause or any other lawful grounds, as described in paragraphs 1-69, constitute the tort of false imprisonment under the laws of the Commonwealth of Pennsylvania.

71.     Under the Federal Tort Claims Act, Defendant United States of America is liable for these actions.

## SIXTH CLAIM FOR RELIEF:

Federal Tort Claims Act – Battery and Assault

72.     The handcuffing, pat-down and other unauthorized contacts with Plaintiff's person, as well as the imminent apprehension of such unauthorized contacts, as described in paragraphs 1-71, constitute the torts of battery and assault under the laws of the Commonwealth of Pennsylvania. Under the Federal Tort Claims Act, Defendant United States of America is liable for these actions.

## SEVENTH CLAIM FOR RELIEF:

Federal Tort Claims Act – False Light

73.     Plaintiff was detained, abusively touched, handcuffed, transported, arrested, and forced to walk to the airport police station in plain view of numerous members of the public, as described in paragraphs 1-72. Plaintiff was also forced to appear in Criminal Court and sit at the Defendant's table in front of numerous members of the public in a crowded courtroom in Philadelphia's Criminal Justice Center. These actions constitute the tort of false light under the laws of the Commonwealth of Pennsylvania.

74. Under the Federal Tort Claims Act, Defendant United States of America is liable for these actions.

## EIGHTH CLAIM FOR RELIEF:

### Failure To Train, Enact And Implement Policies And Procedures And To Supervise Properly

Plaintiff alleges and incorporates by reference thereto the averments set forth in Paragraphs Nos. 1-73 of the within Complaint as if more fully set forth herein.

75. The Defendants failed to adequately train, supervise and/or discipline its employees or agents in the performance of their duties and/or undertook actions which were improper or illegal and demonstrated indifference to the constitutional rights of Individuals, such as Roger Vanderklok.

76. The Defendants had policies and/or customs in place and/or failed to insure that policies, procedures and protocols which existed were properly enforced and personnel supervised in the performance of their duties that enabled their employees, servants or agents to act with deliberate indifference to the constitutional rights of . individuals, such as Roger Vanderklok.

77. The Defendants failed to develop and implement policies, procedures and protocols that then enabled their employees and agents to act with deliberate indifference to the constitutional rights of individuals, such as Roger Vanderklok.

78. The Defendants have established policies and procedures to act as a safeguard against constitutional infractions and restraints upon officers/agents affecting the detention and arrests of citizens.

79. Within this action, the conduct of Defendants were violative of the policies and procedures promulgated by the Defendants and the rights and privileges guaranteed to the Plaintiff by the Constitution of the United States and the Constitution of the state of Pennsylvania. Said rights, privileges and immunities include the right to body integrity; the right to exercise freedom of speech; the right to be free from the use of excessive fore; the right to be free from unreasonable seizures and searches.

80. The acts of the Defendants were done with the purpose and intent of depriving Roger Vanderklok of his rights secured to him by the First, Fourth and Fourteenth Amendments to the United States Constitution. Under the Federal Tort Claims Act, Defendant United States of America is liable for these actions.

## NINTH CLAIM FOR RELIEF:

PA State Malicious Prosecution and § 1983 Malicious Prosecution

Plaintiff's detention, imprisonment, arrest and criminal prosecution without probable cause or any other lawful grounds constituted the tort of malicious prosecution under the laws of the Commonwealth of Pennsylvania and Section 1983. Plaintiff alleges and incorporates by reference thereto the averments set forth in Paragraphs Nos. 1-80 of the within Complaint as if more fully set forth herein.

81. Under the Federal Tort Claims Act, Defendant United States of America is liable for these actions.

82. The TSA officials were "state actors" in that the Police and the TSA have a pre-approved plan and the Police routinely take into custody anyone identified by the

TSA without independently evaluating the presence of probable cause (which also occurred in Nicholas George v. U.S. and other cases).

### TENTH CLAIM FOR RELIEF:

PA State Retaliatory Prosecution and § 1983 Retaliatory Prosecution

Plaintiff's detention, imprisonment, arrest and criminal prosecution without probable cause or any other lawful grounds constituted the tort of retaliatory prosecution under the laws of the Commonwealth of Pennsylvania and Section 1983. Plaintiff alleges and incorporates by reference thereto the averments set forth in Paragraphs Nos. 1-82 of the within Complaint as if more fully set forth herein.

83.     Under the Federal Tort Claims Act, Defendant United States of America is liable for these actions. The TSA officials were "state actors" in that the Police and the TSA have a pre-approved plan and the Police routinely take into custody anyone identified by the TSA without independently evaluating the presence of probable cause.

### ELEVENTH CLAIM FOR RELIEF:

Violation Of Plaintiff's Fourteenth Amendment Rights

Plaintiff alleges and incorporates by reference thereto the averments set forth in Paragraphs Nos. 1-83 of the within Complaint as if more fully set forth herein.

84.     Defendants' actions errors and omissions, as more fully described in the factual section of the within complaint, constituted violations of Plaintiff's rights,

privileges and immunities, as secured by the Fourteenth Amendment to the United States Constitution. Said rights, privileges and immunities include the right to due process and equal protection of the law which encompasses his right to body integrity; the right to be free from the use of excessive fore; the right to be free from unreasonable seizures and searches; and the prohibitions against arrests, detentions, and prosecutions based on fabricated evidence.

85.     The acts of the Defendants were done with the purpose and intent of depriving Plaintiff of his rights secured to him by the Fourteenth Amendment to the United States Constitution.

86.     The acts of the Defendants, as set forth in this complaint, were done willfully, maliciously and/or with a callous disregard and reckless indifference to and disregard of the rights, immunities and privileges guaranteed to Roger Vanderklok by the Fourteenth Amendment to the United States Constitution.

Under the Federal Tort Claims Act, Defendant United States of America is liable for these actions.

## PRAYER FOR RELIEF

WHEREFORE, Roger Vanderklok asks for the entrance of judgment against the Defendant as follows:

(a) Compensatory damages in an amount to be determined at trial;

(b) Punitive damages in an amount to be determined at trial as to all Defendants except the United States of America;

(c) Reasonable attorneys' fees and costs of suit;

(d) Prejudgment and postjudgment interest; and

(e) Such other relief as the Court deems appropriate and just.

PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUS SO TRIABLE

Respectfully submitted by:

/s/ *Thomas B. Malone*
Thomas B. Malone, Esquire
PA. ID No. 77291
The Malone Firm, LLC
1650 Arch St., Su. 1903
Philadelphia, PA 19103