## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ROGER VANDERKLOK, **Plaintiff,** v. UNITED STATES OF AMERICA, *et al.,* **Defendants.** | **CIVIL ACTION NO. 15-00370** |

**PAPPERT, J.**                                                                                          **September 29, 2015**

### MEMORANDUM

Plaintiff Roger Vanderklok ("Vanderklok") attempted to pass through an airport security checkpoint with a carry-on bag containing, among other things, a type of watch encased in a section of plastic pipe. Not surprisingly, agents of the Transportation Safety Administration ("TSA") noticed the "anomaly" in the x-ray screening and asked Vanderklok to wait while the bag was searched and its contents examined. Vanderklok was detained by the TSA, arrested by the Philadelphia Police and subsequently charged with three crimes. He was acquitted at trial of all charges filed against him.

Vanderklok then sued the United States of America ("United States"), the TSA, TSA Agent Charles Kieser ("Kieser"), the City of Philadelphia ("City"), Philadelphia Police Officers Raymond Pinkney ("Pinkney"), Michael Wojciechowski ("Wojciechowski"), and Kenneth Flaville ("Flaville") (collectively, the "Individual Officers"), Department of Homeland Security Secretary Jeh Johnson ("Johnson"), and former TSA Administrator John S. Pistole ("Pistole"). Before the Court are two separate motions to dismiss Vanderklok's claims pursuant to Federal Rule of Civil

1

Procedure 12(b)(6): one filed on behalf of the City; the other filed on behalf of the Individual Officers.  (ECF Nos. 26, 27.)[1]  The Court grants both Motions.

## I.

On January 26, 2013, Vanderklok arrived at Philadelphia International Airport for a flight to Miami, Florida where he was scheduled to run a marathon the following day.  (Am. Compl. ¶¶ 2, 25, ECF No. 22.)  Vanderklok proceeded to the TSA security checkpoint and placed his carry-on bag through the x-ray screening device.  (*Id.* at ¶ 25.)  Though Vanderklok walked through the metal detector without incident, a TSA official asked Vanderklok to step aside for additional examination of his bag.  The Amended Complaint describes Vanderklok's bag and contents as a carry on bag containing a heart monitoring watch, some Power Bars,[2] running gear and his laptop computer.  (*Id.* at ¶¶ 2, 25.)  The TSA official then asked Vanderklok to submit to additional screening because "apparently [the TSA] saw the heart monitoring watch and the Power Bars and thought they looked like the components of an explosive device."  (*Id.* at ¶ 27.)

Vanderklok then alleges that "the TSA officials viewing the screen and handling his bag were talking about the watch and the case it was in."  (*Id.*)  The "case" it was in is not described or defined anywhere in the Amended Complaint, though it is described in Wojciechowski's Arrest Report (the "Arrest Report"), attached as Exhibit A to the Amended Complaint.  The Arrest Report mentions the "anomalies which appeared to be components of a pipe bomb."  (*Id.* at Ex. A.)  Pinkney's handwritten "75-48" Report (the "Complaint Report"), also included as part of Exhibit A to the Amended Complaint, describes the "case" as a "PCP [sic] pipe w/ watch inside."[3]  (*Id.*)

---

[1]    The United States and TSA jointly filed a separate motion to dismiss.  The merits of that motion will be addressed in a separate opinion.

[2]    Power Bars are energy bars sold in a sealed wrapper.  They are rectangular, usually packaged individually, and sold in a variety of flavors.  They typically contain flour, sugar, milk, soy protein and a variety of other ingredients.  https://www.powerbar.com/Products/.

[3]    At oral argument, Plaintiff's counsel acknowledged that the "case" was in fact a piece of plastic PVC pipe cut for Vanderklok at a construction site on which Vanderklok had been working, (Hr'g Tr. 34:18-35:3), and that for purposes of the 12(b)(6) motion, plaintiff would not dispute that fact.  (Hr'g Tr. 39:6-14.)

During the course of the inspection, TSA officials asked Vanderklok about "organic material" contained inside his bag. (*Id.* at ¶ 28.) Not knowing that the TSA officials were referring to the Power Bars, Vanderklok told them that he did not believe he had any "organic material" inside his bag. (*Id.* at ¶ 29.) After finding the Power Bars, the TSA officials ran an "explosive trace detection test" on them, which came back negative. (*Id.* at ¶ 30.) Throughout the interaction with the TSA officials, Vanderklok assured them that he was not a threat and that his bag contained "just [his] running stuff." (*Id.* at ¶ 28.)

Kieser was one of the TSA officials at the scene who interacted with Vanderklok about the search of the bag. According to the Amended Complaint, Kieser grew "agitated" with Vanderklok during the course of this discussion for not knowing that the Power Bars were "organic material." (*Id.* at ¶ 31.)

After the TSA had finished inspecting the bag, Vanderklok, who "did not appreciate the way he was spoken to [by Kieser]," told Kieser that he wanted to file a complaint and asked for a form so that he could document what he believed to be Kieser's inappropriate and aggressive behavior. (*Id.* at ¶¶ 4, 34.) Vanderklok alleges that as a result of this request, Kieser called the Philadelphia Police and "made a string of untrue statements claiming Plaintiff made comments that he did not, knowing that it would result in an illegal seizure and arrest of Mr. Vanderklok." (*Id.* at ¶ 36.) Vanderklok further alleges that Kieser then directed another TSA agent to "watch" him until the Philadelphia Police arrived. (*Id.* ¶ 36.)

Pinkney was the first police officer to respond to Kieser's call. When Pinkney arrived, Kieser told him that Vanderklok had "angrily said to [Kieser] that 'anybody can bring a bomb and you wouldn't even know it.'" (*Id.* at ¶¶ 7, 35.) Pinkney then "without any investigation" placed Vanderklok under arrest and took him into police custody. (*Id.* at ¶ 37.) Pinkney handcuffed Vanderklok and walked him to an elevator in the airport, which they rode to a basement "cell-

room."  (*Id.* at ¶ 64.)

Pinkney took Vanderklok's belongings and placed him in a cell until he was transported by vehicle to another cell at the Philadelphia Police District for additional processing by Wojciechowski.  (*Id.* at ¶¶ 64, 66.)  Once there, Vanderklok overheard a conversation among Wojciechowski and other police personnel about making sure to get "the right A.D.A." to review the case and approve the charges.  (*Id.* at ¶ 66.)  Vanderklok also alleges that he heard statements about being sent to "Guantanamo."  (*Id.*)  The Police released Vanderklok from custody after almost 24 hours, and after taking his fingerprints and photograph.  (*Id.* at ¶ 67.)

At some point on the day of the arrest, Pinkney prepared two documents, the Complaint Report and a "Uniform Police Memo to S.W.D.D." (the "Memo").[4]  (*Id.* at ¶ 61, Ex. A.)  The Complaint Report recounts the facts as relayed to Pinkney:

> R/C Threats.  Below passenger's carry on bag was being checked by TSA because he had a PCP [sic] pipe w/ watch inside.  Passenger became frustrated and said <u>anybody can bring a bomb</u> in here and nobody would know.  Police was called and passenger was taken into custody for investigation.  TSA Supervisor Kieser heard the comment.

(*Id.* at Ex. A (underlining in original).)  The Memo reflects a similar recitation of events.[5]  (*Id.*)  Vanderklok alleges that Pinkney relayed to Wojciechowski that Vanderklok told Kieser: "I could bring a bomb through here any day of the week and you would never find it."  (*Id.* at ¶ 7, Ex. A.)

Wojciechowski's Arrest Report, dated February 12, 2013, reflects a summary of interviews he conducted with Kieser and Pinkney after the incident took place.  In the "Interview Summary" from his discussion with Kieser, Wojciechowski transcribed Kieser's complaint as follows:

> After the passenger became loud towards the screening officer, the Complainant went to try and calm the situation, the Complainant explained what they were looking for and why the bag had to be checked.  The passenger (the defendant) then stated, "I could bring a bomb through here any day of the week, and you would never know it." . . .  The comment was made in a public area with several

---

[4]     Plaintiff attached both of these documents to the Complaint.  (*See* Am. Compl., Ex. A.)

[5]     *See* Am. Compl. Ex. A ("TSA Supervisor Kieser called Police and stated Passenger was getting his carry on bag checked and said anybody can bring a bomb and you wouldn't even know it.  Police took passenger to H.Q. for further investigation.").

other passengers nearby.

(*Id.* at Ex. A.)  Wojciechowski wrote in the "Interview Summary" section from his discussion with

Pinkney that Pinkney "responded to the checkpoint and was met by the Complainant.  After the

facts were related to the Officer, Officer Pinkney took the Defendant to the Airport Unit HQ for

further investigation."  (*Id.*)  Flaville approved Wojciechowski's Arrest Report.  (*Id.*)

Vanderklok was charged with threatening the placement of a bomb, terroristic threats, and

disorderly conduct.  (*Id.* at ¶ 8.)  During the course of Vanderklok's arrest and detainment,

Pinkney, Wojciechowski, and Flaville never watched the videotape of the incident as captured by

the security cameras at the checkpoint.  (*Id.* at ¶ 38.)  At his criminal trial on April 8, 2013, a

Philadelphia Common Pleas Court judge granted a defense motion for judgment of acquittal.  (*Id.*

at ¶ 12, Ex. E.)

Vanderklok filed this lawsuit on January 23, 2015.[6]  (ECF No. 1.)  On May 27, 2015,

Vanderklok filed an Amended Complaint against the same nine defendants.  (ECF No. 22.)

Specifically, the Amended Complaint alleges claims against Pinkney, Wojciechowski, Flaville,

and the City pursuant to: (1) 42 U.S.C. § 1983 ("Section 1983") for unconstitutional search and

seizure in violation of his Fourth Amendment rights; (2) Section 1983 for infringement of his

freedom of speech in violation of his First Amendment rights; (3) Pennsylvania state law for false

arrest, false imprisonment, and battery and assault; (4) Pennsylvania state law and Section 1983

for Malicious Prosecution and Retaliatory Prosecution; and (5) *Monell* claims against the City.

(*Id.*)  The parties stipulated to a dismissal of all state-law tort claims against the City.[7]  (ECF No.

41.)  At the heart of Vanderklok's claims is that the Individual Officers violated his constitutional

rights for arresting and detaining him without probable cause, and that the City failed to implement

---

[6]        By Order dated July 23, 2015, this case was reassigned from Judge William H. Yohn.  (ECF No. 35.)
[7]        The parties also stipulated to a dismissal of all claims against the TSA, Secretary Johnson, and Pistole, and all
constitutional claims against the United States.  (ECF No. 41.)

policies and procedures that encourage its officers to make a determination of probable cause for arrest upon the referral of a TSA agent.

The Individual Officers contend that the claims against them should be dismissed because they did not violate any of Vanderklok's constitutional rights and, in any event, are entitled to qualified immunity. (Officers' Mot. Dismiss ¶ 3, ECF No. 26.)  The City similarly argues that Vanderklok's civil rights were not violated, and he therefore has no claims against it. (City Mot. Dismiss ¶¶ 2-3, ECF No. 27.)

## II.

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must plead factual allegations sufficient "to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007).   The "mere possibility of misconduct" is not enough; the complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that  is plausible on its face," *i.e.*, sufficient facts to permit "the court to draw the reasonable inference  that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678-79  (2009) (quotation omitted).

The court must construe the complaint in the light most favorable to the plaintiff. *In re Ins. Brokerage Antitrust Litig.,* 618 F.3d 300, 314 (3d Cir. 2010) (quoting *Gelman v. State Farm Mut. Auto. Ins. Co.*, 583 F.3d 187, 190 (3d Cir. 2009)). However, while all allegations contained in the complaint must be accepted as true, the court need not give credence to mere "legal conclusions" couched as facts. *Iqbal,* 556 U.S. at 678.  A court should "consider only the allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim." *Lum v. Bank of Am.,* 361 F.3d 217, 221 n.3 (3d Cir. 2004), *abrogated in part on other grounds by Twombly*, 550 U.S. at 557.

**III.**

In *Saucier v. Katz*, 533 U.S. 194, 201 (2001), the United States Supreme Court articulated the analysis courts apply to determine the existence of qualified immunity.  The facts, when viewed in a light most favorable to the plaintiff, must show that the officer's conduct violated a constitutional right.  If the officer's conduct did not violate a constitutional right, then it is not necessary to proceed with the qualified immunity analysis.  If, on the other hand, the officer's conduct did violate a constitutional right, then the court must determine if the right was clearly established.  *Id.*  To be "clearly established," the right must be sufficiently clear such that "every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. Al-Kidd*, 131 S.Ct. 2074, 2083 (2011).

"[T]he Supreme Court has repeatedly stressed the importance of resolving immunity questions at the earliest possible stages of litigation, *Curley v. Klem*, 298 F.3d 271, 277 (3d Cir. 2002) (collecting cases), because "[if] a case is erroneously permitted to go to trial, then qualified immunity is effectively lost."  *Id.*  A decision on qualified immunity, however, "will be premature when there are unresolved disputes of historical fact relevant to the immunity analysis."  *Id.* at 278.  *See also Hunter v. Bryant*, 502 U.S. 224, 228 (1991) (reversing holding that the probable cause determination was a question for the trier of fact because "[i]mmunity ordinarily should be decided by the court long before trial").

The validity of Vanderklok's claims hinges on the existence or lack of probable cause for his arrest.  The parties agree on the relevant facts critical to this analysis.  It is undisputed that Kieser told Pinkney the underlying facts that prompted the additional screening, and that, according to Kieser, Vanderklok said something along the lines of "anybody can bring a bomb

and you wouldn't even know it."[8]  (*Id.* at ¶¶ 7, 35.)  These facts were then relayed up the chain of command from Pinkney to Wojciechowski, and then to Flaville.  (*See id.* at Ex. A.)  The Individual Officers do not dispute Vanderklok's allegations that they did not watch the surveillance tape prior to or during Vanderklok's arrest.  Nor do the Individual Officers contend that they conducted any additional investigation of Kieser's complaint  beyond speaking with Kieser himself.  The question is whether these undisputed facts constitute probable cause for Vanderklok's arrest.

## A.

The Fourth Amendment prohibits a police officer from arresting a citizen without probable cause.  *Orsatti v. New Jersey State Police*, 71 F.3d 480, 482 (3d Cir. 1995) (citing *Papachristou v. City of Jacksonville*, 405 U.S. 156, 169 (1972)).  The proper inquiry "is not whether the person arrested in fact committed the offense but whether the arresting officers had probable cause to believe the person arrested had committed the offense."  *Dowling v. City of Phila.*, 855 F.2d 136, 141 (3d Cir. 1988).

Vanderklok's suit against the Individual Officers centers on two arguments:  First, he contends that the Individual Officers, in addition to listening to Kieser's account, were required to conduct their own "investigation" into the alleged events before making the arrest; Second, he argues that even taking Kieser's account at face value does not amount to probable cause to make an arrest for any crime.  Thus, in determining whether there was probable cause to arrest Vanderklok, the critical question is whether Pinkney (and in turn, Wojciechowski and Flaville) were entitled to rely on Kieser's description of the events as they occurred, without their own independent verification of what transpired.  And if so, did the circumstances as the officers

---

[8]        There are also reports that the statement was instead:  "I could bring a bomb through here any day of the week, and you would never know it."  (Am. Compl., Ex. A.)  The probable cause determination remains the same under either statement, and no party argues that the difference between these two statements is material to the Court's analysis.

understood them constitute probable cause to arrest Vanderklok for any offense that could be charged under the circumstances, namely disorderly conduct, terroristic threats, or threat to use weapons of mass destruction.

An officer is not charged with conducting an independent investigation to verify statements made by a credible eye-witness if those statements provide him with probable cause to arrest.  *See Merkle v. Upper Dublin Sch. Dist.,* 211 F.3d 782, 790-91 n.8 (3d Cir. 2000) (citing *Gramenos v. Jewel Cos., Inc.*, 797 F.2d 432, 439 (7th Cir.1986), *cert. denied*, 481 U.S. 1028 (1987); *Morrison v. United States*, 491 F.2d 344, 346 (8th Cir.1974)) (officer "was not required to undertake an exhaustive investigation in order to validate the probable cause that, in his mind, already existed."); *see also Potts v. City Of Philadelphia*, 224 F.Supp.2d 919, 934 (E.D.Pa.2002) ("A police officer, after all, is not obligated 'to conduct a mini-trial' before arresting a suspect.").  In assessing a victim or eye-witness account, the question is whether "a reasonable person in [the officer's] position could have concluded based on this knowledge, that [the suspect] had committed a crime."  *Merkle*, 211 F.3d at 790-91.  "Once probable cause is established, an officer has no duty to search for exculpatory evidence or to further investigate the circumstances surrounding the incident."  *Anderson v. Goga*, 2013 WL 3242445, at *2 (W.D. Pa. June 25, 2013) (citing *Tavernaris v. City of Beaver Falls*, 2008 WL 2571469, at *2 (W.D.Pa. Jun.25, 2008)); *see Mustafa v. City of Chicago*, 442 F.3d 544, 548 (7th Cir.2006) ("But police officers have no duty to investigate extenuating circumstances or search for exculpatory evidence once probable cause has been established via the accusation of a credible witness. [ ] They may simply arrest the accused suspect.").

In the context of statements made by fellow officers, the Third Circuit has held that probable cause can be based on a fellow officer's statement only if the statement is supported by actual facts that satisfy the probable cause standard.  *Rogers v. Powell*, 120 F.3d 446, 453 (3d

9

Cir. 1997).  Statements by fellow officers that there is probable cause for an arrest, by themselves, do not provide the "facts and circumstances" necessary to support a finding of probable cause.  *Whiteley v. Warden*, 401 U.S. 560, 568 (1971).  In *Rogers*, the Third Circuit considered the circumstances in which an officer could rely on statements of fellow officers when making an arrest.  In that case, the arrest was unlawful because the officer relied solely on a fellow officer's mistaken statement that an arrest warrant had been issued for the suspect. *Rogers*, 120 F.3d at 453-54.  The Third Circuit noted that "statements by fellow officers conveying that there is probable cause for a person's arrest, by themselves, cannot provide the 'facts and circumstances' necessary to support a finding of probable cause." *Id* at 453.  Thus, it was insufficient for the officers to rely on bare statements from other officers that an arrest warrant existed for an individual without additional "facts and circumstances to support an independent finding of probable cause."  *Id.* at 454.

Whether Kieser is considered a "fellow officer" or just an eye-witness to the underlying events—which he undoubtedly was—the standard is essentially the same: Kieser's account must have provided sufficient *facts* to give Pinkney probable cause to arrest Vanderklok.[9]

Probable cause exists when, "at the time of the arrest, the facts and circumstances within the officer's knowledge are 'sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense.'" *Glasser*, 750 F.2d at 1206 (3d Cir. 1984) (citing *Beck v. Ohio*, 379 U.S. 89, 91 (1964)).  Probable cause "does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction." *Adams v. Williams*, 407 U.S. 143, 149 (1972).  Therefore, the evidentiary standard for probable cause is significantly lower than the standard which is required for conviction.  *See Wilson v.*

---

[9]       Additionally, the Third Circuit in *Rogers* did not find it necessary to inquire "whether the mistake was the trooper's or the probation officer's" for purposes of determining whether the officer was given probable cause to arrest. *Berg v. Allegheny*, 219 F.3d 261, 271 (3d. Cir. 2000) (discussing *Rogers*).

*Russo*, 212 F.3d 781, 789 (3d Cir. 2000) (holding that probable cause only requires a "fair probability" that a person committed the relevant crime).

The crime for which a suspect is eventually charged is irrelevant to the probable cause analysis. *Barna v. City of Perth Amboy*, 42 F.3d 809, 819 (3d Cir. 1994) ("Probable cause need only exist as to any offense that could be charged under the circumstances."). Whether a person is later acquitted of the crime for which she or he was arrested is also irrelevant to the probable cause analysis. *Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979). While probable cause to arrest requires more than mere suspicion, the law recognizes that probable cause determinations do "not require the fine resolution of conflicting evidence that a reasonable doubt or even a preponderance standard demands." *Paff v. Kaltenbach*, 204 F.3d 425, 436 (3d Cir. 2000) (quoting *Gerstein v. Pugh*, 420 U.S. 103, 121 (1975)). A "'common sense' approach [must be taken] to the issue of probable cause" and a determination as to its existence must be based on "the totality of the circumstances." *Sharrar v. Felsing*, 128 F.3d 810, 818 (3d Cir. 1997).

The Court must therefore determine whether Pinkney had probable cause, based on the facts that Kieser provided, to believe that Vanderklok was committing the offense of either disorderly conduct, threat to use weapons of mass destruction, or terroristic threats. The probable cause analysis centers on what Pinkney knew the facts and circumstances to be at the time of the arrest. *See Glasser*, 750 F.2d at 1206 ("The determination that probable cause exists for a warrantless arrest is fundamentally a factual analysis that must be performed by the officers at the scene. It is the function of the court to determine whether the objective facts available to the officers at the time of arrest were sufficient to justify a reasonable belief that an offense was being committed."). Here, the "objective facts available to" Pinkney were provided by Kieser. Vanderklok has not alleged that Pinkney did not find, or should not have found, Kieser to be

11

credible at the time Pinkney made the arrest.  Thus, the probable cause analysis must focus on

what Kieser told Pinkney, since that is the primary source of Pinkney's understanding of the

underlying dispute.

Here, Pinkney was provided with enough facts to arrest Vanderklok for disorderly

conduct. [10]

> § 5503.  Disorderly Conduct
>
> (a) Offense defined.—A person is guilty of disorderly conduct if, with intent
> to cause public inconvenience, annoyance or alarm, or recklessly creating a
> risk thereof, he:
> (1) engages in fighting or threatening, or in violent or tumultuous behavior;
> (2) makes unreasonable noise;
> (3) uses obscene language, or makes an obscene gesture; or
> (4) creates a hazardous or physically offensive condition by any act which
> serves no legitimate purpose of the actor.

18 Pa.C.S. § 5503(a).  Words which "cause or *unjustifiably risk* a public disturbance," *Giles v.*

*Davis*, 427 F.3d 197, 204 (3d Cir. 2005) (emphasis added), and "unruliness which *can* or does

lead to tumult or disorder," *Com. v. Fedorek*, 946 A.2d 93, 100 (Pa. 2008) (emphasis added), are

sufficient to establish a violation.  It is therefore unnecessary for Vanderklok's words or actions

to have actually caused a disturbance, and it is sufficient that they *risked* causing a disturbance.

A "hazardous" condition is one which engenders "danger or risk."  *Com v. Roth*, 531 A.3d 1133,

1137 (Pa. Super. 1987).

Pinkney was asked to make the probable cause determination upon responding to

Kieser's call and hearing his complaint against Vanderklok.   His decision did "not require the

fine resolution of conflicting evidence that a reasonable doubt or even a preponderance standard

demands." *Kaltenbach*, 204 F.3d at 436 (internal quotations omitted).  Pinkney received a phone

---

[10]     Since probable cause exists for disorderly conduct, the Court need not engage in an analysis of whether
probable cause existed for the other two charges: terroristic threats and threat to use weapons of mass destruction. *See
Barna*, 42 F.3d at 819 ("Probable cause need only exist as to any offense that could be charged under the
circumstances.").

call about a dispute at the airport security checkpoint, and learned the following facts from

Kieser upon responding to the scene: Vanderklok was asked to submit to a search because his

bag contained a pipe with a watch; he became frustrated and "angrily" told Kieser that "anybody

can bring a bomb in here and nobody would know." (Am. Compl. at ¶ 7, Ex. A.)  It is apparent

from Pinkney's Complaint Report that he was familiar with the basic facts giving rise to the

dispute. (*See id.*)  These facts are also sufficient to allow the Court to determine whether there

was probable cause to arrest Vanderklok.[11]

Viewing the totality of the circumstances, the objective facts available to Pinkney were

sufficient to justify a reasonable belief that Vanderklok's statement and the manner in which he

said it amounted to disorderly conduct.  Unlike *Rogers*, where the police officer was relying on

bare allegations that there was probable cause for the suspect's arrest, Pinkney had the specific

"facts and circumstances to support an independent finding of probable cause." 120 F.3d at 454.

Pinkney did not need evidence that Vanderklok's statement created a disturbance; rather, it is

sufficient that such a statement "unjustifiably risk" creating a disturbance, *Giles*, 427 F.3d at

204, which is a calculation that can rightfully be based on Pinkney's prior experience.  *See*

*United States v. Ortiz*, 422 U.S. 891, 897 (1975).  Mentions of possessing a bomb or sneaking a

bomb through airport security—particularly those made "angrily"—may be cause for alarm and

the basis of a disorderly conduct charge.  *See Mustafa*, 442 F.3d at 548 ("Particularly in light of

the time and place of the event, which occurred in an international airport three months after the

September 11 attacks, and the understandable sensitivity of air travelers and airport security

personnel at that time, it was reasonable for the officers to conclude that Mustafa had committed

---

[11]       In *Menear v. City of Philadelphia*, which presented a very similar fact pattern to the one at issue here, the
Third Circuit held that dismissal was not warranted because the complaint "does not allege what [the officers] were
told or what they knew at the time of the arrest." 119 F.App'x 395, 396 (3d. Cir. 2005).  That is critically
distinguishable from this case because Vanderklok's Amended Complaint *does* allege what Pinkney was told at the
time of the arrest.  Though there is a factual dispute about whether Vanderklok made this statement to Kieser, there is
no dispute that Kieser told Pinkney that he did.

disorderly conduct by stating that she might have a bomb in her purse."); *Hannibal v. Sanchez*, 2014 WL 3845172, at *4 (E.D.N.Y. Aug. 5, 2014) ("[P]articularly in the post–9/11 era, any statement—whether true or false—at an airport claiming that the speaker possessed explosives could result in public alarm or inconvenience.  This is especially true where other persons in the vicinity may overhear only a snippet of a conversation or are not able to determine whether the statement was made sarcastically or seriously.").

Pinkney had probable cause to arrest Vanderklok for disorderly conduct based on the account that Kieser provided.  He had no duty to conduct any further investigation, or to search for exculpatory evidence when making the arrest.  *See Merkle.,* 211 F.3d at 790-91; *Anderson*, 2013 WL 3242445, at *2.

## B.

Wojciechowski and Flaville also had a sufficient basis to process Vanderklok's arrest.  Neither of these officers was present at the scene; they both relied on Pinkney's Complaint Report and Memo.

Since Pinkney had the "requisite basis to seize" Vanderklok for the reasons already discussed, Wojciechowski and Flaville were entitled to rely on those specific statements.  *Rogers*, 120 F.3d at 453.  Specifically, Pinkney "possessed the facts and circumstances necessary to support a finding of the requisite basis."  *Id.*  That is evident in Pinkney's Complaint Report and Memo, which document the events surrounding the additional search of Vanderklok's bag, and the alleged statement that Vanderklok made to Kieser about a bomb.

Here, Pinkney provided Wojciechowski and Flaville with the "facts and circumstances" of the dispute leading to the arrest.  (Am. Compl. at Ex. A.)  Wojciechowski drafted his own report, which reflects substantive interview summaries with both Kieser and Pinkney discussing the underlying facts.  (*Id.*)  Flaville approved the arrest report that Wojciechowski prepared.

14

(*Id.*)  Thus, far from relying on bare statements that Vanderklok committed disorderly conduct or made terroristic threats, Wojciechowski and Flaville had an understanding of the specific "facts and circumstances necessary to support a finding of probable cause" when processing the arrest. *Whiteley*, 401 U.S. at 568.

## C.

Even if the Individual Officers lacked probable cause to arrest Vanderklok, they would be protected by qualified immunity because they did not violate a right that was "clearly established." Qualified immunity protects "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  As previously discussed, a right is "clearly established" if "every reasonable official would have understood that what he is doing violates that right."  *Al-Kidd*, 131 S.Ct. at 2083.

A mistake is not reasonable and would constitute a violation of a clearly established right if "it would be clear to a reasonable officer that his conduct was unlawful under the circumstances of the case."  *Williams v. Atl. City Dep't of Police*, 2010 WL 2265215, at *4 (D.N.J. June 2, 2010); *see Kaltenbach,* 204 F.3d at 437 ("The right the official is alleged to have violated must have been 'clearly established' in a . . . particularized . . . sense.  The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.") (quoting in part *Anderson v. Creighton,* 483 U.S. 635, 640 (1987)).  The Third Circuit has specifically held that courts must examine the circumstances that the arresting officer confronts and compare it to the cases that found an absence of probable cause.  *Id*.  Qualified immunity is unavailable if "there are cases that would make it apparent to a reasonable officer in [defendant's] position that probable cause was lacking."  *Id*.

15

There is no clearly defined case law in this Circuit that addresses when or under what circumstances a reference to a bomb in an airport screening checkpoint rises to the level of disorderly conduct under Pennsylvania law.  In other jurisdictions, the courts that have addressed the issue have held that references to possession of a bomb, even jokingly, are sufficient to form the basis of an arrest for disorderly conduct.  *See Mustafa*, 442 F.3d at 548; *Hannibal*, 2014 WL 3845172, at *4.  In the absence of prior case law showing that the decision made by the Individual Officers to arrest Vanderklok violated a "clearly established" Fourth Amendment right, qualified immunity would shield them from liability even if probable cause was missing.

Vanderklok also claims, however, that saying "anybody can bring a bomb and you wouldn't even know it" (or "I could bring a bomb through here any day of the week and you would never find it") is speech protected by the First Amendment.  This is not so clearly established as to override the Individual Officers' qualified immunity.  It is not "apparent" from pre-existing law that Vanderklok's statement is protected by the First Amendment, *Creighton*, 483 U.S. at 640; indeed, case law in this Circuit suggests that there are limits on speech that can be interpreted as a threat at the airport.

In *George v. Rehiel*, 738 F.3d 562, 567 (3d Cir. 2013), airport police detained Nicholas George, who passed through security at the Philadelphia Airport with Arabic-English flashcards. Some of the cards had basic vocabulary, such as "nice," "sad," and "cheap;" other cards had words like "bomb," "terrorist," "explosion," "kill," "an attack," and "to target."   George also possessed a book critical of United States foreign policy.  *Id.* at 567.  The TSA detained George for additional screening and interrogation.  George alleged that TSA subjected him to aggressive interrogation; he was then turned over to Philadelphia police and two FBI Joint Terrorism Task Force officials who interrogated him for approximately 30 minutes.  *Id.* at 567-68.  George was eventually released without arrest.  He brought suit against the TSA and Joint Task Force officials for

16

violations of his First and Fourth Amendment rights.  *Id.* at 568-69.

The district court denied the officers' motion to dismiss, holding that the face of the complaint gave rise to plausible constitutional violations.  On appeal, the Third Circuit Court of Appeals  reversed that decision, stating that "[t]he totality of the circumstances here could cause a reasonable person to believe that the items George was carrying raised the possibility that he might pose a threat to airline security."  *Id.* at 586.  *See also Hannibal*, 2014 WL 3845172 (E.D.N.Y. 2014) (holding that Plaintiff's joking comment in the airport that TSA agents were "looking to confiscate my explosives" is not protected by the First Amendment).  In *George*, the Third Circuit also noted that it would be "hard-pressed" to find a First Amendment violation after having already determined that there was no Fourth Amendment violation.  738 F.3d at 586 (citing *Hartman v. Moore*, 547 U.S. 250 (2006)).

It is not clearly established that the statement "anybody can bring a bomb and you wouldn't even know it," when made to a TSA agent at an airport security checkpoint in this day and age, is protected speech.  Pinkney was provided with sufficient facts to reasonably believe that Vanderklok may have threatened to sneak a bomb past security, or that his comments—whether made with serious intent or not—could cause a disturbance at the checkpoint.  The right to make such a statement is not clearly established, and may even be rightfully restricted.  *See Mustafa*, 442 F.3d at 548; *Hannibal*, 2014 WL 3845172, at *4.

## IV.

To establish his *Monell* claim, Vanderklok must demonstrate that the City, under color of some official policy, caused the officer to violate Vanderklok's constitutional rights.  *Monell v. Dep't of Soc. Servs. of City of New York,* 436 U.S. 658, 690-92 (1978).  "[F]or there to be municipal liability, there still must be a violation of the plaintiff's constitutional rights."  *Brown v. Commonwealth*, 318 F.3d 473, 482 (3d Cir. 2003) (citing *Collins v. City of Harker Heights*, 503

17

U.S. 115, 112 (1992). A municipality, however, cannot be held liable under § 1983 based solely on the conduct of its employees. *Id.* at 691. For liability to attach under § 1983, the municipality *itself* must cause the constitutional violation at issue. *City of Canton, Ohio v. Harris,* 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).

For the reasons already discussed, Vanderklok has not stated a claim that his constitutional rights were violated: the police officers had probable cause to arrest him for disorderly conduct. Without an underlying constitutional violation, Vanderklok's *Monell* claim must similarly be dismissed. *See City of Los Angeles v. Heller*, 475 U.S. 796, 797 (1986) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that departmental regulations might have *authorized* the use of constitutionally excessive force is quite beside the point."); *Grazier ex rel. White v. City of Philadelphia,* 328 F.3d 120, 124 n.5 (3d Cir. 2003) ("Here . . . the question is whether the City is liable for causing its officers to commit constitutional violations. Therefore, once the jury found that [the officers] did not cause any constitutional harm, it no longer makes sense to ask whether the City caused them to do it."); *see also City of Canton v. Harris*, 489 U.S. 378, 390 (1989) (observing that a City "may be held liable *if its policy actually causes injury*") (emphasis added).[12]

Vanderklok has already amended his Complaint once and has not requested leave to do so again. Even if he did, allowing him to amend once more would be futile. *See Koken v. GPC Intern., Inc.,* 443 F.Supp.2d 631, 634 (D.Del.2006) (citing *In re Burlington Coat Factory Secs.*

_____

[12] The Third Circuit has held that a municipality's liability must be looked at independent from the officer's liability in the context of a substantive due process claim for injuries sustained in high-speed police chases. *Fagan v. City of Vineland*, 22 F.3d 1283, 1296 (3d. Cir. 1994). In that specific circumstance, the Third Circuit noted the "illogical results" from conditioning municipal liability on the individual police officer's liability in every case. *Id.* "A municipality would escape liability whenever the conduct of the acting police officer did not meet the 'shocks the conscience' standard, even though municipal policymakers, acting with deliberate indifference or even malice, implemented a policy which dictated his injury-causing actions." *Id.* The Third Circuit, however, carefully confined its ruling to Fourteenth Amendment substantive due process claims arising out of a high-speed police pursuit so as not to conflict with the Supreme Court's decision in *Heller*. *Id.* at 1294. Vanderklok's claims fall squarely under *Heller*, not *Fagan*, and thus his claims against the City cannot proceed without a showing of an underlying constitutional violation.

*Litig.,* 114 F.3d 1410, 1434 (3d Cir.1997)); *Harrison Beverage Co. v. Dribeck Importers, Inc.,* 133

F.R.D. 463, 468 (D.N.J.1990) (court may properly deny leave to amend where amendment would

not withstand a motion to dismiss).  Vanderklok cannot maintain claims against the Individual

Officers or a *Monell* claim because he has not successfully alleged any underlying constitutional

violation.  *See Knellinger v. York St. Prop. Dev., LP*, 57 F. Supp. 3d 462, 473 (E.D.Pa. 2014)

(holding that it would be futile to grant Plaintiff leave to amend his Complaint because there was

no underlying constitutional violation).

     An appropriate Order follows.


          */s/ Gerald J. Pappert*
          GERALD J. PAPPERT, J.